Nichols, Judge,
dissenting:
I regret that I feel compelled to dissent in this case, though perhaps not as keenly as if my views commanded majority support, leading to a new trial and further delay in righting the ancient wrongs done the ancestors of these Indians. My minority position, happily, exempts me from feeling any moral scruples against saying what I think. Then too, I am not certain the errors I am concerned about do not to a degree offset each other, so that in the overall, the amount *151 the court awards may be not so far removed from what I would have awarded if I had had sole charge of the litigation from its beginning.
A preliminary question is this: the court lays great stress on the stipulations and concessions of the parties as eliminating inquiry into issues that otherwise it would have to explore, as e.g., the dates of “taking.” I agree that the court is never obliged to inquire into disputes the parties have abandoned, and often it is wiser not to, as in Wagner v. United States, 181 Ct. Cl. 807, 387 F.2d 966 (1967). It is not deemed to have decided any issue that merely “lurks in the record.” Clearly, however, it is not bound, unless it chooses to be, by stipulations as to what the law is, or involving or incorporating a legal conclusion, Sanford's Estate v. Commissioner, 308 U.S. 39, 51, reh. denied 308 U.S. 637 (1939); The Sac and Fox Tribe of Indians of Oklahoma v. United States, 161 Ct. Cl. 189, 198, 315 F.2d 896, 901, cert. denied 375 U.S. 921 (1963). In this category I would put e.g., a stipulation as to the date of a “taking” in eminent domain. At times a judge may consider the parties have boxed him into a position he anticipates he will have to break out of sooner or later. Then he should speak out, if for no other purpose, so he will not be foreover explaining and distinguishing the case in the future. Here we deal with legal doctrines that will remain alive and important as long as there is a Fifth Amendment to the United States Constitution.
I take up now the matter I find troublesome.
FIRST, The Fisheries. It does indeed seem strange that plaintiffs get nothing for the fisheries in view of our recitals in the original opinion at 147 Ct. Cl. 341, 177 F. Supp. 468, “The most valuable asset lost to these Indians was their fishing rights * * No doubt, as we now hold, the supposed value of the fish is not an appropriate valuation technique. No doubt too, as the court says, no one owns or can own any exclusive fishing rights in navigable water, other than, perhaps, relating to shellfish. I would have supposed that one who owned as plaintiffs here did, all the fast lands bordering on so many sounds, bays, and coves, teeming with fish, would have enjoyed such enormous advantages over *152 others in exploiting the fisheries thereon that willing buyers would have paid enhanced prices for the land, even if they could obtain therewith no ownership in the fish. A person owning a building on Fifth Avenue might claim it was worth more because of its favorable location without thereby asserting any proprietorship in the vehicular and pedestrian traffic daily passing by his door. The recent case of United States v. Rands, 389 U.S. 121 (1967), raises some doubt in my mind about this, but I would have considered whether I could distinguish it if the record gave support to such a theory. The result of our commissioner’s going off on the wrong tangent here is apparently that plaintiffs get nowhere at all in just the area where we thought originally they had the best case. I hope this decision is not taken as authority that, should 'an island such as Cuftyhunk, Block Island, or Tangier be taken by eminent domain, the court in setting a valuation must utterly ignore the fact that fishing goes on from there.
SECOND, The Gold Mines. The taking dates herein, as stipulated, were dates of Congressional enactments or of patents, in most cases confirming titles of persons the court calls “squatters”, who had been in occupancy long before. Thus it is the awards to the Indians include payment for some fine producing gold mines, in fact discovered and developed by whites. As the commissioner finds, these mines required the developers to make large capital investments. A squatter is, I suppose, a trespasser, and I find it hard to believe the investors would have knowingly invested in a trespass from which they might be legally ousted at any time. As a practical matter they conceived of themselves as owners, with the confident expectation that their de facto ownership would eventually become a good paper title by Governmental act. After entry but before patent no one, I am sure, would have paid 10‡ for the Indians’ underlying title. The Indians’ cause of action as now validated by Congress accrued on the first entry, for the legislation makes the Government liable for “failure to protect” as well as for a taking. The “failure to protect” was complete and utter between entry and patent. I think the enactments and patents, relied on as takings, were not intended to extinguish the Indian title, which was not *153 at that time deemed to exist. They were intended to quiet title as between the miners and the United States. A person could not get a patent if he was not already in possession. A mere trespasser, not in good faith, will possibly lose the value of improvements it has itself placed on the land. American Cement Plaster Co. v. Acme Cement Plaster Co., 181 S.W. 257 (Tex. Civ. App., 1915); Cf. Christopher v. Garrett, 292 S.W.2d 926 (Tex. Civ. App., 1956); but it is a misconstruction of the enabling legislation here to put the Government in the position of such a trespasser. So far as I know it has occurred but is contrary to most precedent to make a lawful taker pay for an improvement it has itself installed in good faith. See discussions of the problem of valuing land taken by eminent domain when the taker has in good faith improved the land prior to the taking. Orgel, Valuation Under Eminent Domain (1936) 310 and ff.; 5 Nichols, Eminent Domain (3d Ed. 1952) 224 and ff.
However, if the Indians must be treated as owning the gold mines, still it is wrong to base the award on estimates of the unmined gold in place. Such an award is condemned as speculative. United States v. Sowards, 370 F.2d 87 (10th Cir. 1966) and cases cited at p. 90. Likewise it is wrong to use the estimate of gold in place as a starting point to estimate further profits. United States v. Meyer, 113 F.2d 387 (7th Cir.), cert. denied 311 U.S. 706 (1940). 5 Nichols, Eminent Domain, supra, 230, and cases cited. This is an estimate on an estimate.
In my opinion the Indian Claims Commission handled the problem of valuing Indian 'lands containing minerals with perfect correctness in The Winnebago Tribe and Nation of Indians, Et Al. v. United States, 16 Ind. Cl. Comm. 81 (1965), which we are affirming without opinion, 181 Ct. Cl. 1202. The Commission refused to make a fact finding speculating on possible profits after the taking date from the minerals involved. For consistency with the proceedings in Tlingit and Haida, we should be reversing the Commission, but rightly we are not.
As a practical matter, the original proprietors of the soil, however well protected by 'law and skillfully represented, could not have expected to pocket all or most of the profits *154 from mining on their lands. It is common knowledge that the -party who has the capital, the equipment, the know-how, and the access to markets, will always take the lion’s share. The commissioner’s method of valuation here donates these things to the Indians.
I think a proper award for the property, such of it as had its highest and best use for mining, would be made by postulating a willing buyer and a willing seller negotiating for the fee simple title on the date of first entry, both skillful of course, both knowing whatever was ascertainable about the geology of the area, and both protected by law. United States v. Emigrant New York Indians, 177 Ct. Cl. 263, 289 (1966). From this viewpoint, I would not be too much influenced by the history of the mines that were successful, nor would I deem plaintiffs necessarily out of court as to mineral properties we know by hindsight were never successful. Prices between willing buyers and willing sellers are always influenced by the known presence of minerals, to some extent, however slight.
I am sure if the commissioner had adhered to proper valuation methods his awards for mineral properties would have been much less over all.
THIRD, The Town Sites. I believe these too are grossly overvalued. Again this results from the stipulated taking dates. The Capital of Alaska, Juneau, was not patented until it had been a going concern for many years. Hence the Indians are being paid for a white man’s town. If the State House had been built on the taking date, no doubt there would be an award for that -also.
FOURTH, The Timber Land. As to this, I merely note that there is no indication that the possession of the Indians was disturbed before the stipulated taking dates, so the problems do not arise.
In short, the Indians are being denied payment for the most valuable de facto asset of which they were deprived and instead are being compensated for de jure assets they never could have reasonably supposed belonged to them. I am sure they will be greatly impressed with the wonders of the white man’s justice. We may hold that events prior to the case’s coming back before us limit our power to influence the course *155 of events at this point, bnt I think it appropriate for one of ns to register lack of complacency, at least.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul E. Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. The court has already concluded that as a matter of law plaintiffs are entitled to recover, the amount of such recovery to be determined in further proceedings (147 Ct. Cl. 315). Such proceedings have now been had and this report is limited thereto.
The Issue of Abandonment
2. (a) One of the issues that was reserved for further proceedings was whether there had 'been, prior to any pertinent taking date, any voluntary abandonment or relinquishment by plaintiffs of any of the lands included in the area found to have been aboriginally used and occupied by plaintiffs in 1867 (when Alaska was purchased from Eussia).
In the proceedings relating to plaintiffs’ right to recover, plaintiffs contended that the findings then made were sufficient to establish that they had not abandoned any part of the claimed area. However, inasmuch as, under a prior order of the court (set forth in finding 3, 147 Ct. Cl. at 348), this issue was included in those to be reserved for further proceedings, and since defendant had indicated that it intended to offer proof thereon (147 Ct. Cl. at 342), the court did not then pass on plaintiffs’ contentions.
(b) In the further proceedings, defendant offered no proof on this issue.
The Issue of Offsets
3. (a) Another issue reserved for the further proceedings was the amount of offsets, if any, which should be credited against any recovery by plaintiffs.
(b) The record does not indicate the making of any expenditures by defendant for or on behalf of plaintiffs which would constitute the basis for any offset against plaintiffs’ recovery.
*156 The Issue of the Amount of Recovery
4. Plaintiffs contend that, under a proper construction of the special jurisdictional act herein involved (147 Ct. Cl. 315, 343-348), the measure of their recovery should be, in the words of the act, “The equitable and just value” of their claims “for lands or other tribal or community property rights taken from them”, and “the loss” to plaintiffs “of their right, title, or interest, arising from occupancy and use, in lands or other tribal or community property, without just compensation therefor”, with the court to grant a judgment “for such sum as” it “shall find to be equitable 'and just for the reasonable value of” such property “taken” by defendant. Although plaintiffs do not claim “just compensation” in the technical constitutional sense, and therefore do not claim interest as for a constitutional “taking”, they nevertheless contend that the act’s requirements would be fulfilled by a recovery which would reflect the principles conventionally applied in determining “just compensation” as for an eminent domain “taking”. Accordingly, plaintiffs’ evidence is directed to the “fair market value” of the property “taken”, i.e., the price that a willing buyer would pay a willing seller on the basis of the highest and best, or most advantageous and valuable, use of the property at the several dates of taking (and not the special value which the property may have had to the owner or the purchaser). On this basis, plaintiffs claim the value of the lands and waters and their resources taken by defendant was $77,543,000. Plaintiffs also claim additional damages, based upon both the language of the act and of the court’s opinion, for defendant’s “failure or refusal * * * to protect their interests in lands or other tribal or community property in Alaska, and for loss of use of the same” (147 Ct. Cl. 343). On this basis, plaintiffs seek compensation in the sum of $2,635,000 for the exploitation and use of their lands, waters and resources prior to the various taking dates. Thus, plaintiffs’ total claim is $80,178,000.
Defendant’s responsive evidence is also addressed to the “fair market value” of the property involved on the various *157 dates described in the court’s decision upon which the areas involved were acquired or taken by defendant, but not conceding that there was any “taking” in the constitutional sense. On this basis, defendant says the full, fair market value was $3,250,000.
In addition, defendant presents an alternative theory of compensation, i.e., a “Value to the Indians” bams. This approach is based on certain language in the court’s opinion,[1] as well as on defendant’s contention concerning the proper interpretation of the jurisdictional act. On this basis, defendant claims that the loss suffered by plaintiffs as a result of being deprived of their full and complete “ownership” rights in their lands and waters was $1,287,200.
Fair Market Value
General
5. The area of southeast Alaska herein involved is generally described in the previous proceedings and the outer boundaries thereof are set forth on the map included in the court’s opinion. There were several events which constituted the takings of certain parts of the area. The parties have stipulated the dates of taking of certain parts and the land acreages thereof. Each area will be separately considered and evaluated. The boundaries of each of such areas are shown on plaintiffs’ exhibit No. 190, which is incorporated herein by reference, the areas being designated by the parties as Areas 1, 2 (2a and 2b), 3, 4 (4a and 4b), 5, and 6 (6a, 6b, 6c, 6d and 6e), in accordance with the sequence of their having been taken, except that defendant contends that Area 6 is not within any area for which the court has held defendant to be liable. On this area, therefore, the parties have not stipulated concerning any general taking date.
*158 ÁREA 1 (Annette Islands)—
Valuation as oe Makoh 3,1891

General

6. (a) By the act of March 3, 1891 (26 Stat. 1095, 1101), the Annette Islands were set apart as a reservation for use of the Metlakahtla or Tsimshian Indians who emigrated from British Columbia (147 Ct. Cl. at 418-420, findings 88-89), and were thus removed from their former status as Tlingit and Haida Territory. The parties have stipulated that the area involved in such body of lands comprises 86,730 acres, and that the entire area should be valued as of March 3,1891.
(b) Plaintiffs contend that the fair market value of this area as of such date was, including the resources therein and the appurtenant fisheries, $284,000. The area’s resources relied upon as contributing to this value are principally its timberlands; its mineralization; its townsite and settlement lands; and the appurtenant fisheries. These varied resources are relied on as supporting plaintiffs’ contention that the area was adaptable to multiple uses, although the valuation contended for does not, plaintiffs assert, represent any duplications arising out of the several uses.
Defendant contends here (as it does also on the other areas) that plaintiffs have failed to demonstrate that this area as such had any separate value as of the taking date (although, as hereinafter set forth, it does propose certain findings as to a total value of all of the parts taken, without a breakdown of the particular areas).
7. The Annette Islands, consisting of Annette Island and several small islands adjoining, are located on the north side of Dixon’s Entrance, approximately 30 miles north of the United States-Canada border. Of the total area, almost 99 percent is in the main island, Annette Island. The balance is made up of several small, forested islands lying close to the shores of the largest.

*159
Forest Lands

8. Of the 86,730 acres in Area 1,81,179 acres consist of forest lands.[2] Plaintiffs claim such forest lands had a fair market value as of March 3, 1891, of $46,824.[3] Defendant contends these forest lands would not have contributed anything to the value of the area as of such date (which is the same basic position defendant takes as to the forest lands in the other areas involved in this case).[4]
9. The topography varies from flat lowland at the southwest end of Annette Island to steep, rocky, low-lying mountain tops, all less than 4,000 feet elevation, that form a ridge dividing the east and west sides of the main island. Of the total land area, 98 percent lies under 2,000 feet elevation. No part is more than 3 miles from tidewater.
10. Although somewhat exposed to prevailing winds from the south, Annette Island has several protected bays and harbors with deep enough water for use in conjunction with sawmill development. Port Chester, which is an indentation midway on the west side of Annette Island, provides a safe harbor for such use. The Tsimshian Indians erected a sawmill at this location in 1887.
Other protected bays and harbors, located around the entire perimeter of Annette Island, are suitable for booming and rafting of logs or location of sawmills. For the most part the shoreline is gentle, sloping gradually back from the beach for varying distances before meeting the steeper slopes of the upland.
*160 11» In 1891, Port Chester provided safe anchorage for ocean-going vessels. It was the location of Metlakahtla, an Indian town on the shore of its south entrance.
12. On the basis of substantially current Forest Service figures, of the 81,179 acres of forest land, 22,162 acres are commercial and 59,017 acres noncommercial forest land. The commercial forest land comprises 8,280 acres of accessible and 13,882 acres of inaccessible timberland.[5]
13. The forest is composed of spruce, hemlock and cedar, with a small volume of hardwoods. The commercial stands of timber are located in.a narrow band at lower elevations around the perimeter of the island. Most of the timber is within 2 miles of tidewater but practically all commercial accessible timber is less than 1 mile from tidewater.
14. Plaintiffs base a substantial portion of their forest land claims in all of the areas involved in this case on a “stumpage” price or value, i.e., the value of the standing timber on the land (although the term is also used in the industry as referring to 'a quantity of timber that has been cut). This value of the timber is calculated by estimating the amount of board feet of timber in the particular area, measured in the usual lumber industry terms of thousand board feet (MBF or MBM). At least during the 1891-1925 period involved in Areas 1-5, the stumpage prices upon which plaintiffs rely, although related to the value of the standing timber on the land, also, in the great majority of cases, included the land. Generally forest land as such was not, during such period, considered as having any value separate and apart from the standing timber on it. However, the basic element making *161 up the value of stumpage as standing timber is its value for the production of commercial forest products.[6]
15. (a) In 1891 tbe commercial forest land in Area 1 contained 310,296 MBM of accessible, and 448,304 MBM of inaccessible, timber. This consisted of 58.12 percent hemlock, 33.72 percent Sitka spruce, 7.14 percent cedar (Alaska and red), and 1.02 percent other species.
(b) These figures are based principally on a 1957 Forest Service survey of the Tongass National Forest. However, some timber in 1891 (as well as in each area involved in this case) which was standing on the valuation date was cut subsequent to that time but before the recent Forest Service surveys. Therefore, a determination of the timber which was commercial accessible on the valuation date requires the addition of the volume of this cut timber to the volume of commercial accessible timber standing when the survey was made. No cutting adjustment would appear to be necessary with respect to the inaccessible area, since presumably there was no cutting there.
(c) The volume of the timber which was cut must be estimated because in the main actual cutting records do not exist. Plaintiffs’ timberland appraiser, William A. Eastman, Jr., has estimated the volume cut of each species for all the areas involved in this case (basing his estimate, however, upon an acreage for each area which differs somewhat from the stipulated acreage in the cases of Areas 2,3, and 4). These estimates of the proportion of presently commercial accessible timber which was cut after the valuation date are reasonably accurate.
(d) Decreases in timber volume 'as of the recent Forest Service survey date due to forest fires, insect infestations, *162 disease and decay, mortality, etc. (i.e., due to all causes except cutting), are approximately offset by growth.
(e) On the above basis, 42,900 MBF have been added to the Forest Service 1957 survey for timber which was cut from the commercial accessible portions of Area 1 between 1891, the valuation date, and 1957, the date of the Forest Service survey, based on an estimated cut of 6,435 MBF of hemlock, 34,320 of Sitka spruce, and 2,145 of red cedar. Thus, the adjusted volume for hemlock standing as of 1891 is 168,771 MBM, for Sitka spruce, 117,079, and for red cedar, 13,242, a total of 299,092. The balance, making up the total of 310,296, is composed of Alaska cedar and other species.
16. The $46,824 which plaintiffs claim for the forest land in Area 1 is computed as follows:
(a) The 310,296 MBM of commercial accessible timber of all species (standing on 8,280 acres, and composed of 168,771 MBM of hemlock, 117,079 of Sitka spruce, 8,316 of Alaska cedar, 13,242 of red cedar, and 2,888 other) is valued at 10 cents per MBM, totaling $31,030 (or approximately $3.75 per acre.
(b) There were 13,882 acres of forest land which contained timber of commercial quality but which were inaccessible. Although this acreage contained 448,304 MBM of Sitka spruce, hemlock and other species, plaintiffs do not seek a valuation therefor on an MBM basis (as they do for the commercial accessible), but only on a basis of 50 cents per acre, for a total for such acreage of $6,941.
(c) There were 59,017 acres of forest land, both accessible and inaccessible, supporting noncommercial timber of unesti-mated volume, for which plaintiffs seek 15 cents per acre. This value is predicated on such lands being intermingled with and contributing to the makeup of the whole tract of timber, as well as the value of the acreage for hunting, recreational and other uses.
17. In 1891, the average quality of spruce was higher than today because the best trees of this species have been removed from shoreside stands. The protected bays and harbors suitable for booming and rafting of logs, the gradually sloping shoreline, and the location of virtually all the accessible tim- *163 bar at lower elevations within a mile of tidewater generally render the topography favorable for logging.
Here, however (as well as in the other areas), proximity to tidewater, while in itself a factor favorable to logging, was no guarantee of trouble-free logging. The costs of transporting logs overland, either directly to the mill or first to the waterways and then to the mill, are frequently quite high even today because of muskeg and rugged terrain. Moreover, the trucks and the access roads necessary for their use which are now being employed in overland transit were unavailable during the period 1891-1925.
There were many fine locations accessible by waterways which were suitable for the construction of mills and where ocean-going vessels could have found safe deepwater anchorage while being loaded with the products of the mills for shipment to market. Rafting of logs to the millsites, however, would not have been without difficulty, and especially so during the fall and winter storm seasons.
18. The timberlands in Area 1 (and in the other areas herein involved) were within the extensive “Coast Forest” which ranges northward for approximately 2,000 miles along the coastal sections of Oregon, Washington, British Columbia, and into southeastern Alaska and as far north and west as Afognak Island. The forests of southeastern Alaska are predominantly a mixed stand of western hemlock and Sitka spruce, with the two less prevalent species of Alaska cedar and western red cedar associated in many places with the mixed stands. In addition, any one of the four species may be found occasionally in a pure stand of small extent.
19. The Japanese Current provides southeastern Alaska with a temperate climate which permits logging approximately 10 months of the year and milling practically all year round. The deep-water harbors at the potential millsites would in this climate have been open year-round.
20. The dominant specie in the forests of Area 1 (and in all the other areas involved in this case) was western hemlock. As of 1891, except for some local use, there was virtually no demand for this specie. It was and is used primarily for pulpwood. The pulpwood industry was only in its infancy at that time. There were huge supplies of hemlock available *164 in the United States for which, there was no demand. There was no significant demand for this specie for purposes other than pulpwood, although it was in fact suitable for certain limited purposes. A prospective purchaser of Area 1 in 1891 would not have considered even the commercially accessible hemlock portion of the area as contributing any significant amount of value to the area. He would not have envisioned any significant demand for such specie for the foreseeable future. No substantial investment in large areas of western hemlock forest lands would have been justified.
21. There was some significant demand in the United States for Sitka spruce and cedar in 1891. In 1869, the production of Sitka spruce lumber amounted to about 17 million board feet and the production increased steadily in ensuing years, reaching over 100 million board feet by 1891. No production figures are available as of this period in respect to western red cedar and Alaska cedar separate from other cedars. The cedar of Alaska, although not as good quality as western Washington cedar, could be used for a variety of uses, principally shingles, lumber, poles, posts and piling in the case of western red cedar, and interior finish, furniture and cabinet work in the case of Alaska cedar. However, a purchaser would not have envisioned in the foreseeable future any great demand for these Alaska species. There were, similarly, huge supplies of spruce and cedar in more favorable locations in the United States which were more than capable of filling the demand for the foreseeable future. However, a prospective purchaser would have been justified in purchasing pure stands of commercial accessible spruce and cedar, or mixed stands of spruce-hemlock containing significant proportions of spruce, for holding for possible future use or cuttings. Accordingly, as of 1891, the value of all of the forest land within Area 1 would not have significantly exceeded the value of that part thereof on which stood, in substantial quantities, Sitka spruce and cedar which were accessible and of commercial grade.
22. The Tsimshian Indians constructed a sawmill at Port Chester in 1887 and by 1891, the taking date, it was running quite continuously, producing lumber for the buildings there *165 and supplying the canneries in the area with, boxes for shipping salmon.
23. There were no comparable sales of timberlands within the Territory of Alaska at or near 1891, or any of the valuation dates involved in this case.
In contrast with the States, the laws and policies made applicable to Alaska from the time of its purchase by the United States in 1867 through the various dates involved in this case effectively prevented the acquisition of Alaskan timberlands by private owners.
Up to 1884 the land laws of the United States had not been extended to Alaska and it was not possible to obtain private ownership of any land. Between 1884 and 1891, patents and legal title could only be obtained for mineral claims. The act of March 3,1891 (26 Stat. 1095) authorized patents for townsites not in excess of 640 acres and for industrial sites not in excess of 160 acres. The homestead laws were not extended to Alaska until the act of May 14, 1898 (30 Stat. 409), which limited homesteads to 80 acres. This was increased to 320 acres by the act of March 3,1903 (32 Stat. 1028) and later reduced, by the act of July 8,1916 (39 Stat. 352), to 160 acres. The “Timber and Stone Act,” enacted on June 3, 1898, entitled “An Act for the sale of timberlands in the States of California, Oregon, Nevada, and in Washington Territory” and later extended to all public land States, was never made applicable to Alaska.
The act of May 14, 1898, did permit the Secretary of the Interior to sell Alaskan timber at not less than his appraised value for use in Alaska, but not for export. However, no applications to purchase timber were made for 5 years thereafter. This may have been due not only to the lack of demand for Alaskan timber but to the restrictive nature of the regulations issued by the Secretary.
24. (a) The forest lands of neighboring British Columbia, which are most closely comparable to the stands of southeast Alaska, are found in the coastal region of the Province, particularly the northern coastal belt designated as the Prince Bupert District, including the Queen Charlotte Islands. The composition of the stands on the Queen *166 Charlotte Islands and the northern coast was 35.5 percent hemlock, 24.04 percent spruce, 23.81 percent cedar, and 11.03 percent balsam. Thus, the total percent of hemlock to other desirable species was much less than in southeastern Alaska.
(b) The British Columbia Land Act of 1888 regulated the sale, leasing and licensing of Crown Lands in British Columbia. Sales and leases were made under this act until 1906 when timberlands were withdrawn from sale and the granting of leases of timberlands discontinued. The act provided for a rather complicated system designed to promote forest exploitation. Land suitable for lumbering was offered for sale at $2.50 per acre, plus a royalty of 50 cents per MBF. Each purchaser was limited to one lot from 160 acres to 640 acres. In 1891, the sale price was increased to $5 per acre. In 1906, timberlands wei^e withdrawn from sale.
The act also authorized the granting of leases for a term not in excess of 30 years for the purpose of cutting timber. The fixed annual rental was 10 cents per acre plus a royalty of 50 cents per MBF. Leases were conditioned on the operation of a sawmill with a capacity of 1,000 board feet per 12-hour day for each 400 acres held under lease. In 1895, the term for which leases could be granted was reduced to 21 years and the annual rental was increased to 15 cents per acre. In later years other changes were made in the law regulating timber leases. In 1906, the granting of further leases was discontinued.
Due to the different composition of the forest, which was more suitable for saw log lumbering, and the nature of the complex provisions of the 1888 Land Act for exploitation by the devices of lease and license, which bore slight resemblance to a free market, the situation was not comparable.
25. Absent any reliable pattern of comparable sales either in Alaska or British Columbia, sales of comparable forest lands in the nearest locality within the United States would be relevant. These would be the coastal forests of Washington and Oregon. The average stumpage price for Sitka spruce in western Washington in 1891 was 48 cents per MBF. For western red cedar it was 60 cents per MBF.
However, the forest lands of the Pacific Northwest were in the Douglas Fir Belt. The Douglas fir was a valued tree. *167 Douglas fir forests which also contained stands of Sitka spruce and cedar would be much more valuable than the forest lands of southeastern Alaska during the periods involved in this case because of the predominance of hemlock in the southeastern Alaska forests, a specie for which there was no significant demand. There is no Douglas fir in Alaska.
26. The market value of timberlands in southeastern Alaska supporting stands of Sitka spruce and western red cedar would have been greatly less than that of similar land in western Washington. This was principally due to the greater cost of transporting the timber after cutting and milling, a factor which the prospective purchaser of the land would have had very much in mind. Transportation at the times involved in this case would have been by ship, with 660 nautical miles separating Ketchikan (in the most southerly portion of southeastern Alaska) from Seattle (and with the most northerly portion containing forest land approximately 450-500 miles farther distant).
27. The importance of the lumber industry in the United States h'ad become established long before 1891. As a result of the growth of demand, the dissipation of eastern and mid-western forest reserves, and the impending depletion in the south, businessmen had become aware of the value of standing timber as a good investment and the policy was adopted of purchasing large blocks of timberlands not operable at the time of purchase but to be held in reserve for future cutting. By 1891, the rush of entrymen to the public timberlands in the west to acquire salable claims was underway and many timber companies and investors were actively engaged in buying claims and “blocking up” holdings.
There are data which establish that over the span of 20 years prior to 1907-1909, there were large acquisitions by private owners of the virgin timberlands of the Pacific Northwest States. These were principally Douglas fir timberlands. The lands did include, however, some 79.3 billion board feet of standing timber of the hemlock and spruce species and some 56.7 billion board feet of the cedar species. There are no data 'as to the extent of such Pacific Northwest timberland acquisitions as of 1891. In any event, these Pacific North *168 west timberlands were primarily suitable for the production of saw lumber. As stated, the southeastern Alaskan timber-lands were not, for the most part, suitable for this purpose, and there was no significant demand for such timber as pulpwood in 1801 (or at any of the taking dates involved in this case). What demand there was for hemlock for pulpwood purposes was insignificant compared to the enormous supply that was already available in the United States. Such demand would not have had any appreciable affect upon the forests of southeastern Alaska insofar as creating any significant value for them is concerned.
28. Calculating the value of the forest lands in Area 1 (as well as the other areas involved in this case), or 'any part thereof, on a stumpage MBF ¡basis, as plaintiffs have done, would not be proper. No purchaser, as of the dates involved in this case, would, considering the then lack of demand for the species of these forests, have purchased the timberlands as timber stumpage. The conversion of the forests into a number of thousands of board feet, and then multiplying such number by a current market price per MBF, would presuppose something in the nature of a current demand for the stumpage which the particular locality could reasonably service. It would, therefore, be more appropriate to a situation where there was some current ready market for the species involved, or where there was an established 'industry demand which would, in the foreseeable future, enable the forest to be converted into such stumpage values, or possibly higher ones. Here this was not the situation. So far as cutting these forests is concerned, and selling the timber for the production of manufactured products, the prospective purchaser could not have reasonably hoped to realize on his investment in the foreseeable future.
As stated, the primary interest an investor would possibly have had in 1891 (and the other taking dates involved in this case) in the forest lands involved would have been in the spruce and cedar portions, for those were the only species which could be considered the basis for a lumber product operation (as distinguished from a pulpwood operation), and 'his interest in even such spruce and cedar portions would be for holding as a reserve and for possible relatively short- *169 term increase in value as timberland acreage. For this purpose, a price per acre 'for the spruce and cedar acreage, which was located in the commercial accessible areas, would have been paid, 'and not, as plaintiffs claim, a stumpage MBF price for all the species, including hemlock, in such areas.
29. Under the Timber and Stone Act of June 3,1878 (27 Stat. 348), as amended, parcels of public-domain timberland in the Pacific Northwest were being purchased by entrymen, during the last two decades of the 19th century, at $2.50 per acre and then resold to timberland investors at higher prices. As has been noted, in British Columbia, under the Land Act passed in 1888, timberlands were sold at $2.50 per acre, and a royalty of 50 cents per MBF was also charged. In 1891, the sale price was increased to $5 per acre along with the royalty of 50 cents per MBF.
30. Based on all of the considerations set forth in the record, including the opinions of the experts, it is concluded that the fair market value of the forest lands situated in Area 1 was, as of March 3,1891, $2,956, computed as follows:
(a) There were 588 acres of essentially pure Sitka spruce stands of commercial quality within the accessible forest area. These lands would have had a value of $1 per acre, totaling $588.
(b) There were 1,184 acres of essentially pure cedar stands (containing 19,413 MBM) of commercial quality within the accessible part of the forest. These too would have had a value of $1 per acre, totaling $1,184.
(c) There were 2,368 acres of mixed spruce-hemlock of commercial quality within the accessible area in which approximately one-half of the stand was spruce. This acreage would have had a value of 50 cents per acre, totaling $1,184. (The spruce in the above acreage totaled 82,759 MBM.)
(d) There were 4,140 acres of predominantly hemlock timberlands of commercial quality in the accessible area. These would have made no significant contribution at that time to the overall value of the timberlands.
The above comprises the 8,280 acres making up the commercial accessible part of the forest lands.
The balance of the forest lands, consisting of 13,882 acres of commercial, but inaccessible timberlands, containing *170 448,304 MBM Sitka spruce, hemlock and other species (for which plaintiffs claim 50 cents per acre), as well as 59,017 acres, both accessible and inaccessible, of noncommercial timber of unestimated volume (for which plaintiffs claim 15 cents per acre), would not, as timberlands, have made any contribution to the value of the total tract.
31. The above valuation is based on 8,280 acres of commercial accessible timberlands. This is probably a somewhat high figure. It is based on comparatively recent Forest Service surveys. Some trees which are now considered of commercial quality were not so considered in 1891. With advanced techniques, trees may presently be classified as “merchantable” which, because of such factors as size and state of decay, would not have been so considered in 1891. In addition, general improvements in logging methods have rendered “accessible” forest land which would not have been so classified on the several valuation dates involved in this case. (The degree to which it was less is not uniform, but varies as conditions varied from valuation date to valuation date.)
However, no value is being placed on the inaccessible acreage, even though commercial. A prospective purchaser acquiring the entire tract as a reserve for possible future cutting might, nevertheless, well have included some portion thereof in his value calculations, since he could reasonably conclude that technology improvements might in the future make portions of the tract accessible.
It is concluded that one factor would approximately balance out the other, so that no adjustments to the value figures found would be necessary to account for these considerations.

Mineral Lands

32. Plaintiffs claim the mineral potential of Area 1, contained in approximately 1,000 acres, would have added $50,000 to the value of the area as of March 3,1891.[7]
*171 Defendant contends that, as of the taking date, no increase in the value of the tract is warranted by reason of any mineralization.
33. (a) The record does not indicate that, as of the taking date, there was any production, in paying quantities, of any minerals from Area 1. Actually, there has never been any exploitation of the mineral resources of Annette Island. Plaintiffs’ claim of value is based on the following: (1) between 1887 and 1891, seven mineral claims had been recorded on the west side of Annette Island; (2) a 1908 Geological Survey Report refers to claims in existence on the east side of the island at the time the act of March 3, 1891 was passed; (3) the report refers to “abundant evidence of mineralization and small deposits of high-grade ore” being “observed on the island by the writers” (which plaintiffs say would also have been apparent in 1891), and concluded that these deposits and the island’s mineral prospects were “worthy of further investigation”; (4) an 1887 newspaper account (The Alaskan) referring to the arrival of parties on the island to open an iron mine, “some very valuable ore having been discovered by them on the island” and also stating that “a large deposit of lead has been ascertained to exist”; (5) a June 5, 1890 statement in a trade paper (The Juneau City Mining Record) that “some very good quartz locations are reported on Annette Island” and that “there evidently is a rich mineral belt in that section” which “is deserving of the attention of prospectors”; (6) a September 7,1901 statement in another trade paper (The Mining and Scientific Press), concerning the Ketchikan Mining District, referring to the discovery of a mineralized zone running from the eastern to the western shores of Annette Island, stating that “Assays showing silver values from 600 ounces to 2,000 ounces to the ton are common with ore from this locality”, and also that “Gold values also rmi into the hundreds of dollars to the ton, though not in ore with the high silver values.” This account further stated that “Several prospecting shafts were sunk on different veins and shipments of ore made before the mining was stopped” (as a result of the establishment of the reservation) and the prospectors were evicted from the island; (7) a July 8,1895 description in a trade paper (The Alaska Mining Record), *172 in. an article entitled “Mining on Annette Island”, of mineral deposits on the island, tbe account stating that there were “three distinct ledges”, that “some very fine specimens of gold quartz have been taken out”, and that the “Average yield in gold” was “$32 to the ton”; and (8) a report to the Secretary of the Interior in 1927 stating that a sample shipment in 1920 of ore discovered on both the eastern and western side of the island assayed $60 in copper and $4 in gold per ton from the eastern side and $70 per ton in silver and lead from the western side.
(b) Plaintiffs contend that, from the above, the conclusion is warranted that mineral zones had been established by the taking date, with locations having been made; that newspaper accounts, based on the reports of the prospectors, indicated the area was worth further investigation; and that a test shipment showed that ore of commercial grade was present. This justifies, plaintiffs contend, the opinion of their expert that the mining potential of Annette Island would have enhanced the value of Area 1 as of March 8,1891, by $50,000.
34. It is concluded that the evidence relied on is insufficient to establish that such mineralization as there was of Area 1 would, as of the taking date, have added anything of significance to the value of the area. The staking of claims, newspapers accounts based largely on statements of the prospectors themselves, and promising specimens, are in themselves insufficient bases for the establishment of mineral values.
A 1908 U.S. Geological Survey Bulletin, No. 317, “The Ketchikan and Wrangell Mining Districts, Alaska”, states that “little was known of the mineral resources of this country [Annette Island]” on or before the valuation date (p. 179).

Townsite and Settlement Land

[8]

35, Plaintiffs claim that an estimated 50 acres comprising the town of Metlakahtla had, as of March 3,1891, a fair mar *173 ket value of $20,000 ($400 per acre) and that an additional 300 acres in the vicinity of the town had a value of $10,000 (approximately $33 per acre), making a total of $30,000 claimed for such land.
Defendant contends plaintiffs are not entitled to any increased compensation by reason of such townsite and adjoining acreage. Defendant’s contentions are based principally on legal considerations, i.e., plaintiffs lost nothing by reason of the creation of the town, nor did plaintiffs contribute in any way to the creation of the value of the townsite.
36. The town of Metlakahtla was located within a level shore area approximately 5 to 6 miles in length. In planning the town, 66 squares were platted on the best building portion, each square being divided into four lots, each lot being 80 feet wide and 90 feet long. By laying out the town in this way each lot was a corner lot. By 1890, between 150 to 200 houses had been built in the town, about 75 of them being frame houses and the others being substantial log houses. Its population was approximately 823 in 1891.
37. In 1891 the town had thriving sawmill and cannery establishments and an active building business. In addition to the dwelling houses other buildings had been constructed, including a store building (60 feet front, by 120 feet deep, and 30 feet high); a salmon canning plant; a steam sawmill; an industrial home building; and a school building. Other buildings were in the process of construction. In the winter of 1891-1892, 95 new, permanent buildings were erected.
The natives of the town supplied the logs for, and operated, the sawmill. They constructed the buildings of the town with the lumber produced by the sawmill. The mill also supplied lumber for the boxes used by the town’s cannery and the other nearby canneries.
38. A report prepared by a clerk of the General Land Office of the Department of the Interior based on an official inspection of the town made in 1903 indicated the prosperous nature of the town and its excellent financial condition. These circumstances had also been noted in official reports in 1893 and 1896. The 1903 report stated that the cannery had a floor space of 42,294 square feet, cost $15,000 for *174 buildings and wharves, and had equipment and steamers costing, in total, $16,000; that the sawmill (covering 8,000 square feet and having buildings costing $3,000 and machinery and equipment costing $3,000) had produced 190,000 feet of lumber in 1902; that the company (Metlakahtla Industrial Company) which conducted the sawmill and cannery had paid wages amounting to $413,811.38; that there were eight stores in the town; that about 3 miles of well-constructed board sidewalks, 8 feet wide, had been installed; that a system of waterworks costing $10,000 had been constructed, bringing water both for power and domestic uses to the town from a mountain lake situated 2% miles distant; that a well-built church costing over $10,000 had been completed; and that other buildings had also been constructed, including a school house, a doctor’s residence, a home for girls, and two guest houses. The total value of the enumerated structures and equipment amounted to $69,000.
It is not clear, however, how much of this development occurred between the taking date and the subsequent date of the report.
39. The municipality of Metlakahtla was surveyed and platted in 1918 under U.S. Survey No. 1807. The area included in the municipality, as shown on the plat of survey, was 339.8 acres, of which 265.6 acres was a large unsub-divided tract located to the southwest of the subdivided area. The subdivided area contained 74.2 acres. The 1918 plat of survey shows 83 blocks, four lots to each block. The 66 blocks in the original town, each 160 X 180 feet, and the streets, would have occupied approximately 53 acres.
40. There were no comparable sales to provide a basis for valuation. In view of the location of Annette Island in relation to ocean transport routes; its access to superior fishing grounds; its terrain; the area included in the initial town settlement; the development of the town by 1891; the rising trends in population; the output of canned salmon in southeast Alaska; and considering also the value of town-site lots in Juneau (as will hereinafter appear), taking into account, however, the differences in location, economic base and social structure of Juneau and Metlakahtla, it is concluded that an estimated 50 acres of the Metlakahtla town- *175 site, as of March 3,1891, would have bad a value of at least $10,000, or $200 per acre, and that an additional 300 acres in the vicinity of the town of Metlakahtla would have had a value of $4,500, or $15 per acre, making a total of $14,500.

Other Lands

41. The remaining land in Area 1 comprises 4,201 acres, for which plaintiffs claim $800, or approximately 14 cents an acre. The bulk of this remaining acreage is comprised of either muskeg, scrub, brush or mountainous land with elevations rising above 2,000 and as high as 3,600 feet, including barren areas. However, a part of this area is a stretch of level land in the vicinity of the town of Metla-kahtla. As stated in the 1890 Census, Metlakahtla “is situated on the west side of Annette Island, which is comparatively level for 5 or 6 miles in the vicinity of the village. It has the longest beach of any settlement, native or otherwise, in this part of the territory.” Annette Island also has many lakes, including mountain lakes, which could constitute a source of water power. Plaintiffs also claim the land would have some value as contributing to the area’s fur industry.
42. The record is not sufficient to support plaintiffs’ valuation for such remaining acreage. There is no indication as to what part, if 'any, such acreage played in the total area’s fur industry. No separate claim is made for compensation due to the loss of fur resources. Insofar as the beach area contributed to the value of the salmon fishing rights, such rights are separately valued. The bulk of the land would not have had any foreseeable economic significance or potential. Its fair market value as of March 3, 1891 would not have exceeded $100.
Fisheries[9]
43. Plaintiffs claim a fair market value of $157,000 as of the taking date for the salmon fishery resource of Area 1.
Defendant claims that the fishery resource, or the exclusive right to fish in the waters surrounding Area 1, was valueless *176 on the ground, principally, that no one would pay anything to fish in the waters of Area 1 when other salmon waters in Alaska and elsewhere were open for such fishing as a common right.
44. In the decade ending in 1890, the annual output of Alaskan canned salmon had increased from, less than 8,000 cases to approximately 683,000 cases. Alaska’s share of the total Pacific Coast canned salmon pack, including that of British Columbia, had grown from less than 1 percent in 1881 to 43 percent in 1890. This period of rapid expansion was followed in 1890 by a decline in production and prices. Alaskan production had decreased about 5 percent to 683,000 cases in 1890 after having produced 719,000 cases in 1889. The average market value per case of all species of canned salmon had decreased in Alaska from $5 in 1889 to $4.10 in 1890. The gain in production of the Pacific canned salmon output in the decade 1881-1890 was about 130 percent, compared to the infant growth rate of 360 percent in the preceding decade. Output appeared to be leveling off at a relatively stable range of 900,000 to 1 million cases per year. Although total production rose to 1,218,000 cases in 1888 and 1,614,000 cases in 1889, as a result of expansion principally in Alaska and British Columbia, the decline in prices in 1890 suggested that the industry’s capacity had for the time being exceeded its markets and that a period of consolidation might be necessary to restore the balance and stabilize prices at levels that would yield satisfactory profits.
45'. The history of the Pacific salmon industry also suggested the possibility of serious depletion of the fishery resources as a consequence of unrestricted or poorly regulated fishing, inadequate escapement of salmon, and other adverse factors. The Columbia River, the greatest ringle river salmon source in the world, had shown serious depletion since 1883-1884. The Columbia River canned salmon pack had fallen from a volume ranging between 500,000 and 600,000 cases per year during 1880-1885 to 300,000 — 450,000 cases during 1886-1890. The pack of the Sacramento River, which reached 200,000 cases in 1882, had declined to 25,000 cases by 1890.
*177 46. A prospective southeast Alaska investor could foresee that if the trends of depletion of the salmon runs in the Columbia Eiver continued, the rising demand for canned salmon would assure a market for an accessible resource like the Annette Island fishery and, at the same time, strengthen the price. He could reasonably count on maintaining the supply of the Metlakahtla cannery by the observance of prudent conservation practices in fishing Annette Island waters.
47. Southeast Alaska had 12 operating canning plants and produced around 143,000 cases in 1890, a fifth of the territory’s output. The Metlakahtla cannery on Annette Island attempted a first experimental pack of 500 cases in that year. Father William Duncan and the Tsimshian Indians, who had established “New Metlakahtla” (Port Chester) in 1887, had erected a $10,000 canning plant having a capacity of about 8,000 cases. The waters embracing the Annette Islands teemed with millions of salmon, and it was reasonable to expect that, within a year or two, additional facilities would easily permit a pack of at least 10,000 cases, an output level surpassed by 9 of the 12 canneries in the region. It was further reasonable to conclude that, with traps, the salmon catch could be readily multiplied, at this most favorable location, to a pack of 20,000 cases, and that at an early date the prolific salmon runs in the surrounding waters could produce 40,000 cases.
48. (a) The value of the fishery resource of Area 1, which would be the value of the exclusive right to fish in the waters appurtenant to the area, would depend only on the ability to earn profits therefrom. An estimate of prospective profits must, of course, necessarily be based in part on some speculation, for the future of a business venture of this kind cannot be foretold with accuracy and assurance. Nevertheless, profitable enterprises are commonly bought and sold, with, the purchase prices thereof calculated on the basis of reasonable formulae, theories, and economic forecasts.
(b) In arriving at a value for the fisheries of Area 1, a prospective investor would have reasonably calculated as follows:
Estimating an average annual output of 20,000 cases and a market price of $4 as the average price per case of all species *178 of canned salmon (as compared with an overall Alaskan average of $5 in 1889 and $4.10 in 1890), be would reasonably have estimated average gross sales of $80,000 per year, costs of not to exceed an average of $3.25 per case, and profits of 75 cents per case, or $15,000 per year. He would have computed his capital investment requirements at $700 per $1,000 of output, or $56,000 for a pack of 20,000 cases. The estimated profit of $15,000 would thus represent a return of 27 percent on this investment.
In light of the return available on investment in other industries of comparable risk and uncertainty, a return of at least 10 percent would have been necessary to attract capital to the cannery as against the other industries.[10] Thus, prospective profits per year on the investment in the Metlakah-tlan cannery would have had to have been at least $5,600 based on a total investment of $56,000. This is the normal profit the investor could make on $56,000 without investing in the cannery. If this is all the profit he could make, there would be no reason to be attracted to this particular venture. The difference of $9,400 between projected profits of $15,000 and normal return on cannery investment of $5,600 is, therefore, the excess annual income attributable to free access to the Metlakahtlan salmon fishery. It would be the opportunity to earn this excess annual income from his investment that world attract an investor to the purchase of this resource.
(c) Plaintiffs claim a value based upon capitalization of such estimated annual income of $9,400 at 6 percent, which, as allowing for the then foreseeable elements of risk and uncertainty, plaintiffs’ claim would be the proper rate. Plaintiffs treat the industry as a relatively low risk one. Capitalization at such rate yields a value of $157,000 for the salmon fishery resource of Annette Island as of March 3,1891. Thus, by purchasing the fishery resource for $157,000, the purchaser would, by realizing an estimated (excess) annual income of $9,400, earn a return of 6 percent on the purchase price.
*179 (d) However, the valuation figure would be 'based on long-range estimates. The salmon cannery business was not free of risk. The prospective purchaser, in calculating future profits, would necessarily contemplate, for instance, the risks involved in a continued salmon supply (it was subject to fluctuation), future labor and other costs, a continued public demand for salmon, public tastes, possible substitutes, the problems involved in a seasonal operation, including seasonal labor, the fish for the most part being caught in a 2-3 month season, and a host of other contingencies. For these reasons, a capitalization rate of 10 percent would be more realistic.
Accordingly, it is concluded that the fair market value of the exclusive right to fish in the waters of Area 1 was $94,000 as of March 3,1891.[11]
49- The payment of the sum of $94,000 for the exclusive right to exploit the fishery resources of Area 1 would presuppose the seller’s (in this case, the plaintiffs) exercising such control over the similar resources of the other areas of southeastern Alaska which he owned as would protect the purchaser’s rights. The purchaser would reasonably expect, and naturally make it a condition of the purchase, that those who had previously exploited the fishery resources of Area 1 would not be permitted to move on to the other areas owned by the seller and so continue to enjoy the unrestricted right to fish.
50. A prospective purchaser would not have placed anything more than a nominal value on the right to catch fish in the area for processing in other than canned form.

Valuation Summary

51. The fair market value as of March 3, 1891, of the 86,730 acres of Area 1 as a whole was, taking mto consideration the contribution thereto made by its forest lands ($2,956 (finding 30)), its townsite and settlement lands ($14,500 (finding 40)), its remaining acreage ($100 (finding 42)), and *180 its fisheries resources in its surrounding and appurtenant waters ($94,000 (finding 48)), $111,556. This value is based on the finding that Area 1, considering its resources, particularly its timberlands, its townsite and settlement lands, and its appurtenant fisheries, was adaptable to multiple uses, due weight being given to the extent to which each such use contributed to the overall value of the area as a unit without any duplication of value arising out of the several uses.
Abba 2 — Valuation as on August 20, 1902

General

52. This area is composed of two separate areas (designated by the parties as 2a and 2b) which the parties have stipulated comprise a total of 4,911,568 acres. The entire area was reserved as the Alexander Archipelago Forest Reserve by Proclamation issued August 20, 1902. Plaintiffs claim that the fair market value for the area as a whole, taking into consideration the contributions thereto of standing timber, its minerals, the appurtenant fisheries, and the other resources, was $20,772,000 as of such date.
53. Area 2 is made up of two groups of islands facing the Pacific Ocean at the southern and middle portions of southeastern Alaska. The northern group (2a) has its principal area in Chichagof Island, with Yakobi Island and others completing the group. It is bounded by Icy Strait on the north, Chatham Strait on the east, Baranof Island on the south and the Pacific Ocean on the west. The southern group (2b) is made up of a number of islands of which Prince of Wales is the largest, followed by Kupreanof, Kuiu, Dali, Zarembo, ’and Koscuisko Islands. The islands in this group are bounded by Frederick Sound on the north, Dixon Entrance on the south, Clarence Strait on the east, and the Pacific Ocean on the west. The south end of Prince of Wales Island is about 60 miles northwesterly of Prince Rupert, B.C.
54. Of the gross area of almost 5 million acres in Area 2, 70 percent is in the Prince of Wales-Kupreanof-Kuiu group (2b) and the balance is in the Chichagof group (2a). *181 Although not continuous land, comprising, as they do, many channels, bays and inlets, Area 2b is roughly 168 miles long and 56 miles wide, and Area 2a is about 56 miles long and 49 miles wide.
55. The topography of this area is typical of the coastal islands in southeast Alaska. The land slopes upward from tidewater over flats, rises and benches for short distances, becoming steeper toward the inland and terminating in bare, rocky, precipitous mountains along the backbone ranges. Prince of Wales Island, the largest in the area, has many protected, sheltered bays, coves and inlets. The many frontal islands in this group provide a considerable measure of protection for the waterways. In the Chichagof Island area, protected waterways lead from the south end of this island to Sitka, which was a local market for logs on the date of valuation. Except for its rugged Pacific Ocean western exposure, Chichagof Island has many protected bays, inlets and waterways suitable for the movement of ships or logs.

Forest Lands

56. As of the valuation date, of the total acreage in Areas 2a and 2b, 90.75 percent was forest land, consisting of 49.89 percent noncommercial and 40.86 percent commercial. Of the commercial forest land, 69.12 percent was accessible and 30.88 percent inaccessible.
57. Area 2, particularly the Area 2b portion, contains almost continuous forests. Only the highest points are bare. Heavy stands of Sitka spruce and hemlock are found on the lower slopes, near tidewater and in short valleys throughout the area. Dense stands are found, for example, close to tidewater on Koscuisko, Prince of Wales, Kupreanof, and Chichagof Islands. In all of these areas large old stumps, resulting from logging operations in past decades, are found among standing trees generally close to tidewater.
58. The forest land is hemlock-spruce, essentially the same as found in all southeastern Alaska. Stands in which hemlock predominates account for 60 percent of the commercial forest area; hemlock-spruce, 20 percent; and spruce, 10 percent. Cedar types take up 9 percent and hardwoods the balance. Hemlock and spruce stands are evenly distributed *182 over the accessible and inaccessible land area. More cedar occurs in the lowland accessible areas while hardwoods predominate in the upland inaccessible areas.
59. In 1902 the commercial forest land in Area 2 comprised 1,040,761 acres supporting 36,725,546 MBM of accessible timber and 966,106 acres supporting 32,712,052 MBM of inaccessible timber. There were also 2,450,381 acres of forest land supporting uninventoried amounts of noncommercial timber. The commercial timber consisted of 62.9 percent hemlock, 30.5 percent Sitka spruce, 6.0 percent cedar (Alaska and red), and 0.5 percent other species.
60. A favorable feature of the timber was its tidewater location. The best timber was located close to tidewater where the cheapest methods of logging could be used to move the logs to tidewater where good towable waters provided a ready-made route to millsites. With the best spruce stands occupying the most accessible sites along the shore, the timber was adapted to economic operation by having a good volume of cheaply produced logs available immediately to convert into lumber and other products.
61. In 1902, this area had more good quality spruce than found anywhere else in southeast Alaska. The cut of Sitka spruce for lumber production in the United States had reached 165 million board feet in 1899 and then declined to a small extent by 1902. Western hemlock lumber production was still very limited as of 1902. However, lumber production of eastern hemlock in that year exceeded 3 billion board feet.
62. In 1902, the Pacific Northwest was in the midst of a timberland boom with vast acreages of the public timberlands being 'acquired and active trading in the timberlands taking place at rising levels of prices. Small tracts comprising in the aggregate millions of acres were being acquired by entry-men as salable claims which were avidly purchased by timber companies and investors who were engaged in assembling large holdings of timberland. Also large tracts of timber-lands which had been included in State grants and in railroad grants were being transferred to lumber companies and timberland investors. Even lands eliminated from national forests as valuable for agriculture and' needed for settlement *183 were being acquired by entrymen and sold to timberland investors. As noted, however, these thnberlands were in the Douglas Fir Belt.
63. Many of the timber tracts being purchased in the Pacific Northwest ait this time consisted, in whole or in part, of inaccessible timber because of the anticipation that it would become accessible with changes in logging technology, transportation facilities, and economic conditions. The Forest Service has classified as accessible as of its 1957 inventory one-third more timber than that set forth above to be accessible as of 1902 in Area 2.
64. The average price in western Washington, in 1902, for standing timber of the Sitka spruce species was $1.04 per thousand board feet, and for western red cedar, $1.24. Western hemlock thnberlands were selling at an average price of 37 cents per thousand board feet. According to the Census Bulletin for 1900, the stumpage value for all species cut in Alaska was 97 cents per thousand, as against an average stumpage valúe in the United States of $2.26 for spruce, $2.56 for hemlock, and $1.32 for cedar. In British Columbia, in 1902, the price for Provincial thnberlands was $5 per acre plus a royalty of 50 cents per thousand board feet of timber cut. Also in British Columbia during the same year, Government-owned thnberlands were being leased for the purpose of cutting timber at an annual rental of 15 cents an acre plus a royalty of 50 cents per MBM, and for pulp at an annual rental of 2 cents per acre and a royalty not exceeding 25 cents per cord of pulpwood. The pulp leases were issued only for the period 1901-1903 for the purpose of encouraging the establishment of a paper-making industry in the Province. After 354,399 'acres were taken up under pulp leases, the law authorizing them was repealed. In 1900, the Northern Pacific Bailroad sold to the Weyerhauser Timber Company 900,000 acres in southwestern Washington for $6 per acre which, although predominantly Douglas fir, also contained stands of spruce and hemlock.
65. Plaintiffs claim $12,596,365 as the fair market value, as of the taking date, of the forest lands of Area 2, computed as follows:
*184 (a) There were 36,725,'546 MBM of live commercial accessible timber of all species, principally hemlock and Sitka spruce (i.e., 23,107,714 MBM of hemlock, 11,208,637 of Sitka spruce, 1,079,731 of Alaska cedar, 1,134,819 of red cedar, and 194,645 other) standing on 1,040,761 acres. Such timber is valued at 30 cents per MBM, totaling $11,017,664.
(b) There were 966,106 acres of forest land which contained timber of commercial quality but which were inaccessible. Tliis acreage contained 32,712,052 MBM of Sitka spruce, hemlock and other species. Plaintiffs claim $1 per acre therefor, or $966,106.
(c) There were 2,450,381 acres, both accessible and inaccessible, of noncommercial timber of unestimated volume, for which plaintiffs claim 25 cents per acre, totaling $612,595. Plaintiffs contend that such forest land would be essential ‘as an adjunct to the efficient operability of the timber stands on the commercial forest land.
66. The fair market value of the forest lands situated in Area 2 was, as of August 20, 1902, $504,481.30, computed as follows:
(a) There were 97,828 acres of essentially pure Sitka spruce stands within the commercial accessible forest area. These lands would have had a value of $1.50 per acre, totaling $146,742.
(b) There were 110,721 acres of essentially pure cedar stands which were commercial accessible. These too would have had a value of $1.50 per acre, totaling $166,081.50.
(c) There were 214,469 acres of mixed spruce-hemlock of commercial quality within the accessible area in which approximately one-half the stand was spruce. This acreage would have had a value of 75 cents per acre, totaling $160,851.75.
(d) There were 616,121 acres of predominantly hemlock timberlands of commercial quality within the accessible area. This acreage would have had a nominal value of 5 cents per acre, totaling $30,806.05. Between the date of faking of Area 1 (1891), for which no value was ascribed to the hemlock acreage, even though commercial accessible, and the date of taking of Area 2 (approximately 11 years) stumpage prices were being quoted for the first time in *185 western Washington for western hemlock (5 cents in 1900, the first year of quotation, and 21 cents in 1901). The pulpwood industry was growing. However, considering the huge supplies elsewhere more favorably located, and the still almost nonexistent demand for this specie as compared with such supply, no more than a nominal value would be warranted, despite the tremendous activity of the times with respect to the Douglas fir timberlands of the Pacific Northwest.
(e) There were 1,622 acres of other species of commercial quality in accessible areas. The record does not substantiate any value therefor.
The above comprises the 1,040,761 acres making up the commercial accessible part of the forest lands.
The balance of the forest lands, consisting of 966,106 acres of commercial but inaccessible timberlands, as well as 2,450,-381 acres, both accessible and inaccessible, of noncommercial timber would not, as timberlands, have made any contribution to the value of the total tract.

Mineral Lands Area 8a

67. There were three distinct types of mineralization in Area 2a. Gypsum deposits were discovered on the east coast of Chichagof Island near Iyoukeen Cove, lode gold discoveries were made on the west coast of Chichagof Island at Klag Bay and Kimshan Cove, and nickel-copper bearing deposits were located near Fleming Island on the west coast of Chichagof Island and at Bohemia Basin on Yakobi Island.
68. Gypsum (a) There was a gypsum deposit located near Iyoukeen Cove on the eastern side of Chichagof Island about 1 mile from tidewater which (together with the adjoining land required for development of the property, comprising, in all, 200 acres), plaintiffs contend had a fair market value on August 20, 1902 of $100,000.
(b) The location of this deposit was first made in 1901. Tests proved the deposit to be composed of an exceptionally pure gypsum and further investigation and development of the property soon followed. However, as of the taking date, no actual mining had taken place and in fact did not com- *186 menee until 1906. By 1905, the Pacific Coast Gypsum Company bad sunk two tunnels, in eacb of which shafts 65 and 85 feet deep were sunk, practically all in gypsum. However, the extent of the deposit was still being investigated. The prospects of a profitable operation were, however, evidently sufficient by 1905 to warrant large-scale development. At that time the company was constructing a railroad, 1 mile long, to transport the gypsum from the mine to bunkers of 1,000 tons capacity which were to be built on a wharf for loading into barges and shipment to Puget Sound, where the company then contemplated the building of a plaster mill.
(c) It turned out that operations at this mine continued, with only brief interruptions, for almost 20 years after active mining commenced in 1906, and until the deposit was exhausted. Throughout the production period, the quality of the product was excellent. The Puget Sound mill built by the company supplied the market for many years with a large percentage of the plaster products consumed on the Pacific Coast. The mine had a productive capacity of over 100 tons of gypsum a day. In 1929, a Geological Survey Bulletin estimated the total output to have been approximately 500,000 tons.
(d) A prospective purchaser of this property on the valuation date could have reasonably anticipated a good possibility of a profitable return on this exceptionally pure gypsum deposit, provided it were large enough. As of such date, it is reasonable to assume from the large development expenditures they were making, that the developers of the claims concluded that the deposit was of commercial grade and size. At such date, gypsum as mined was classified into four grades of quality — Crude, Land, Plaster of Paris, and Wall Plaster.
The figures for the valuation year on the average United States yield per ton for each grade are not in the record, but such figures for 1904 are available and are sufficiently close in time (2 years) to be useful. They indicate the following yield per ton for each of the four grades:
Crude_$1.09
Land_ 2.03
Plaster of Paris_ 3.21
Wall Plaster_ 4.35
*187 The exceptionally pure quality of the deposit indicates that most of it was at least of the highest two grades. Accordingly, an estimate of $3 yield per ton at the mine would be reasonable, from which, in order to calculate the prospective operating profit, would have to be deducted, of course, the operating costs.
On the basis of the knowledge then existent, the operating costs for open-pit extraction of gypsum would not have been expected to exceed $1 per ton. (The actual production figures on yield and operating costs and profits for this mine are not in the record, and apparently were never published.) Thus, on a 500,000 ton yield over the years, the operating profit at the mine would total approximately $1 million. Cost of investment would, of course, have to be deducted therefrom.
(e) However, a conservative investor would, as of the taking date, have recognized the great risks involved in the undertaking. The development and maintenance costs would be high. Since the deposit was about a mile from Gypsum Creek, where the wharf would have to be built, a 1-mile railroad had to be erected and maintained, plus a wharf and storage bunkers. In addition, there would be transportation costs to Puget Sound. And there would, of course, be the usual considerable hazards incident to any mining operation. Actually, since the mine was worked below the level of Gypsum Creek, it was flooded twice during its life. In addition, an underground watercourse was encountered. Heavy pumping expense was incurred. And, although at that time there was an increasing use of gypsum as a building material, for wall plaster, and for fertilizer, so that it was having increased commercial importance, nevertheless, on a long-range basis, there would necessarily be unknown economic risks.
(f) Considering all the above factors, it is concluded that the fair market value of this excellent, large, gypsum deposit on Chichagof Island, which, together with the necessary adjoining land, in all involving 200 acres, was, on the taking date, at least $50,000 and that such 200 acres would, therefore, have enhanced the value of the entire tract by such amount.
69. Lode Gold and Niclcel-Copper Deposits. Plaintiffs *188 claim $1 million as the fair market value of gold and nickel-copper deposits which were located on the west (Pacific Ocean) coast of Chichagof Island, comprising, together with the adjoining lands necessary for development, 2,800 acres.
70. Lode Gold Deposits. Gold was first discovered at Klag Bay in 1905 by chance by an Indian engaged in salmon fishing. There were numerous fragments of quartz in the bed of a small stream. The float ore was rich enough to yield between $15,000 and $20,000. A small stampede from Sitka followed and a large number of claims were staked in September 1905. Three maj or mines subsequently developed from these locations, the Chichagof, the Golden Gate and the Hirst-Chichagof. The Chichagof mine became highly productive almost immediately after discovery. The Golden Gate began producing in 1910. Subsequently, both mines combined as the Chichagof. This mine, by 1941, produced gold valued at almost $14 million (and silver valued at approximately $158,000).
The Hirst-Chichagof mine at Kimshan Cove developed more slowly, and was not brought into production until 1922. By 1988, it had produced almost $2,500,000 worth of gold.
71. NicTcel-Copper Deposits. Nickel-copper-bearing deposits were located on Chichagof Island in 1911 and on Ya-kobi Island in 1921, although it is possible that discoveries were made in these areas as early as the 1890’s, since two locations were recorded in June 1891, 4 miles northwest of Port-lock Harbor. In addition, a quartz claim was recorded on Yakobi Island in 1894. Several other locations were made in 1900 on Lemisurier Island. Only limited development work was performed until the late 1930’s.
72. (a) Although the gold deposits were not discovered until 1905, 3 years after the 'taking date, plaintiffs rest their claim on the theory that (a) as of the taking date, a prospective buyer (or seller) of the area would have caused a thorough examination to be made by a competent mineral evaluator and that this examination would have included a reconnaissance of the west coast of Chichagof Island where the float rock present at the site of the original discovery surely would have been discovered (as it was by the discovering Indian), and (b) that this discovery would have been fol *189 lowed by a discovery of the lodes of the highly productive Chichagof and Hirst-Chichagof properties.
(b) The basis for ascribing value to the nickel-copper deposits is less clear. If it rests on the same theory as the gold lode deposits, the record is no't developed as to what would have been obvious 'to a competent mineral evaluator had a reconnaissance discovered the deposits as of the taking date, buttressed by any actual production figures or possible profitability.
73, (a) Since the gold lode deposits were not even known to exist as of the taking date, it is concluded that, for the purposes herein involved, no market value should be ascribed to them. Furthermore, even if plaintiffs’ speculative theory of what a reconnaissance as of the taking date would have discovered is accepted, it is not satisfactorily explained 'how that part (which is not shown) of the claimed figure of $1 million ascribable to the gold deposits is arrived at. There is no evidence of production costs or profits.
(b) Even if the nickel-copper deposits are deemed to have been known as of the taking date, it is not satisfactorily explained how they would be considered to have had any recognizable market value. The mere fact that locations were made is not a satisfactory basis for .'ascribing value. Since mining is such a speculative venture, where there is no active, going, operation, some reasonable basis of prospective profitability must be shown.
(c) Plaintiffs’ contention that the 2,800 acres covering the lode gold and nickel-copper-bearing deposits of Area 2a would, as of the taking date, have enhanced the value of the area to the extent of $1 million (or to any extent) is not supported by the record.
Area 2b—

Prince of Wales Island,

74. Hetta Inlet. The Ketchikan Mining District was the southernmost of the several recording districts into Which southeastern Alaska was divided. Prince of Wales Island, consisting of 2,800 square miles, constitutes the 'largest island in the district. The turn of the century was a period of great prospecting and mining activity in the district, throughout *190 which several hundred claims were staked. Hetta Inlet is a deep embayment in the southwest coast of Prince of Wales Island. For the potential mineral land in the region of this inlet, comprising 2,000 acres, plaintiffs claim a fair market value as of the tailing date of $500,000.
75. There were large copper deposits in this section and starting in 1897 many lode claims were located. In 1898 claims were located on Copper Mountain. In 1899 development work was actively commenced by the Alaska Copper Company. Many other claims were located in the vicinity of Copper Mountain between 1900 and 1908. The copper deposits of the inlet attracted wide attention, and were the subject of investigation by the Geological Survey in 1901. There were certain favorable indications. The deposits were located near deep-water harbors, and the availability of cheap coal and coke, as well as the physical development of the mines, indicated low operating costs. Assays indicated rich ore.
76. (a) There were seven main groups of claims in the Hetta Inlet section. However, although production records for the mines on Hetta Inlet are incomplete, insofar as the evidence indicates, only one was ever significantly productive. The remaining groups produced either no or relatively little commercial ore.
There is no indication of any production for the Green Monster, Houghton, and Sultana groups. The claims comprising the Green Monster group, belonging to the Alaska Industrial Company, were, although located in 1900, developed to only a meager extent. Mining conditions were less f avoralble at this location than at many other points along the coast. The Geological Survey reported in 1905 that these claims were “not accessible for mining,” and that “even to prospect them is costly and can be done only during the summer months.” The Houghton group, located in 1901, was likewise developed to only a meager extent between 1901 and 1905, although more active exploration was undertaken during at least the following 3 years. The development of the Sultana group too amounted to little more than the requisite assessment work.
*191 The Corbin group of claims did produce some shipments of ore of un'aseerbainaible quantity to the Copper Mountain smelter during 1905. The mine was sold to the Alaska Metals Mining Company in 1906, which, ¡after commencing ¡active development, including the building of a steampower plant, a wharf and various buildings, suspended operations early in 1907. These -claims were not located until February 1905, 2Yz years after the valuation date.
Both the Copper Mountain and Copper City groups did produce some ore of small quantity. The only reported figure for production from the former, where prospecting had begun in 1897, was an $18,000 yield in 1902. The following 2 years saw no production while smelter construction and other development work was underway, with production apparently resumed with the opening of the smelter in June 1905 until shut down early in 1907. The Copper City mine or Bed Whig group shipped small quantities of ore to Puget Sound between 1903, when operations first commenced, and 1908. A 1905 IJ.S. Geological Survey Beport on Alaskan mineral resources noted that shipments to that time had amounted to 1,600 tons, yielding $60,000 in copper and gold values. In 1911 it was still under development.
(b) Only the Jumbo mine exploiting the deposits of Jumbo Basin, belonging to the Alaska Industrial Company, and situated on the northwest side of Copper Mountain, proved to be productive, yielding $1,768,342 on 122,037 tons of copper, gold and silver ore between 1907, when it first started to produce, and 1923, when production apparently ceased, equivalent to $14.50 per ton (there was no production between 1919 and 1922 and only approximately $56,500 worth in 1923). It is difficult to determine the degree to which a prospective purchaser on the valuation date would have envisioned the full potential of these claims, for although the deposits were discovered in 1897, it was not until 1902 that active development was begun, with prospect tunnels being driven in the succeeding years. The first ore was not shipped for smelting until 1907. There is no record of operating costs or profits, if any, of this mine.
(c) No evidence was introduced concerning operating costs, preproduction development and construction expenses, *192 or profits, of the Hetta Inlet mines. The only relevant figures, which are incomplete, indicate an ultimate yield of approximately $1,850,000 from the mines.
(d) Although the copper deposits of Hetta Inlet did excite interest and investigation, and some favorable assays were produced, at least partly on the basis of which some development work proceeded prior to the taking date, as of such date there had 'been no significant production and it was not possible to tell, with any reasonable degree of certainty, whether the deposits could be profitably worked. As a pure speculation, someone might have paid something for the copper deposits of the inlet as of the taking date. However, the evidence does not indicate any rational basis for calculating prospective profitability, which would be translatable into a then current market value. Accordingly, no market value can be prescribed for these deposits.
77. Kasacm Bay. (a) Plaintiffs claim that, as of the taking date, 1,500 acres of potential mineral land in the Kasaan Peninsula section of Prince of Wales Island, containing iron, copper, gold, silver and platinum deposits, had a fair market value of $600,000.
(b) The Russians discovered copper ore on the Kasaan Peninsula, a promontory on the east side of Prince of Wales Island, as early as 1865. However, no attempts at development were made then or for many years thereafter.
Numerous lode claims were, however, made by American prospectors in the Kasaan Bay section between 1898 and 1902 and some mines ultimately developed. The most prominent mines in the section were the Mount Andrew, Mamie, Stevenstown, It, Rush and Brown, and Salt Chuck. Here, too, some ore tests were favorable and trade journal reports indicated interest in the area. However, none of these mines became productive until after the date of taking. A 1902 Geological Survey Report (Professional Paper No. 1, “Preliminary Report on the Ketchikan Mining District, Alaska”) stated that mining operations had been limited to shallow open cuts which had not extended beyond 50 feet below the surface, so that there was “but little to guide the investigator besides the surface exposures” (p. 97). Mount Andrew became productive in 1906, the Mamie and Stevenstown in *193 1905, the It in 1909, the Rush and Brown in 1906, and the Salt Chuck in 1907.
(c) Production of the Mount Andrew-Mamie area, which includes the Mount Andrew, Mamie, and Stevenstown mines, amounted to more than 270,000 tons of copper ore between 1905 and 1918. This ore produced 12,800,000 pounds of copper having a value of $2,415,000, 7,000 fine ounces of gold having a value of $143,000, and 56,000 fine ounces of silver having a value of $35,000, a total yield of approximately $2,600,000. The Salt Chuck mine was the only one to continue producing copper ore after World War I. In 1916, platinum deposits were discovered there and production continued until 1926. Total production of all the Kasaan Bay mines amount to approximately 670,000 tons of ore valued at more than $6,200,000, with copper accounting for most of the value.
(d) There is, considering the then state of the development, insufficient evidence to support the assignment of any value to the claimed 1,500 acres of mineral land of the Kasaan Bay section as of the date of taking.
78. Moira Sound, (a) Plaintiffs claim that 700 acres of mineral land, consisting of copper, gold, lead and marble deposits, in the Moira Sound section located on the east side of Prince of Wales Island had a fair market value of $125,000 as of the taking date.
(b) Numerous claims were located in this section in 1898 and 1899 and some mines subsequently developed, principally in three localities, i.e., Dolomi, North Arm and Niblack Anchorage. Optimistic accounts of the area’s potential appeared in trade journals, based largely upon statements of the mines’ owners or operators. However, no significant production from any of the mines occurred prior to the taking and most were not even developed as of such date. None of the mines ever became large producers. Both the Golden Fleece and the Valparaiso mines of Dolomi Region were still being developed as of 1902, neither having had any substantial gold production prior thereto. Active development of the Cymru mine in the North Arm section did not begin until 1906. In addition, the marble deposits in this section, which were of varying quality, were not actively *194 worked until 1904 (by 1906, work ceased and in 1907 all machinery was removed). None of the claims or deposits (gold and copper) in the Niblack Anchorage area had been developed prior to' the taking date. Development of the Dana group of claims (the Copper Cliff mine) did not commence until 1903.
(c) The evidence does not indicate how, on the basis of prospective profitability (profits minus operating costs and costs of development and plant), the claimed value of $125,000, or any value, is justified. Accordingly, no allowance is made for the mineral lands of Moira Sound.
79. 8'howl Arm. ,(a) Plaintiffs claim that 500 acres of mineral land containing gold, silver and copper deposits in the Skowl Arm section of Prince of Wales Island had a fair market value of $50,000 as of the taking date.
(b) The major mining property in this region, the Khayyam mine or McKenzie claims, was located in 1898. Its surface showing of pyrite ore was good enough to generate optimism, but the depth of the vein was unknown as of 1902. Deported sales of a two-thirds interest in 1899 for $40,000 and in 1930 of the entire group of claims for $1 million were not regarded by plaintiffs’ expert as being indicative of true value. The Mammoth group of claims were only being developed in 1902. A1906 Geological Survey Deport indicated unsatisfactory smelter returns from the Khayyam. After 1908 there were no further reports on the mines of this region. There are no production figures or proof of profitable workings.
(c) The evidence, consisting principally of then current optimism, and the development work undertaken both prior to and after the taking, is insufficient to support plaintiffs’ claims.
80. Twelve Mile Arm. (a) Plaintiffs claim that 600 acres of mineral land, containing deposits of gold, silver, lead and copper, in the Twelve Mile Arm section of Prince of Wales Island had a fair market value of $75,000.
(b) There was much prospecting in the Twelve Mile Arm section prior to the date of taking. Mineral discoveries were made in 1899 and the following year the town of Hollis was established, becoming a center of activity. From the *195 period 1901 to 1903, a trade paper, the Mining Journal, contained optimistic accounts of allegedly valuable ore deposits in the section, especially the Crackerjack and Puyallup properties (a 14-ton shipment from the latter allegedly returning an average of $159 per ton). However, there was no significant production of ore prior to the taking date, and even subsequent thereto production in the area did not turn out to be large. Work on the Puyallup was discontinued in 1906. A 1907 Geological Survey Report of the area stated that mining activity had been slight in recent years. Actual evidence of production is absent. Several option agreements, ranging from $10,000 to $100,000, recorded between April 1901 and November 1902, partially relied upon by plaintiffs, are inconclusive as to valuation. (Plaintiffs’ expert admitted these agreements, under which only nominal amounts of cash passed, were not indicative of the extent of any true value.) Since sound production or profit figures or other reliable evidence is not available, no valuation of these mineral deposits can be formulated.
(c) The evidence is insufficient to support plaintiffs’ claim (based largely on early reports of ore grades) that Area 2b was enhanced in value by the mineral deposits in the Twelve Mile Arm section.
81. Shalcan Bay. (a) Plaintiffs claim that 1,200 acres of mineral land, consisting of marble deposits, in the Shakan Bay section on the northwest side of Prince of Wales Island had a value of $100,000.
(b) Reliable evidence of value as of the date of the taking is not contained in the record. Development of the deposits of the Alaska Marble Company, operating on Marble Creek, which were first discovered in 1896, was not commenced until 1904. 'Similarly, operations on the claims of the El Oapitan Marble Company (located in 1901) did not commence until 1904. The Vermont Marble Company’s development, also on Marble Island, although first discovered in 1899, was also based on claims that were not located until 1903. A sale of three marble claims on Klawack Passage (later Dry Bay) to El Oapitan Marble Company for $50,000 was recorded on August 29,1902 (9 days after the taking date), but evidence *196 as to the reliability or soundness of the recorded figure is lacking.
The only evidence as to production of marble or its value are figures relating to total value of all producers in Alaska from 1901 to 1925. (This amounted to $2,629,214. As of 1925 the Alaska Marble Company, which did not commence operations until 1904, was still producing marble from Marble Island. Most of the Alaska marble came from its quarries.) No 1902 value can be ascertained from these figures.
(c) As of the taking date, the evidence is not sufficient to warrant the addition of any value to Area 2b by reason of the marble deposits of the Shakan Bay section.
82. Cholmondeley 8ownd and McLecm Arm. (a) Plaintiffs claim that 500 acres of mineral land in the Cholmondeley Sound section on the east side of Prince of Wales Island had a value of $25,000 and that 100 acres of such lands in the McLean Arm section on the southern tip of the island had a value of $15,000.
(b) No satisfactory evidence supports such valuations. In the Cholmondeley Sound section, there were some 200 claims located, and some development work, prior to the taking date. In themselves, this is hot evidence of value. There is no evidence that any of these claims ever produced minerals. In the McLean Arm section too, substantially all that occurred was the location of claims. General optimistic reports in newspapers and trade journals, based principally on statements of mine owners or superintendents, also cannot be the basis for any assignment of actual value. Despite early optimism concerning the Croesus claims in Cholmondeley Sound, the ore body was found to be of only limited extent and operations were suspended at the end of 1902.

O oronaUon Island

83. (a) Plaintiffs claim that 400 acres of mineral land on Coronation Island had a value of $25,000.
(b) The claim is based on the Volunteer group of 20 claims located in 1900 at Egg Harbor. Allegedly on the basis of a reported sample shipment of 16 tons of ore in August 1901 netting $88 per ton in silver and lead, a lease for 99 years was granted on this property in November 1901 for an alleged *197 rental value of $1,300,000. Plaintiffs’ expert doubted this amount was paid in cash or was valid evidence of value in such amount. Prior to the taking date, the evidence is based only on the claims’ locations, newspaper optimistic reports, and the alleged lease.
(c) The evidence is insufficient to support the claimed value for the Coronation Island mineral lands.

Dali Island,

84. (a) Plaintiffs claim that 250 acres of mineral land on Dali Island had a value of $25,000.
(b) The evidence of value consists of the existence of 106 lode claims prior to the taking, plus an optimistic newspaper report of the gold and silver ore values of the Mt. Vesta group. These are insufficient bases for the assignment of the claimed value.

Kupreanof Island

85. (a) Plaintiffs claim that 250 acres of mineral land on Kupreanof Island had a value of $10,000. The island is the second largest land mass in Area 2b.
(b) The claim is based on the alleged mineral potential of two groups of claims, the Kupreanof and the Portage Mountain, which were located prior to the taking date. As to the former, after prospect work was done from 1900 to 1902, followed by a relocation of the claims in 1902, only the annual assessment work was performed. A 1908 Geological Survey Report stated the position of the deposit was not favorable for economical mining. As to the latter the same report stated that, despite the exposure of mineral-bearing veins in several places, no large ore body had been developed. Value is claimed on the theory that expenditures were made to develop the properties. There was no production of any substance prior to such date.
(c) The evidence is insufficient to sustain plaintiffs’ claim concerning Kupreanof Island.

Summary

86. (a) The mineral resources of Area 2b, for which plaintiffs claim $1,550,000, did not enhance the fair market value of such area in any ascertainable amount.
*198 (b) The fair market value of the mineral lands, ing 11,000 acres, of Areas 2a and 2b combined, for which plaintiffs claim $2,650,000, enhanced their fair market value by the amount of $50,000, i.e., the 200 acres of gypsum deposits.

Other Lards

87. The remaining land in Areas 2a and 2b comprises 448,320 acres. The bulk of this acreage comprises lands with elevations above 2,000 feet, including barren and exposed rocky areas with some peaks rising to 4,000 feet, or muskeg, scrub or shrub areas. However, there are small areas of grassy and arable lands. The 1890 Census refers to “many places along the Chichagof shores where level and even grassy lands invite cultivation.” A 1906 Forest Inspector’s official report on the Archipelago Forest Keserve (Area 2) refers to the arable character of the alluvial deposits at the head of Port Frederick, and to the alluvial flats at the heads of Duncan Canal, Hamilton Bay and Sam’s Bay on Kupreanof Island. Also, there are many grass-covered tide flats which are used for the production of hay for forage for livestock. There is no evidence, however, that there was any significant demand for such lands for such purpose as of the taking date.
88. There are numerous rivers, waterfalls and lakes which combine beauty with excellent opportunties for camping and recreation. The largest and best known lakes are in the mountains along the southern coast. This area affords excellent hunting and sport fishing. However, there is no evidence that there was any recognizable demand of these lands for any such purposes as of the taking date.
89. In 1902 there were nine sites occupied by operating canneries within Areas 2a and 2b, five located on Prince of Wales Island, two on Kuiu Island, and one each on Ku-preanof and Chichagof Islands. In addition, there were numerous salteries, sawmills and mining camps. There were no permanent white settlements in Area 2 in 1902. (However, 5 years later the town of Craig was founded on the west coast of Prince of Wales Island.)
9.0. Plaintiffs claim $66,000 as the fair market value of said *199 143,320 acres, which, is approximately 15 cents per acre ($66,498). The great bulk of this land, admittedly barren, rocky and mountainous, had no economic significance or foreseeable potential, and had no value. The evidence is insufficient to support a fair market value amount for the entire acreage involved in excess of the sum of $10,000.

Fisheries

91. (a) Plaintiffs claim the fair market value of their exclusive right to exploit the fisheries resources of Area 2 was $5,460,000 as of the taking date, of which $5,200,000 is based on the salmon resource as represented by canned salmon, and $260,000 on such resource as represented by salmon products industries other than salmon canning. Since fishing rights of this kind are normally treated as common property, there are no comparable sales which may be used for “market value” purposes. There was a market, however, for fish processing, principally canned salmon, which was necessarily based on the right to fish, so that the value of the fisheries, or the exclusive right to fish, may fairly be measured by the profitability of the fish processing industry. Insofar as this industry would be more profitable than alternative employment of capital at substantially comparable risks, the “excess profit” would fairly be attributable to the income-producing capacity of the fisheries. As in Area 1, plaintiffs have, to arrive at such value, adopted the reasonable method described below.
(b) In 1902, the great bulk of the value of southeast Alaska’s fishery production was represented by canned salmon. In that year, of the 26 canneries operating in all southeast Alaska, nine were located within Area 2. During the 1902 season, these nine canneries had a combined catch of 4,615,000 salmon, which accounted for over 44 percent of the total for southeast Alaska. Their pack of about 303,000 cases of canned salmon was 33.1 percent of the total southeast Alaska output. The ratio of the southeast Alaska pack produced in this area did not differ greatly in the later years in which successive additions to the National Forest were made.
(c) The assumption is reasonable that the fishery resource *200 associated with, an individual area was represented by pi’oportion the area’s pack bore to the total southeast Alaska pack. While in some cases the fish were caught at some distance from the cannery and therefore outside of the boundaries of an area as delineated by the parties, over 90 percent of the fish was caught within the inland waters of the area’s bays, rivers and harbors, rather than in the open waters of the ocean, where principally halibut fishing took place.
92. The value of the output of the nine canneries of Area 2 in 1902 was approximately $845,000. The total canned salmon output of southeast Alaska in 1902 was approximately $2,650,000. The ratio of the value of the pack of the nine canneries to the region as a whole was 31.9 percent. This ratio approximates that of the number of cases of 33.1 percent.
93. The 3-year weighted average price of all species of canned salmon from 1900 to 1902 in southeast Alaska was approximately $3.20 per case. Investment averaged approximately $2.75 per case, and the return on investment was approximately 21 percent, yielding profits of 59 cents per case. Allowing for a 10 percent return on investment, or 28 cents per case, as the return necessary to attract capital, which, on the basis of returns on alternative investments at that time, would be reasonable, the “excess profit” of the canneries attributable to the fishery resource would be 31 cents per case.
94. (a) In calculating the total “excess profit” of the entire fishery operation which a prospective purchaser could reasonably expect to realize, the operation of the independent fishermen, which a purchaser would also have the right to take over, and from whom the canneries were purchasing around two-thirds of their fish, would also have to be taken into consideration. This excess profit is difficult to calculate, but it can reasonably be assumed to have existed to some extent, for the independent fishermen chose to make an investment in equipment (boats, net, gear) to indulge in this activity instead of becoming a cannery worker or other wage earner, and presumably they did so at least in part because of the excess profit accruing to this form of activity. Thus, not all of the *201 profit return attributable to the fishery resource accrued to the canneries or were reflected in their profits.
(b) Plaintiffs claim such excess profit may fairly he calculated as amounting to 3 cents per case, calculated 'as follows:
In 1900 and 1902, the estimated value of the raw fish catch was about 10 percent of the value of the final salmon products, mostly canned. The cost of raw fish per case of canned salmon may therefore be estimated at 10 percent of the price of canned salmon per case ($3.20), or 32 cents per case. On this basis it would be estimated that the fishermen earned an “excess profit” of approximately 10 percent of the value of the raw fish sold, or about 3 cents per case of canned salmon. However, one questionable factor entering the calculation would be the recognized fact that, in dealing with the canners, the independent fisherman could not realize the full value incident to bargaining on equal terms. Yet, fishermen continued to engage in such business in increasing numbers, from which it is reasonable to conclude that the returns justified such activity as against alternative employment.
(c) It -is concluded that the addition of 2 cents per case as representing the excess profit of the fisherman would be reasonable and that such profit, also attributable to the free access to the fishery resource, should be added to the prospective excess profit the exclusive owner of the resource would reasonably expect to realize.
95. A single owner controlling the entire fishery resource could reasonably expect to increase the efficiency of the overall fish-catch operation as against the then existing methods of obtaining the total catch, and thus increase his prospective profits. Estimating the increased profits that would result from anticipated increased efficiency is, however, difficult. A reasonable method of measuring this factor is as follows:
During the early part of the first decade of the century, about one-third of the salmon catch in Alaska was taken by canneries. The unit costs of cannery fishing operations are reasonably estimated to have been approximately one-third less than that of the independent fishermen, principally due to the control by the canneries of most of the traps. Thus, *202 the canneries required a lower investment per Were the canneries to take over the control of the entire fishing operation, it is therefore reasonable to assume that additional income would result from their more efficient methods of operation, and that such income would apply to two-thirds of the catch. Thus the cost of two-thirds of the catch, representing that part taken by the independent fishermen, could be reduced by one-third. This would reduce the cost of the total catch by 25 percent (i.e., the two-thirds of the total catch taken by the independent fishermen accounted for 75 percent of the cost of the total catch. Reducing three-fourths of the total cost by one-third reduces the cost of the total catch by 25 percent.) A savings of 25 percent on the total cost of the raw fish of 32 cents per case produces an 8-cent per case cost reduction as a result of reasonably anticipated improved efficiency in fishing operations relating to the total fish catch. Thus, on this basis the owner of the fishery resource might well earn 8 cents per case in addition to the profits being earned during the period prior to 1902. However, this additional 8-cent profit figure resulting from expected increased efficiency is necessarily based on so many estimates that, although each is apparently reasonable, a conservative investor would be justified in calculating the total additional expected profit due to this factor on a 5-cent basis.
96. A further addition to prospective profits which could reasonably be expected by the purchaser would result from the additional increment to be derived from the economies of private ownership as compared with the earnings that had been realized under a common property exploitation. The exploitation of the fisheries resources as a common, rather than as a private, property obviously reduced their capacity to yield the full return possible under a sole, integrated, private property operation. The wasteful interference of competing fishermen would be eliminated. Transportation and packing facilities would be integrated. Labor and material would be more efficiently employed and duplications eliminated.
While it is not possible to translate accurately into an exact amount the increase in profits that would result from transferring a common property right to a private property right, *203 one reasonable method would 'be to calculate it on the 'basis of approximately 10 percent of the expected reduced costs of fishing under the improved efficiency hereinabove set forth, i.e., 27 cents per case (32 cents as cost of raw fish (finding 94(b) less 5 cents due to increased fish-catching efficiency (finding 95)). Ten percent of 27 cents per case, the expected costs of fishing mider improved efficiency, would thus yield approximately 2 cents additional per case.
97» An estimated excess income of approximately 40 cents on every case of canned salmon sold would thus be reasonably anticipated by the sole owner of the fishery resource, computed as follows:

Cents

Cannery excess profits_ 31
Fishermen's excess profits_ 02
Improved fisfr-eatefi efficiency (traps, etc.)_ 05
Private fishery exploitation_ 02
Total_ 40
98. (a) With respect to the size of the pack against which the excess profit 40-cent figure should be applied, it would be reasonable to conclude that a buyer would have anticipated in 1902 that the salmon pack would increase at the rate of 10 percent a year in response to rising demand, and that returns from the fisheries would rise correspondingly. The salmon industry being still in a stage of extremely rapid growth, he would 'assume, however, that the high rates of increase would not continue indefinitely. On a 10-year forecast, a pack reaching approximately-790,000 oases in 1912 could be anticipated, a level that appeared to be maintainable from then on. Although the perpetuation of a salmon supply could not be guaranteed, there appeared at that time to be no substantial problem, at least for some time, of a supply of fish sufficient to meet such an overall demand, although from year to year there might be variations in the salmon rims. As noted (finding 45), the supply in some streams and rivers (principally due to destructive methods of exploitation) had already been sharply reduced. Nevertheless, the catch of salmon in southeast Alaska had been increasing at the rate of 15 to 20 percent a year, and a prospective purchaser, were he to have control of the entire resource in the area, could anticipate the *204 establishment of more controlled and efficient methods of exploitation.
Similarly, a constantly rising demand could not be guaranteed. The 1902 pack was more than the market could absorb at that time, but generally, the sahnon canning industry was already a well-established one and, on the basis of recent results, the long-range prospect, based both on prospective domestic and foreign demand, was promising. (The Metlakahtla cannery’s pack reached 28,000 cases in 1901, compared with less than 18,000 in 1900.)
On the above bases, and using the production figures from 1896 on as a guide, a prospective buyer in 1902 could reasonably have projected a demand for canned salmon in southeast Alaska based on a 10 percent increase per year for approximately 10 years. The 1902 Area 2 pack of approximately 803,000 cases would thus increase to approximately 791,000 in 1912. Conservatively, the annual increase would not be calculated beyond, and the estimate would be based on a leveling off thereafter, with such amount being maintained up to 1922 (i.e., 20 years from the taking date).
The prospect of the industry’s maintaining its unusual profitability would appear to be reasonably good. This was well recognized as early as 1900. Despite temporary periods of overexpansion and elimination of some marginal canneries (sometimes due to salmon runs in some waters being depleted), the industry was expanding rapidly in southeast Alaska and more capital was constantly being attracted to it. The Alaska Packers Association, operating throughout Alaska, and then packing over half of the total Alaska output, had gross profits of 68 cents per case in 1901 and 61 cents per case in 1902.
A 10 percent annual increase on the 1902 pack of approximately 303,000 cases for 10 years, which would produce 791,000 cases in 1912, and the maintenance of that level for the next 10 years, would result in a 20-year average of approximately 662,000 cases per year.
Conservatively, it would thus be reasonable to project a 20-year estimate on an average annual basis of approximately 650,000 cases.
*205 (b)A prospective purchaser of the fishery resources of Area 2 would thus reasonably estimate that, in his exclusive ownership, annual excess profits would, on a 20-year average basis, equal approximately $260,000, i.e., 650,000 cases X 40 cents per case (and about $316,000 thereafter, although such expectation would be so far in the future, and therefore so speculative, that its use for capitalization purposes would not appear to be warranted).
99. A 10 percent capitalization rate would appear appropriate for 1902 (as it was for 1891). Thus, the value of this aspect of the fishery resources of Area 2, i.e., expressed in terms of the profits reasonably to be expected from operating salmon canneries, would be $2,600,000.
100. (a) There were in Area 2 salmon products industries other than salmon canning. There was some demand for salmon in other than canned form. In 1902, salted, pickled and smoked salmon products represented approximately 3 percent of the total value of the salmon fisheries.
(b) Three percent of $2,600,000, the value of the canned salmon resource, would reasonably represent the value of the salmon fisheries used in salmon products other than salmon canning. This would amount to $78,000.
(c) No significant value would have been attributed to the halibut, herring, or other minor fisheries resources of Area 2.
(d) On the above bases, the fair market value of the fisheries resources of Area 2 on August 20, 1902, was $2,678,000.

Valuation Summary

1Q1. The fair market value of Area 2 as a whole, taking into consideration the contribution thereto made by its forest lands ($504,481.30 (finding 66)), its mineral lands ($50,000 (finding 86)), its other lands ($10,000 (finding 90)), and its fisheries resources in its surrounding and appurtenant waters ($2,678,000 (finding 100)) was $3,242,481.30 as of the date of taking. Each separate classification of land and resources could be exploited in accordance with its highest and best use without significant interference with or reduction of the value of any other.
*206 Aeea 3 — Valuation as OF SEPTEMBER 10, 1907

General

102. (a) Area 3 consists of 1,687,572 acres, almost entirely mainland, in the southeast comer of southeast Alaska. It is a relatively narrow area, measuring approximately 25 miles wide and 95 miles long. It consists of part of the area reserved as the Tongass National Forest by Proclamation issued September 10, 1907. It is bounded on the west by Revillagigedo Channel, Behrn Canal and Unuk River; on the south by Main Passage; and on the east and north by a section of the Portland Canal and a mountain range. Ketchikan is about 25 miles west and Prince Rupert about 30 miles southeast. Many canals, bays and inlets indent at least 125 miles of its borders. The main inlet, Boca de Quadra, extends 80 percent of the distance across the area. The topography is generally rough, steep and broken. The areas bordering tidewater are more moderate in character with lands sloping gradually back from the beach for short distances and then ascending rapidly beyond. Mountainous areas lie along the east and north boundaries but are generally under 7,500 feet elevation. The average elevation for the area is about 2,500-3,000 feet above sea level. All of the forested area is under this average elevation and forms a narrow band along tidewater and in short valleys.
There are several deep-water harbors in the area which would be suitable for industrial plant sites and permit excellent safe anchorage for ocean-going vessels. The Portland and Behm Canals provide protected waterways for such operations.
(b) Plaintiffs claim that the fair market value of this area as a whole, including the resources thereof and the appurtenant fisheries, was as of the taking date $3,151,000.

Forest Lands

103. Of the 1,687,572 acres in Area 3, 63.48 percent or 1,071,271 acres, is forest land, and 36.52 percent is non-forest land. As of the taking date, it may reasonably be estimated that the forest land consisted of 67.25 percent non *207 commercial and 32.75 percent commercial. Of tbe commercial, 22 percent of tbe acreage supported stands of timber considered, in 1907, accessible, and 78 percent inaccessible. Tbe small area of commercial accessible forest land in relation to the total occurs as a very narrow band bordering tidewater in tbe many coves, canals and inlets.
For 'the 1,071,271 acres of forest land, plaintiffs claim $2,389,875.
104. Tbe logging conditions in Area 3 were very favorable. Good stands of timber stood a short distance from tidewater, generally on steep ground. Tbe largest and best quality timber occupied low elevation sites near tidewater. As the heaviest stands occurred near the beach at low elevations, logs cut from nearby trees could easily be pulled into the water and logging costs would be held to a minimum. The downhill pull on logs over favorable grades would be more advantageous to southeast Alaska loggers than would be the case in western Washington about 1907 where loggers were cutting timber at various distances from tidewater, necessitating construction of logging railroads and negotiation of adverse grades in logging and hauling. There was a concentration of old growth timber in several areas along the Behm Canal, with protected harbors, suitable for millsites. Logs cut from nearby shoreside areas could be cheaply towed to these conversion sites.
105. In 1906 and 1907, lumber production in the United States of hemlock, eastern and western, was at a level in excess of 3 billion board feet. However, this was still only a tiny fraction of the available supply in localities more accessible than Alaska. There was still no significant demand, as compared with the total supply, for hemlock. During these years, lumber production of Sitka spruce was at a level in excess of 200 million feet. Also, by this time spruce and hemlock had become established as leading species for pulpwood. Of 3,962,000 cords of pulpwood consumed in the United States in 1907, spruce accounted for over 2,700,000 cords and hemlock accounted for 575,000 cords. However, the demand for these species for pulpwood was still, on an overall supply basis, insignificant.
*208 106. The 1907 date of valuation occurs at a acquisitions 'by private owners of the publicly owned timber-lands of the Pacific Northwest and British Columbia had reached a peak. By this time, nearly two-thirds of the standing timber of the Pacific Northwest had passed into private ownership. The remaining standing timber in this region was for the most part not available for sale, having been reserved by the Government for conservation and other public purposes. In British Columbia, about three-fourths of the standing timber was by this date held under various forms of private tenure, the bulk under licenses renewable for 21 years, with most of the rest under leases or owned outright. The remaining one-fourth was Government-owned timber-lands which, in December 1907 were, as a conservation measure, withdrawn from all forms of alienation.
107. In the Pacific Northwest, the intensive demand for timberlands and the resulting active trading produced peak prices in 1907 for some species of standing timber which were not exceeded until World War I. The increase in 10 years ending about 1907 generally averaged more than threefold. Average per thousand stumpage prices in 1907 of the four leading species of western Washington were reported as follows : for Douglas fir, $2.50; for Sitka spruce, $2.80; for western red cedar, $2.40,* for western hemlock, 90 cents. The 1907 price for each of these species was more than double the price reported for the same species 5 years earlier.
108. Plaintiffs’ claim of $2,389,875 is computed as follows:
(a)’ There were 2,765,623 MBM of live commercial accessible timber of all species, principally hemlock and Sitka spruce (i.e., 1,653,289 hemlock, 922,335 Sitka spruce, 54,484 Alaska cedar, 131,367 red cedar, and 4,148 other) standing on 77,010 acres. Such timber is valued at 70 cents per MBM, totaling $1,935,936.
(b) There were 273,831 acres of forest land which contained timber of commercial quality but which were inaccessible. This acreage contained 8,777,045 MBM 'of hemlock, Sitka spruce and other species. Plaintiffs claim $1 per acre therefor, or $273,831.
(c) There were 720,430 acres, both accessible and inacces *209 sible, of noncommercial timber of unestimated volume, for which, plaintiffs claim, for reasons similar to those already indicated, 25 cents per acre, or $180,108.
109. The fair market value of the forest lands situated in Area 3 was, as of September 10, 1907, $56,266.50, computed as follows:
(a) There were 8,440 acres of essentially pure Sitka spruce stands of commercial grade within the accessible forest area. The active trading 'in the forest lands of the Pacific Northwest, with the resultant sharp increase in price in such lands, including stumpage prices in western Washington, justifies a somewhat higher price than the $1.50 per acre value for southeast Alaska spruce lands found as of 1902 for Area 2. Accordingly, it is concluded that these spruce lands would have had a value of $2 per acre, totaling $16,880.
(b) There were 10,073 acres of essentially pure cedar stands of commercial grade within the accessible area. These too would have had a value of $2 per acre, totaling $20,146.
(c) There were 14,901 acres of mixed spruce-hemlock of commercial quality within the accessible area in which approximately one-half the stand was spruce. This acreage would have had a value of $1 an acre, totaling $14,901.
(d) There were 43,395 acres of predominantly hemlock timberlands of commercial grade within the accessible area. This acreage would have the nominal value of 10 cents per acre (representing a slight ’increase over the 5-cent 1902 price and reflecting the higher stumpage prices for western hemlock being quoted in western Washington), totaling $4,339.50.
(e) There were 201 acres of other species of commercial quality in the accessible area. The record does not substantiate any value therefor.
The above comprises the 77,010 acres making up the commercial accessible part of the forest lands.
The balance of the forest lands, consisting of 273,831 acres of commercial but 'inaccessible timberlands, as well as 720,430 acres, both accessible and inaccessible, of noncommercial timber, would not, 'as timberlands, have made any contribution to the value of the total tract.

*210
Mineral Lands

110. Boca de Quadra Section, (a) Plaintiffs claim that 200 acres of mineral land containing copper and gold deposits in the Boca de Quadra section on the southwestern coast of Area 3 had a fair market value of $5,000.
(b) A number of locations were made in 1907 in this section, some prior to the taking date. Although there was some evidence of mineralization in this region (a 1902 U.S. Geological Survey Report stated that sulphide deposits and workable gold placers “have been reported”, and a trade paper reported that a group of copper claims had been bonded and were to undergo exploration), there is no evidence of any sound basis upon which a prospective purchaser could reasonably estimate the possibility of profitable mining. Accordingly, it cannot be found that this section enhanced the value of Area 3 in any amount.
111. Unule Bwer Section, (a) Plaintiffs claim that 300 acres of mineral land in the Unuk River section containing gold, silver and copper deposits had a fair market value of $5,000.
(b) Placer gold was reported in this section in the early 1870’s, but little attention was paid to the area at that time. References to gold, silver and copper deposits, with some development work being done, were made in a trade paper (The Mining Journal) in 1901. Development work was still proceeding in 1906, according to another trade paper (Mining and Scientific Press). There is no information as to the extent of development or production, if any. Again there is, therefore, no acceptable evidence which would indicate how a prospective purchaser could rationally estimate the possibility of profitable mining as of the taking date. It cannot, consequently, be found that this section enhanced the value of Area 3 in any amount.[12]
*211 112. The evidence does not establish that the mineralized sections of Area 3 would have enhanced the fair market value of the area in any amount.[13]

Other Lands

113. (a) The remaining lands in Area 3 consist of'615,801 acres of nonforest land, for which plaintiffs claim the sum of $92,000, or approximately 15 cents per acre (14.9 cents).
(ib) Approximately 10 percent of the nonforest land of Area 3 is covered by glacier, or permanent snowfields. Most of the rest is covered with scrub or mountains having an elevation in excess of 2,000 feet, including regions in the Peabody Mountains, the Rosseau Range and the Halleck Range, with the backbone of this last range exceeding 5,000 feet in elevation. Lakes abound in this area and there are a number of favorable waterpower stations (although there is no showing that there would be any demand for such power in this area in the foreseeable future). There are shore afeas and delta lands at the mouths of rivers and glacial moraines and tills, some of which are suitable for limited agriculture or as site's for communities and industrial establishments. Game is plentiful.
(c) The greater part of this acreage, 'having no economic significance or foreseeable potential, had no value. The evidence is not sufficient to support a fair market value amount for the entire acreage in excess of the sum of $15,000.

Fisheries

114. The only salmon cannery operating in Area 3 in 1907, located at Mink Arm in Boca de Quadra, was built by the Quadra Packing Company in 1896. It had operated in 1901, 1902, and 1903, but was closed in 1904, 1905, and 1906. It reopened in 1907, and operated intermittently thereafter.
*212 115. The salmon catch totaled 631,000 in 1901 and 34,141 cases were packed, valued at $105,000. The following year the catch reached 741,500 and 39,000 cases of canned salmon were packed, valued at $97,500. However, 5 years later, in 1907, the year of taking, the company reported a pack of only 25,155 cases, valued at $88,449. (The following year, the pack totaled 35,208 cases, valued at $102,387.)
116. The 1907 pack of this cannery represented 2.8 percent of the number of cases produced in southeast Alaska. (In 1908, the proportion was about 3.5 percent.) In earlier years the ratio of the pack in this area to that in the entire region was somewhat higher, amounting to 4.8 percent in 1901 and 4.3 percent in 1902. The value of the pack in 1901 represented 4.7 percent of the total value of the pack in the region. It accounted for a similar proportion in 1902, but only 2.8 percent in 1907 (and 3.3 in 1908).
117. (a) Plaintiffs compute their claim of $660,000 for the value of the fisheries resources of Area 3 as follows:
The canneries of Area 4, which area was taken in 1909, accounted for 364,000 cases in that year. As shown (finding 115), in 1907 the one cannery of Area 3 packed around 25,000 cases, or approximately 7 percent of Area 4’s 1909 pack. Plaintiffs contend that the circumstances and considerations involved in Area 3 as of 1907 were essentially similar to those of Area 4 in 1909. Since, as will be hereinafter shown, plaintiffs value the canned salmon aspect of the Area 4 fisheries at over $9 million, they estimate 7 percent thereof, or $660,000, as the value of the Area 3 fisheries resource.
(b) If the record of the one cannery in Area 3 reflects the value of the fisheries resource in such area, expressed in terms of canned salmon, it seems plain that the value of the resource in this area was not, on a proportionate basis, as great as the other areas. The record of this one cannery was extremely spotty. For 3 years prior to the taking year it was not even operating. (And even after the taking date, it operated only intermittently.) It would seem that, compared with the other areas, there was something wrong with this particular area. Accordingly, to value this area on a strictly proportionate basis to another excellent area is not *213 proper. Further, to base a 1907 valuation on 1909 results, which would not be known in 1907, is again improper.
118. (a) Since the fishery resource of Area 3 clearly had some value, it would seem fair (lacking any better evidence concerning this particular area at the time of taking) to conclude, in view of the inconsistent record of the one cannery in the area, that the profit per case to which a prospective purchaser would look as producing value would be approximately one-half of the 40 cents enjoyed by the canneries of Area 2 as of 1902.
The 1907 pack was 25,000 cases, and a prospective purchaser, in view of the cannery’s past history, would in all probability not have envisaged, for long-term computation purposes, a pack greatly in excess thereof for this particular area. Accordingly, an average of 30,000 cases would appear appropriate against which to apply said profit of 20 cents, making an annual average profit of $6,000. Capitalized at 10 percent gives a value of $60,000 to this aspect of the area’s fishery resource.
(b) There is little information available on the halibut, herring, or minor fisheries catch in this region. The commercial value of the catch does not appear to have been important. Accordingly, no value is assigned to any of the fisheries other than salmon.

Valuation Summary

119. The fair market value of Area 3 as a whole, consisting of 1,687,572 acres, taking into consideration the contribution thereto made by its forest lands ($56,226.50), its other lands ($15,000) and its appurtenant fisheries resources ($60,000), was, as of the date of taking, $131,226.50.
AReas 4a and 4b — Valuation as of February 16, 1909 (Except as to Parcels Patented Prior)

General

120. Area 4 consists of two separate areas which the parties have designated as 4a and 4b, the entire area comprising, as stipulated, 8,457,172 acres. Both parts were 'added to the Tongass National Forest by Proclamation of February 16, *214 1909. Plaintiffs claim that the fair market value of the entire area, including its resources and appurtenant fisheries, was $46,350,000, it being agreed by the parties that the valuation should be as of such date, except as to parcels of land which were patented prior to the taking date, which parcels are to he valued as of the date of the issuance of the patent. Area 4a extends north from Duke Island at the southern end of southeast Alaska to its apex near Skagway. Area 4b is on the North Pacific Ocean at the northwest extremity of southeast Alaska and extends from Yakutat Bay to Dry Bay. Area 4a, approximately 360 miles north and south and varying between 18 and 120 miles in width, consists of a large area of mainland west of the United States-Oanada border, three large islands, namely, Admiralty, Baranof and Revillagigedo, and a number of smaller islands, such as GraVina, Etolin, Wrangell, Mitkof and Kruzof Islands. It is bounded by the Behm Canal, Unuk River and the United States-Canada border on the east, and Clarence Strait, Wrangell Narrows, Frederick Sound, Pacific Ocean, Chatham Strait and Lynn Canal on the west. Area 4b is about 72 miles long, varies in width from 8 to 40 miles, and averages about 25 miles in width. Of the total area of 8,457,172 acres, 53.66 percent is forest land and 46.34 percent nonforest land.
121. The topography of Areas 4a and 4b varies with a wide range of elevations, slopes and Characteristics of relief. Many parts of the area are extremely rough, rugged and broken. There is, however, a large area of forest land with gentle-to-moderate topography. Some forest areas are level or gently sloping, such as on Kuiu and Kupreanof Islands, around Thomas Bay, and at Yakutat. Although elevations vary from sea level to almost 9,000 feet for the area as a whole, the commercial forest timberline is less than 2,000 feet throughout the area.
122. Seven principal towns are established in Area 4a. Ketchikan, at the southeastern end of Area 4a, is the location of Ketchikan Spruce Mills established in 1903 (and, since the taking date, the Ketchikan Pulp Company, which commenced producing dissolving-type pulp in 1954). Wrangell, 85 miles north of Ketchikan, is the site of another operating sawmill, the Wrangell Lumber Company. Petersburg, 35 *215 miles northwest of WrangeE, is also the site of current and past sawmill operations. Juneau, the capital of Alaska, 125 nadies northwesterly of Petersburg in the northerly part of Arpa. 4a, is the location of the Columbia Lumber Company sawmill. Douglas, across Casbineau Channel from Juneau, is adjacent to the famous Treadwell mining area. Skagway, near the northern tip of the area, is a terminus of the White Pass and Yukon Bailroad. Sitka, the first territorial capital of Alaska, situated near the westerly margin of Area 4a, on Baranof Island, is the site of a pulpmill and sawmills.
123. This area has many good harbors, protected waterways, and excellent tidewater locations for logging and milling operations. It also 'has many large Streams, which would be of considerable importance in the event of waterpower development, and which flow westward from extensive glacial systems along the United 'States-Oanada border toward the sea.

Forest Lands

124. There were 4,538,118 acres of forest land in Areas 4a and 4b of which 47.4 percent was commercial and 52.6 noncommercial as of February 16,1909. The commercial forest area was 49.73 percent accessible and 50.27 percent inaccessible. There were 1,069,726 acres of commercial forest land containing 32,305,725 MBM of accessible timber, 1,081,342 acres of commercial forest land containing 32,011,208 MBM of inaccessible timber, and 2,387,050 acres of noncommercial forest land.
Sitka spruce was the dominant type in 19.60 percent of the commercial, accessible forest land, hemlock-spruce stands in 36.33 percent, and hemlock in 55.50 percent. Cedar and hardwood types predominated in the balance in about even amounts. Hemlock made up 61 percent of the total net volume of timber on commercial forest land, Sitka spruce 34 percent, cedar 4 percent, and other species 1 percent.
125. Were there sufficient demand therefor, the stands of timber, located in narrow bands with 75 percent within 2 mEes of tidewater on ground adapted to logging machinery and methods and equipment of the day, could be easily converted into logs, puEed short distances into tidewater and *216 either be stored in one of the many bays, coves or inlets, or transported in rafts by towing to one of many suitable mill-sites close by, where the logs could be converted into lumber or pulp products. The area had a number of natural advantages for such purposes, including many excellent harbors and a wholly interconnecting system of waterways, a favorable climate (comparable to Olympic Peninsula of western Washington or British Columbia) which permitted a long (10-12 months) operating season, more than adequate sources of hydroelectric power, and large supplies of fresh water.
126. (a) The situation with respect to southeast Alaska’s timberlands was substantially the same in 1909 as it was in 1907 (the date of the Area 3 taking). As previously noted, large bodies of timberland in the west were acquired by lumber companies and investors during the 20-year period 1889-1908. By 1909, under the Timber and Stone Act alone, over 12 million acres of publicly owned timberlands had been acquired, of which approximately 10 million were transferred to timberland investors by the entrymen.
(b) In the Pacific Northwest and British Columbia, there were approximately 260 billion board feet of mixed hemlock-spruce. In southeast Alaska at that time there were approximately 151 billion board feet, of which hemlock constituted about 75 percent of the total and spruce 20 percent. The speculation in the western timberlands was for holding purposes only. The actual cut of timber at about this time was only five-tenths of 1 percent of the total timber stand in private hands. Therefore, the great bulk of the lands passing into private hands during this speculative period was sold on an acreage basis, and not on a stumpage basis, which is the basis upon which plaintiffs claim the commercial accessible timber involved in this case. (And even on such stumpage basis, plaintiffs claim the southeast Alaska timber, on the basis of quoted stumpage prices for 1909 in western Washington, would have been worth only approximately one-fourth as much.) And, as noted, while there was, in the Pacific Northwest, a certain amount of hemlock and spruce in the Douglas fir stands, the lands were considered as Douglas fir timberlands. Even as to the pulp industry, of which, by 1909, hemlock was becoming the principal *217 specie used (originally only a small amount was used for pulp, spruce being largely used), the amount cut for this purpose was still only a tiny fraction of tlie total. In forests that were almost entirely hemlock, there was practically no logging. And the hemlock forests of southeast Alaska, because of their distance from such places in the United States as might constitute a source of demand, and the consequent transportation cost problem, would be even less attractive as an investment. In British Columbia, despite the active efforts of the Government to encourage such industry, pulp and paper manufacture had not yet been established on a commercial basis. In 1909, there was only one active mill there that produced only approximately 1,316 cords (although four companies had taken out pulp licenses in 1901).
(c) The total volume of all species of timber in private ownership in the Pacific Northwest alone in 1909 was 1,013 billion board feet. The actual cut that year was only eight-tenths of 1 percent of such amount. An investor in 1909 could hardly have visualized when in the foreseeable future any significant amount of the almost inexhaustible supply of the hemlock forests of southeast Alaska could have been profitably utilized for pulp purposes, which was their then only foreseeable use. As of approximately that time (1910), only one-tenth of a million cords of softwoods, or 500,000 board feet, was cut in the west for pulpwood (none was recorded for 1905). At this rate, it would take hundreds of years to utilize fully the lumber in Area 4.
(d) An investment in timberlands merely for holding purposes involves costs in addition to acquisition costs, such as taxes, interest, and protection. There was, consequently, substantially no demand at that time for pure hemlock stands. Instead, the problem was what to do about the seemingly almost inexhaustible supply of western hemlock for which there was such an insignificant demand. The small demand in the United States for Sitka spruce could easily be met by the ample supplies of the State of Washington for the foreseeable future. Thus, insofar as immediate conversion into cash is concerned, the Sitka spruce of southeast *218 A In,ska, would at that time have been of interest only for local purposes.
127. The average prices for standing timber of the four leading species of western Washington were reported for the year 1909 as $2.30 per MBM for Douglas fir; $2.22 for Sitka spruce; $2.22 for western red cedar; and 99 cents for western hemlock.
128. Plaintiffs claim $24,292,113 as the fair market value of the 4,538,118 acres of forest land in Area 4 as of the taking date, computed as follows:
(a) There were 32,305,725 MBM of live commercial accessible timber of all species, principally hemlock and Sitka spruce (i.e., 19,286,518 hemlock, 11,662,367 Sitka spruce, 549,197 Alaska cedar, 516,892 red cedar, and 290,751 other) standing on 1,069,726 acres. Such timber is valued at 70 cents per MBM, totaling $22,614,008.
(b) There were 1,081,342 acres of forest land which contained timber of commercial quality but which were inaccessible. This acreage contained 32,011,208 MBM of hemlock, Sitka spruce, and other species (20,011,128 being in hemlock and 10,269,707 being in spruce). Plaintiffs claim $1 per acre therefor, or $1,081,342.
(c) There were 2,387,050 acres, both accessible and inaccessible, of noncommercial timber of unestimated volume for which plaintiffs claim 25 cents per acre, or $596,763.
129. The fair market value of the forest lands situated in Area 4 was, as of February 16, 1909, $747,099.20, computed as follows:
(a) There were 209,787 acres of essentially pure Sitka spruce stands of commercial grade in the accessible forest area. The value per acre would be the same as was found for Area 3, i.e., $2, thus totaling $419,574.
(b) There were 46,760 acres of essentially pure cedar stands of commercial grade within the accessible area. These too would have had a value of $2 per acre, totaling $93,520.
(c) There were 174,637 acres of mixed spruce-hemlock of commercial quality within the accessible area in which approximately one-half the stand was spruce. This acreage would have had a value of $1 an acre, totaling $174,637.
*219 (d) There were 593,682 acres of predominately hemlock timberlands of commercial grade within the accessible area. This acreage would have had a value of 10 cents per acre, totaling $59,388.20.
(e) The record does not substantiate any value for the balance of 44,860 acres of other species of commercial quality in the accessible area.
The above comprises the 1,069,726 acres making up the commercial accessible part of the forest lands in the area.
The balance of the forest lands, consisting of 1,081,342 acres of commercial but inaccessible timberlands, as well as 2,387,050 acres, both accessible and inaccessible, of noncommercial timber, would not, as timberlands, have made any contribution to the value of the total tract.

Mineral Lands

■130. Plaintiffs claim that the mineral resources of Area 4, consisting of 93,800 acres of land, had, as of February 16, 1909, or as of the date the lands were patented, a fair market value of $9,677,898. This total comprises 18,800 acres in Area 4a, valued at $9,302,898, and 75,000 acres in Area 4b, valued at $375,000.

Area J¡.a

131. (a) The most prominent mineralized zone of southeast Alaska was the Juneau Gold Belt, located in this area, and extending a distance of approximately 110 miles from Berner’s Bay on the northwest to Windham Bay on the southeast. Placer discoveries were made in the belt, in the vicinity of Windham Bay and Sumdum, as early as 1869. The next major discovery within the belt was made in 1880 when Joe Juneau and Bichard Harris located placer and lode gold deposits on Gold Creek east of where the city of Juneau is now located. In October of that year, numerous locations, including 21 lode claims and 18 placer claims, were recorded. Two claims were located on Douglas Island, to which the belt extended, all the others being on Gold Creek and tributary streams. In December 1880, nine additional lode and 52 placer claims were located in the Gold Creek area. . Prospectors soon spread over much of the area. Locations were made up to 1885, including the Treadwell group in 1881, *220 which, was the most famous, 'and from then to 1895 most of the area was patented and various mining companies formed.
(b) Within a few years after the discovery of the Juneau and Douglas Island mineral zones, the mines of the area attracted international attention and mining experts from both Europe and the United States made frequent visits to the area starting in the late 1880’s. Numerous examinations were made of individual mines 'and properties, but not until 1903 was an organized eff ort made to study and map the entire Juneau Gold Belt. Under the auspices of the United 'States Geological Survey a detailed geological survey was commenced by Arthur C. Spencer, the results of which were published in 1906 as U.S. Geological Survey Bulletin No. 287. The belt was described as including a complex of discontinuous veins of irregular form and occurrence, as well as impregnated rock masses and mixed vein and impregnation deposits, such mixed deposits constituting the ore bodies of the Treadwell mines, the observed depth of the veins in the vicinity of Juneau 'being 4,000 feet. The ore was mainly gold with some small amounts of silver. The vein ores were described 'as containing the largest values per ton, the combined vein and impregnation deposits being intermediate, and the impregnated masses without veins being of such low grade that they could not be mined with profit. The ores of the Juneau region were described as carrying more than half of their gold in a free milling condition, the ores being treated in stamp mills (the free gold being collected by mercury).
(c) It was recognized that the Juneau region on the whole involved the exploitation of low-grade ores and that, where profitable mining was at all possible, well-financed, large-scale operations were required.

Douglas Island

132. (a) Even though the early discoveries were made on the Juneau side of the Gastineau Channel, the mines on Douglas Island were the first to obtain production of major proportions. A party of five prospectors from Juneau crossed the channel on January 27,1881, and made both placer *221 and lode discoveries in the area where the Treadwell mines were later developed. From 1880 through 1909, 85 placer and 612 locations were made on Douglas Island. Most of the pla'cer mining was completed by 1884 by which time the decomposed outcrop of the Treadwell lode had been worked to a depth of nearly 10 feet. The Eleventh Census reported a yield of $12,000 in 1881 and $3,000 in 1882 from the Ready Bullion outcrop, and an estimated $40,000 to $120,000 from the Paris claim between 1882 and 1884.
(b) Commencing with the transfer of the Paris lode to John Treadwell on September 3, 1881, work progressed continuously in the development of the lodes of the area. By May 1882, Treadwell placed 'a 5-ton mill in operation on his newly acquired property.
13,3. AlasTca-Treadwell Gold Mining Company (Alaska Mill and Mining Company'). In 1884, the Alaska Mill and Mini rig Company, organized by Treadwell, commenced operating Treadwell’s Paris claim and a 120-stamp mill was built that year. The claim was patented on March 3,1888, which thus becomes the valuation date. In that year, the mill was expanded to 240 stamps. Production had shown a steady increase since 1884. The total yield in 1885 was around $250,000 from approximately 35,000 tons of ore crushed, the yield being $7.02 per ton. In 1886, almost 91,000 tons were crushed, yielding over $360,000, or $4.03 per ton. In 1887, the total yield was over $476,000 from over 108,000 tons crushed, or $4.40 per ton. In 1888, the total yield was almost $430,000 from over 121,000 tons crushed, with a yield per ton of $3.55. By the end of 1888, the operating profit totaled $729,000, or $2.05 per ton, with dividends of $350,000 having been paid to the company’s stockholders. The 1888 expansion of the mill to 240 stamps resulted in an increase in production in 1889 to over 214,500 tons crushed.
Thus, by the end of 1888, production totaled 354,800 tons which yielded $1,515,323.47 with an operating profit of $729,000, or $2.05 per ton from a recovered value of $4.27 per ton. The first single year for which detailed production cost data are available is 1889 when 214,544 tons were produced *222 with a total yield of $652,490.78 and an operating profit of $308,000. An average yield of $3.04 per ton resulted in an operating profit of $1.44 per ton with operating costs at $1.60 per ton. (For the period June 1, 1890 to May 31, 1891, the yield per ton was $3.58; the total cost of operation and construction per ton, $1.68; and the net profit per ton, $1.90.)
184. (a) In 1888, the state of the property’s development was substantially as follows:
A 540-foot crosscut tunnel had been driven to expose the vein 250 feet below the surface. Drifting on the vein had been extended for 1,360 feet (the last 60 feet having been driven in ore on the adjoining property of the Alasba-Mexi-can Gold Mining Company). Three open pits were connected by raises and drifts to the main haulageway, which terminated at the head of the 240-stamp mill. (By May 31, 1891, approximately $1 million had been spent in developing the mine, plant, and water supply.)
(b) The dimensions of the three pits were 'as follows :

Using a conventional factor of 13 cubic feet of ore in place per ton, the pit dimensions would indicate 15,769 tons of ore per vertical foot of depth.
135. Mineral resources are worth only what they reasonably can be expected to produce in net profits, i.e., returns over and •above the costs of operation and the necessary investment in plant.
On this basis, the following could have been observed and reasonably expected from the Treadwell mineral property 'as of the date of taking:
*223 (a) The property had been and was currently in production and earning a considerable amount of money. Considering the great mass of ore on the property, of which only a small part had been extracted up to the date of patent, the reasonable expectation was that it would continue to be a profitable producer for many years. As such, the property would be recognized as having great value.
(b) The vein had ¡been developed to a depth of only 250 feet below the outcrop, but the position of the zone was well established for a total distance of 7,450 feet along the strike (or through the Ready Bullion claim to the southeast). The character of the vein and general mineralization of the area was of a type which could be expected to continue to depth. The natural relief of the area was sufficient to expose similar mineralized structures over a vertical range of nearly 3,000 feet. No mineralogical change could be detected over the entire exposed range of mineral structures. This suggested that additional depth on the Treadwell vein could be expected without change in mineral content.
(c) The measurements of the three pits indicated that an average of 15,769 tons had been extracted per vertical foot of depth. Open-pit mining, which had been carried on with a glory-hole (a funnel-shaped excavation) connection to the main haulageway, could not be extended beyond the main level. Underground mining below the main tunnel would permit more selective mining than had been practiced in the open-pit glory-hole operation. A tonnage of 75 percent of that obtained per vertical foot in the pits could be expected from underground mining, or 11,826.75 tons per vertical foot.
(d) Production to the end of 1888 was 354,800 tons with an average yield of $4.27 per ton, although such yield had dropped to $3.55 per ton in 1888. Operating 'costs and profits with the 240-stamp mill would reasonably be calculated, at least for 1889, to approximate what they actually turned out to be for such year, the first year of operation with such min, i.e., $1.60 per ton as costs and $1.44 per ton as profits.
*224 136. Based on the above factors, a reasonably prudent prospective purchaser would have made the following estimates for the Treadwell mine:
Total tons of ore indicated to a depth of 1,000 feet— 11, 826, 760
Tons mined to April 1, 1888- 264, 059
Tons remaining to depth of 1,000 feet- 11,562, 691
Anticipated recovery (80%)- 9,250,153
yield per ton (assuming the mining of generally the same grade of ore as in the past)- [14] $3. 00
Total yield_§27,750,459
Total operating cost per ton (including construction and equipment cost of $0.10 per ton during production)- [15] “$1.75
Operating profit per ton_ 1.25
Total operating profit_$11,562, 691
Estimated optimum period of operations for indicated tonnage_ 20 years
Average annual production_[16] 462,508 tons
Average annual operating profit- $578,135
137. A method commonly used to determine the fair price of mineral property is the application of an appropriate rate of return on investments in mining operations to the anticipated earnings of the mining property. In effect, the investor is thus purchasing the right to receive future income. The rate of return which will be required on the investment is a function of the risk involved in any particular venture. Rates range from as low as 10 percent on deposits where the future is relatively secure to as high as 30 percent on properties of high risk. Here, the extent of the development, the established nature of the operation, and the thus far highly successful financial record, were all favorable factors. On these bases, plaintiffs contend that a return of no more than 15 percent would have been required by a pro *225 spective investor. However, in addition to tbe usual problems of such a hazardous venture as mining, this particular operation presented the challenging problem of mining at a profit of what was generally conceded to be, on an overall basis, a low-grade ore. In addition, there would necessarily be problems and risks involved in stepping up production from the then current annual production schedule of 100,000-120,000 tons to the prospective annual tonnage of approximately 462,500 tons, in order to achieve the proposed average annual operating profit of $578,000. For these reasons, 18 percent would appear to be a more appropriate capitalization rate.
138. Since, on the basis of mining to a depth of 1,000 feet, it is assumed that the mine would be fully depleted in 20 years, the value of the mineral property may be computed on the basis of the present value of an annuity for 20 years using a compound interest rate of 18 percent. At an annual average operating profit of $578,135, the value of the Tread-well mine in March 1888 would thus have been $3,094,583 ($578,135X5.3527).[17] Preproduction capital investment for development (calculated on the reasonable basis of 10 cents per ton) would be approximately $925,015 (9,250,153 tons anticipated to be recovered). Subtracting this sum from the total value of the mine leaves a value for the mineral resources, without improvements, of $2,169,568.[18]
*226 139. AlasJea-Mexiccm Gold Mining Company. Omega, Mexican, Oro Fino, and Oro Fino No. 2 claims, which, were patented on September 18,1891 (which becomes the taking date for this property), were located between June 6, 1881 and October 1, 1888. They were situated on the southeast extension of the Treadwell vein. Corresponding millsites for the four claims were located along the Gastineau Channel in 1884. On January 2, 1886, John Treadwell, who had previously acquired title to all of the claims, deeded the Omega and Mexican claims to the Mexican Gold and Silver Mining Company and the Oro Fino and Oro Fino No. 2 claims to the Admiralty Gold and Silver Mining Company. The holdings of the two companies were consolidated on April 24, 1889, and on March 2, 1892, were deeded, for $999,960 in stock of the company, to the Alaska-Mexican Gold Mining Company, a Minnesota corporation under which the mine operated until closed in 1917. In a 500-ton mill test in 1891 the ore was found to contain $7 per ton in gold and to 'be similar to the ore of the Paris.
140. The Mexican mine was recognized in 1890 as being 3,700 feet in length with an average vein width of 45 feet. The vein was opened by an 800-foot crosscut tunnel from which a 900-foot drift ran northwest in the vein. The southeast drift was 500 feet long. The tunnel was connected with the surface by a shaft 140 feet deep. The average elevation of the ledge was approximately 190 feet. These factors, plus the measurement of three surface pits and the tunnel level, indicated the average length of commercial mineralization to be 750 feet, and the average width of the vein to be from 35 to 45 feet. Considering the narrower width and a factor of 13 cubic feet of ore in place per ton, the mine dimensions indicated 2,019 tons per vertical foot of depth.[19]
141. By the end of 1891 the Treadwell mine had extended the workings 120 feet 'below the haulage tunnel, exposing the vein to a depth of 370 feet. With this additional information, the ore bodies on the Treadwell structure could be pro-j eoted to depth with more assurance. The grade of ore in the *227 Mexican mine, as based on the 500-ton test made in 1891, indicated gold values higher than at the Treadwell mine. This small tonnage, however, could not be considered to be representative and the assumption of a grade similar to that established by production at the Treadwell would have been more reasonable. Mining costs as established at the Treadwell mine would reasonably have been considered to be applicable to the Mexican mine.
142. From the above information, which was available by September 18,1891, the following estimates could reasonably be projected:
Total tons of ore indicated to a depth of 1,000 feet- 2, 019,000
Anticipated recovery (80%)- 1, 615,200
Yield per ton_ $3. 00
Total yield_§4, 845,600
Total operating costs per ton (including construction and equipment cost of 10 cents per ton during production)_ $1.75
Operating profit per ton- $1.25
Total operating profit-$2,019,000
143. An operating period of 10 years would reasonably have been estimated for extraction of the indicated reserve of 1,615,200 tons, or 161,520 tons per year, at an annual 'operating profit of $201,900. Lacking the production record which the Treadwell mine had at the time of evaluation, the Mexican mine would have been considered as involving a greater risk, and a prospective purchaser would reasonably have required a 20 percent investment return. Applying to the estimated annual earnings the appropriate 'annuity factor for a 20 percent compound interest rate over a 10-year life of operation, the value of the mine would be $846,465 ($201,900X4.1925) on September 18,1891. Subtracting from this total value a preproduetion development investment of 10 cents per ton, or $161,520, leaves a value for the mineral resources of $684,945.[20]
*228 144. Alaska-United Gold Mining Company. The Alaska-United Gold Mining Company, a West Virginia corporation, was the last of the three major companies on the great Tread-well lode to reach production. The company acquired the property known as the 700-Foot Claim, located between the Paris clia/im of the Treadwell mine and the north end of the Alaska-Mexican mine. The claim, with others, was located in 1881 and patented March 3, 1888. The heady Bullion claims, patented on July 2,1890, were acquired on November 14, 1895.
145. The 700-Foot Claim. The 700-Foot claim had not been extensively developed by March 1888, the taking date. (It was later definitely established, that it held 750 feet of the outcrop of the Treadwell lode.) It was known that the last 60 feet of the southeast extension of the Treadwell tunnel, which had been extended 860 feet, entered this prop-perty at a point where the Treadwell lode was 105 feet wide. Its width decreased to an average of 3'5 feet in the Alaska-Mexican property, and had an average width of 70 feet. The lode showed commercial mineralization at the surface for a length of 250 feet (which was later mined). At 13 cubic feet per ton, these dimensions indicated 1,346 tons of ore per vertical foot of depth for the 700-Foot claim.[21]
146. As the 700-Foot claim was on the extension of the Treadwell lode, the application of mining costs comparable to those established in the Treadwell mine would be reasonable. On the basis of the development in the Treadwell mine by 1888 and the calculations above set forth, the following projection was reasonable:
Total tons of ore indicated to a depth of 1,000 feet_ 1,346,000
Anticipated recovery (80%)_ 1,076,800
Yield per ton_ $3. 00
Total yield-$3,230,400
Total operating cost per ton (including construction and equipment cost of 10 cents per ton diming production) _ $1. 75
Operating profit per ton_ $1.25
Total operating profit_$1,346,000
*229 147. Inasmuch as the 700-Foot claim was on the Treadwell lode, the two properties would best be operated as a single entity. However, considering the lack of development of this claim, with no production from it as of the taking date, the risk involved was far greater than for the already proved Treadwell mine. Accordingly, a return of 25 percent on investment would reasonably have been required. Based on the calculation of 1,076,800 recoverable tons over a 20-year period (the same as the Treadwell, presuming a joint operation), an annual production of 53,840 tons with an operating profit of $67,300 would have been anticipated. Computed on an annuity formula with a compound interest rate of 25 percent over 20 years, the value would have been $266,097 ($67,300X3.9539). Subtracting 10 cents per ton for preproduction development investment, or $107,680, would leave a value of $158,417 for the mineral resources.[22]
148. The Beady Bullion Property. As of the taking date, it was known that the Eeady Bullion ledge, constituting the southeast extension of the Alaska-Mexican, extended for 500 feet along the strike where the average width was 40 feet. It was recognized as valuable property. On the basis of 13 cubic feet of ore per ton, 1,538 tons per vertical foot would reasonably have been estimated.[23] The values obtained from sluicing the outcrop in 1881 and 1882 (about $15,000 being washed out) indicated that values comparable to the Treadwell mine, namely, $3 per ton, could reasonably be expected. From the knowledge of the property and the adjoining properties at the time, the following estimates could reasonably have been made on July 2, 1890, the date of patent:
Total tons of ore indicated to depth of 1,000 feet_ 1,538,000
Anticipated recovery (80%)_ 1,230,400
Yield per ton_ $3.00
Total yield-$3,691,200
Total operating cost per ton (including construction and equipment cost of 10 cents per ton during production) _ $1.75
Operating profit per ton_ $1.25
Total operating profit_$1, 538,000
*230 149v From the projected size of the recovery of 1,230,400 tons of ore, a prospective purchaser would have anticipated a 10-year operation, annual production of 123,040 tons, and an annual operating profit of $153,800. The risk involved was comparable to that of the 700-Foot claim, and a return of 25 percent on the investment would therefore have been required. This property was, at the time of taking, for the most part undeveloped. The first substantial production from it actually did not take place until 1899, over 9 years after the patent date. At such 25 percent rate the property would have had a value of $549,142 ($153,800 X 3.5705). Subtracting 10 cents per ton for preproduction development investment, or $123,040, would leave a value for the mineral resources of $426,102.[24]
15,0. The combined mineral resources value of the 700-Foot claim and the Eeady Bullion property, both belonging to the Alaska-United Gold Mining Company, were, at the respective dates of patent, $584,519 ($158,417 for the 700-Foot and $426,102 for the Eeady Bullion) .[25]
151. Other Properties on Douglas Island, (a) In addition to the Treadwell group of mines, plaintiffs claim $175,000 as the fair market value of seven other properties located on Douglas Island comprising 2,312.71 acres with alleged valuable gold lode deposits, i.e., the Mineral King Mining Company ($25,000) (fractional interests patented January 22, 1901); the Bear’s Nest and a group of adjoining Douglas Island claims ($50,000) (patented between December 26, 1890 and October 1, 1892); the Great Eastern (patented March 18,1901) and Independence Group (patented from April 18, 1901 to November 13, 1903) of claims ($25,000); the Union and Alaska Mining Company group of claims ($10,000) *231 (patented 1891, 1894 and 1898); the Alaska-Consolidated Gold Mining Company group of claims ($5,000) (unpatented as of the taking dates); the Nevada Creek claims ($50,000) (certain claims patented May 3, 1904, and others June 15, 1908); and the Yakima (patented October 10, 1903) and Homestake Groups (unpatented) ($10,000 for both). However, the evidence is insufficient to support an assignment of value 'to 'any of these properties. The amounts claimed are arbitrary values based on such unacceptable factors as the adjoining location of the properties to the Treadwell lode (without any indication, however, that there were investigations sufficiently thorough to justify an informed opinion that the Treadwell veins actually extended to the properties); reports of sales (unverified) for alleged large sums; optimistic newspaper reports (based largely on statements of the owners or operators themselves); the expenditures of certain amounts on the properties (with no indication of success) ; and the mere presence of minerals (low grade), with no significant exploration or any reasonable assurance of profitable mining. There is no evidence that any significant ore body had been discovered on any of these properties. None of the properties ever became a significant producer, either before or after their patent dates.
(b) The mineral resources of Douglas Island, covering in all approximately 2,500 'acres, would, on the basis of the four Treadwell mines or properties alone, have enhanced the value of Area 4a by the sum of $3,439,032. ($2,169,568 — Alaska Treadwell; $684,945 — Alaska-Mexican; $158,417 — 700-Foot, Alaska-United; $426,102 — Ready Bullion, Alaska-United.)

Gold Creek

152. Gold Creek, the mouth of which is at Juneau, and emptying into Gastineau Channel, drains an area of less than 10 square miles in extent. From its head to Juneau is only about 5 miles. Geologically, this river basin is within the Juneau Gold Belt. The area was discovered in August 1880 by Juneau and Harris who found rich gold gravels as well as specimens of quartz float containing free gold. Following up the stream they discovered auriferous quartz. They staked both placer and quartz claims and carried away to Sitka almost 1,000 pounds of ore. The strike caused great *232 excitement and in November a party of 30 left Creek, arriving in December and making numerous locations. This small group grew and founded the town of Juneau. This new gold field created much activity in 1881 and the entire region was prospected. The first work in the area was placer mining, the prospectors naturally seeking the quickest returns with the least expense. Many miners made several dollars a day working on the gravel deposits in Gold Creek and its tributary streams.
153. (a) During the early years after discovery in 1880 the deposits of Gold Creek were worked as numerous individual holdings. Small under-financed companies operated under extreme handicaps in attempting to develop the gold deposits of the district. A 1906 United States Geological Survey Bulletin (No. 287, “The Juneau Gold Belt, Alaska”), recounted the history of mining operations and production of the first 22 years of operation. It reported that no entirely reliable estimate of the total production of the Gold Creek placers and quartz mines up to that time could be made. One 1884 estimate of production in the three prior years of $450,000, or an average of $150,000 per year, was referred to, as was another estimate of $400,000. Data supplied by William Ebner and Thomas S. Nowell of Juneau, who were then engaged in mining, showed a total output between 1881 and 1903 of approximately $1,700,000. An estimate based on incomplete data in the annual reports of the Director of the Mint indicates that production may have been nearly $2,800,000. The bulletin then concludes that about $2,250,000 “may be fairly taken as representing an approximation to the true value of the output from Gold Creek”, of which the quartz mines produced about $1 million, the Nowell placer approximately $400,000, and the small placers, “which were mostly exhausted before 1890”, an estimated $850,000. (p. 60.)
(b) Official mining records show that 574 placer and 589 lode locations in the Gold Creek section were recorded in the 30-year period from 1880 through 1909. In the period from 1880 through 1889, there were 440 placer and 264 lode locations. New placer locations declined to 102 in the following decade and to 32 in the 10 years from 1900 through 1909. *233 New lode locations were 172 from 1890 through. 1899, and 153 in the following 10 years through 1909.
154. Gold Creek Placers. The placer deposits were actively worked during the early years of the Gold Creek mines. The locations were classified by the miners as hill (those situated between the gulches west of Silver Bow Basin), gulch (those in the beds of minor streams), and creek (those in the broad gravel valleys along Gold Creek) claims. The higher grade deposits on the hillsides and gulches were soon exhausted by individuals and small groups working by simple-hand methods. After being worked profitably during the early years, they were practically exhausted and abandoned by 1890. They had produced gold valued at between $600,000-$800,000. The larger, lower grade creek placers, requiring more organized development, were worked periodically for a longer period of time. The placer deposits were derived from gold-bearing quartz veins occurring in a band of rocks 2,000 to 3,000 feet wide. The mineral zone was exposed for a length of almost 4 miles within the Gold Creek basin. Three large areas, the Last Chance, Middle iFlat, and Nowell placers, and several smaller areas, received attention for a number of years.
155. (a) The Last Chance placer claims, located in the lower part of Gold Creek less than a mile from Juneau, were patented on June 8,1892. These placers were not suited for small-scale operations, but it was not until 1897 that the property was brought under single control (the Last Chance Hydraulic Mining Company being organized in 1898). During the summer of 1900, some work was done to bring the property into production and subsequent operations were carried out during the summer of 1903 by the Jualpa Mining Company, the then holder of the property. In the summer of 1905 the company erected a large derrick, built a dam to control the waters of Gold Creek, and constructed 'a flume 4,250 feet in length and 20 feet by 9 feet in cross section. As of 1906, the value of the property was Still unknown, the 1906 Geological Survey Bulletin stating that “the value of the ground will doubtless be known to the owners” as a result of the flume (p. 84, n. a). There were numerous recorded sales of the Last Chance placer claims. The first sale on February *234 23,1898, conveyed title to the 21 claims for $45,000. Between June 4, 1901 'and May 11, 1903 several other sales were recorded in which both fractional and 100 percent interests were conveyed at values ranging from $1,000 to $599,400. Plaintiffs concede these sales data are not a reliable measure of value.
(b) Plaintiffs claim the Last Chance placer claims enhanced the value of Area 4 by $50,000 as of the talcing date of 1892. Since it still was not known as late as 1905, 13 years after the taking, what, if any, value the property had insofar as profitable mining is concerned, plaintiffs’ valuation cannot be accepted. (The record does not indicate how much, if any, gold was ever produced from this property.)
156. (a) The Middle Flat placers, involving 11 claims, were patented on May 6,1891. As of such date, there was no significant production nor is there any indication of value in any specified or even approximate amount based on reasonably anticipated production. (As late as 1906, the Geological Survey was unenthusias'tic about the value of these placers, concluding that the conditions under which the gravels accumulated were unfavorable for bed rock concentration, and that there did not seem to be any valuable amount of gold distributed through the gravels except along the west side.) The Nowell placers, constituting 172 acres, located 'at the upper end of Silver Bow Busin, near the head of Gold Creek, were patented between 1891 and 1895. Both the Middle Flat and Nowell placers were Owned by the Silver Bow Basin Mining Company. The Geological Survey Bulletin in 1906 reported the consolidation of various claims in the Nowell placers in 1889, the completion of a drainage tunnel in 1891, the operation of two hydraulic monitors from 1891 to 1901, when litigation interrupted 'operations, and the extraction in this 11-year period of between $350,000 and $400,000 from only around 20 acres of ground. The Survey subsequently reported that the production for 1895 to 1901 had been “nearly $500,000 in gold” and that operations were resumed in 1905. In two succeeding years, 1907 and 1908, a small 'amount of work was reported. Obviously, by 1895, it was known that this property was a valuable one, production having taken *235 place since 1891. However, the record does not indicate how profitable this production was.
In October 1889, a mortgage for $100,000 was executed by the Silver Bow Basin Mining Company in favor of the International Trust Company to raise money for the purchase and development of the Silver Bow Basin placer ground. A sale on July 13, 1889 purportedly conveyed interests in various claims for $35,000. Two other transactions recorded in December 1891 included mortgage bonds in the amount of $100,000 and a bond for $300,000 secured by the claim of the Silver Bow Basin Mining Company, but the reliability of these figures is not established.
(b) Plaintiffs claim that the placers of the Silver Bow Basin Mining Company enhanced the value of Area 4 by $100,000. The Nowell placers obviously had some value. The evidence fails to support any significant value for the Middle Flat placers, or to justify the claimed $100,000 value for both.
157. Several other placer claims within Gold Creek were patented between 1889 and 1907, five of which covered 51.69 acres, including two groups, the Specimen Gulch (patented June 19, 1889) and the Lurvey placers (patented February 6,1892). Both groups were involved in transactions during the early years of the camp, when the best locations were first exploited. Plaintiffs claim $10,000 for all five groups of claims, but the basis for this valuation is not shown.
158. Plaintiffs claim that the aforementioned Gold Creek placers, constituting 293.49 acres of patented placer claims, had the total fair market value of $160,000 as of their respective patent dates. It is concluded, however, that the record would not support a value for these placers, the most valuable of which were the Nowell placers, in excess of $50,000. On an 11-year total production basis of $350,000 to $400,000, between 1891 and 1901, the Nowell placers produced an average of approximately $35,000 per year. Placer mining was not as costly 'as lode mining, and production continued for many, years, indicating at least some degree of profitability.
159. Gold Creek Lode Deposits. Plaintiffs claim that 708.35 acres of patented lode claims, and 2,498.16 acres of unpatented mineral claims (which, together with the 293.49 *236 acres of patented placer claims, make a total of 3,500 acres in the Gold Creek area) had a fair market value, at the several dates of their taking, of $3,067,596.
160. (a) The development of the lode mines of the Gold Creek area began in 1881, shortly after the discovery of the area in 1880. For many years the operation's were conducted by small, poorly organized, under financed, companies which, considering the great problems presented by the area, lacked the considerable technical skills that were required. In later years, after the consolidation of holdings and much costly testing and development work, during which losses were incurred, profits were finally realized. The outstanding mine was that of the Alaska-Juneau Gold Mining Company.
(b) The basic problem to the successful, profitable development of the area was early recognized to be that inherent in miriing ore of such low grade. While the area as a whole appeared to have enormous amounts of such low-grade ore, the mineralization was irregular, the ore was not of uniform grade throughout, and it took years of testing and development before the extent of the various deposits in the area could be ascertained with sufficient certainty to justify large-scale production.
161{. Plaintiffs’ $3,067,596 claim is based on a supposed common ownership and development of all the lode deposits in the Gold Creek area through one main operating tunnel located near tidewater (despite the several taking dates) and is computed as follows:
As of the several patent dates or as of February 6, 1909, it could have been reasonably estimated that there were ore reserves (to the depth of the hypothetical tidewater tunnel) of 130,000,000 tons which, on the basis of a 20-year operation, would result in 6,500,000 tons mined per year. Only 50 percent of this tonnage, or 3,250,000 tons would, however, be milled. At an estimated yield of 85 cents per ton mined, the total annual yield would be $5,525,000 (6,500,000 X 85 cents), with an operating cost, however, of $3,737,500, composed of $2,925,000 as the costs of mining (general mining expenses, taxes, and marketing, estimated as 45 cents per ton (6,500,000 tons X 45 cents = $2,925,000) and $812,500 *237 as the cost of milling (3,250,000 tonsX25 cents=$812,500)), thus leaving a total annual operating profit of $1,787,500, or 27.5 cents per ton. An annuity, based upon such $1,787,500 annual operating profit with a high risk compounded 25 percent return on investment, computed on the basis of a 20-year life, produces a value of $7,067,596 ($1,787,500 X 3.9539), from which, however, is deducted an estimated $4,000,000 as the cost of the plant required before production, leaving a net value of $3,067,596.
162. (a) From 1881 to 1903, mills ranging from 5 to 30 stamps to test and work the ores were installed at the location of numerous claims throughout the area. During this period, approximately $1 million in gold was produced.
By 1905, three principal companies evolved from consolidations of many individual holdings, the Ebner Gold Mining Company, organized in 1895, the Alaska-Juneau Gold Mining Company, organized in 1897, and the Alaska-Perseverance Mining Company, organized around 1899, later taken over first by the Alaska-Gastineau Mining Company and then the Alaska Gold Mining Company.
Included in these properties are some that were patented as of 1887,1889,1890,1891,1897,1900,1901, and 1902. Further patents were granted in 1908.
By 1904, considerable tunnel work had been performed on the Perseverance property. The Alaska-Juneau mine had been operating a 40-stamp mill, principally for experimental purposes, for 5 years. In 1904, approximately 25,000 tons were milled. The Ebner property was operating a 15-sfcamp mill and had produced approximately 80,000 tons.
(b) From 1905 to 1910 (embracing the 1909 taking date) work continued seasonally on these three major properties on only a relatively small scale. Underground development at Alaska-Juneau was at approximately 3,000 feet. The mine’s operating record from 1901 showed an average yield of 86.2 cents per ton at a cost of 14.9 cents for milling and 42.3 cents for mining, for an operating profit of 29 cents per ton. Alaska-Perseverance’s tunnel work was extended t o 2,500 feet. A 100-stamp mill was built by 1908. Its ore *238 zone bad been opened for 1,100 feet in length and widths of 60-80 feet. Plans for heavy investments preliminary to large-scale production were being made with respect to all three properties.
163. By 1909, a competent mining engineer-geologist could reasonably have concluded, as a result of the Ebner, Perseverance, and Alaska-Juneau operations up to that time (which operations were more experimental than commercial), that the Gold Creek Juneau lode contained a huge tonnage of low-grade ore that very probably could be mined at a commercial profit if operated on a large-scale all-year basis. This would demand low cost underground mining, sea level mills (to obtain all-year water for milling purposes, thus avoiding the freezing of fresh water at higher levels), and a continuous supply of cheap power.
164. (a) By February 16, 1909, there were 708.35 acres of patented lode claims in the Gold Creek area. The evidence does not support any individual values, as of the several patent dates, of these small properties. It was obvious at such early dates that only low-cost large-scale operations of these low-grade deposits would have any chance of success. It was only as of the 1909 taking date, when an additional 2,498.16 acres of unpatented claims were taken, that all the holdings, both patented and unpatented, would have ■been brought under common ownership, with a reasonable opportunity for profitable development.
(b) As of such February 16, 1909 taking date, plaintiffs’ basic claim, as computed above, is reasonable, except that the following adjustments should be made:
While as early as June 19, 1887, the date of the earliest patent, there was, as shown by the mineral locations and the mine development that had taken place since the 1880 discovery, a general knowledge of the extent of the Gold Creek mineralized zone, nevertheless, as of such February 16, 1909 date, the testing and development work, on a total area basis, was far from complete. Furthermore, the area was not of uniform mineralization. The Juneau Gold Belt was divided into poorly defined ore bands. It would seem there *239 fore, that a prudent investor would, on the basis of what was then known, have based his calculations on ore reserves to the depth of the contemplated tidewater tunnel of 100 million tons instead of 130 million.[26]
In addition, the annuity based upon the estimated annual profit should be at the compounded interest rate of 30 percent, the highest risk rate, rather than the proposed 25 percent rate. Considering the tremendous challenge presented in the profitable operation of this mass of low-grade ore, the highest risk rate would be warranted.[27]
On these bases, plaintiffs’ figures would be adjusted as follows:
On a 20-year anticipated operation, 5 million tons a year would be mined, and 2,500,000 tons milled. The total annual yield would be $4,250,000 (5 million tons X 85 cents). The total annual operating costs would be $2,875,000 (cost of mining = 5 million tons X 45 cents = $2,250,000; cost of milling = 2,500,000 tons X 25 cents = $625,000). The total annual operating profit would be $1,375,000 ($4,250,000 — $2,875,000). The annuity based upon such profit with compound interest of 30 percent, computed for a 20-year life of operation, indicates a fair market value for the Gold Creek section of the Juneau gold lode as of February 16, 1909 of $4,559,225 ($1,375,000 X 3.3158). Deducting the $4 million *240 plant investment leaves a net fair market value for all the lode deposits, both patented and unpatented, of $559,225.[28]

Montcma Basin

165, (a) Plaintiffs claim that, as of their taking dates, the mineral potential of 500 acres in the Montana Busin section, which includes McGinnis Creek, Peterson Creek, Windfall Creek, 'and Eagle Eiver, and lies on the northwestern extension of the Juneau Gold Belt, having a length of 15 miles and an average width of 5 miles, enhanced the value of Area 4 by $100,000.
(b) Placer mining began in this section on Montana and Windfall creeks as early as 1882. Development, however, failed to produce more than a minimum wage. Although *241 renewed attempts at placer mining were continued through the years, no significant production resulted. However, quartz outcrops were discovered and lode mining began soon after the early placer discoveries. New claim locations were being made up to the 1909 taking date. Development was carried on at Montana Creek, Peterson Creek, Auk Bay, and Eagle Eiver. The only significant production, however, was from the Eagle Eiver mine.
166. The Eagle Eiver mine area was discovered in 1902 and development and production began in 1903. Between 1903 and 1905, the mine, with a 20-stamp mill, produced gold valued at approximately $250,000. Some ore samples averaged as high as $30 per ton, but it was recognized, in this low-grade ore belt requiring high tonnage production, that such an average could not be maintained in actual production. Production decreased during the years 1906-1907 as a result of faulting of the ore body, but further development work below the faulted area showed the vein to be in place. Three claims representing the main workings of the mine were patented on September 8, 1906. In that year, however, production dropped to $22,177, and in 1907 to only $16,350. In 1908, however, production was $97,218, and in 1909, $50,746. There is no evidence of operating costs and profits, or construction costs, before or during production, either for the production preceding the valuation dates or for that which followed in the few years after the valuation dates.[29]
187. (a) Plaintiffs claim that the ore comprising the Eagle Eiver mine, encompassing 200 acres, had a fair market value as of the patent taking date of $75,000. The mine was an operating and producing one of some substance at the taking dates, although production had fallen off sharply in 1906, the patent year. It was recognized in 1904 that the three ore shoots then 'being mined were of limited extent. However, additional ore Shoots were subsequently mined. Production increased sharply in 1908. While cost data is lacking, continuous production since 1903 indicates profitability. It is not possible to determine what portion of the deposit and pro *242 duction. of the entire mine was from tbe three 'areas patented on September 6, 1906. It is also not possible to determine the knowledge as of 1906 or 1909 as to how much of the deposit, insofar as known valuable ore shoots are concerned, remained. For these reasons, it is concluded that the evidence supports no more than a value of $25,000 for the area comprising the Eagle Eiver mine (approximately 200 acres, including the three claims of 56.019 acres patented in 1906).
(b) Plaintiffs claim $25,000 as the fair market value of 300 other acres in the Basin, 40.11 acres of which were patented on November 12, 1900. Only very limited investigation was undertaken during or before 1909, and only ore with too low a grade was found. No extensive prospecting was begun until 1910. There is no evidence of significant production at any time, either before or after the valuation dates (some patents were granted after 1909). There is insufficient evidence to support the claim that the mineral deposits of these 300 acres added in any way to the value of the land of Area 4a as of the valuation dates. The mere grant of patents does no’t, in and of itself, create value.

Berners Bay

168. The Berners Bay section is at the northeast extremity of the Juneau Gold Belt, approximately 50 miles northwest of Juneau. Mining activity hi the section was centered around Sherman, Johnson and Ophir Creeks located on the peninsula between Berners Bay and Lynn Canal. This section ranks second only to the Douglas Island-Gold Creek section in the abundance of auriferous mineralization. There were several mining companies active in the section and a number of patents were acquired prior to the 1909 taking date. The prominent mines were the Comet, Kensington, Johnson, Ophir, Jualin, Fremming, Indiana, Horrible, and Ivanhoe. Plaintiffs claim $302,500 as the fair market value, as of their respective taking dates, of 1,433.16 mineral acres.
169c Oomet Mine, (a) The Comet mine consisted of 11 lode claims and four millsites patented on August 1,1894, and two additional claims, all comprising 273.81 acres, for which plaintiffs claim $100,000. Development work began prior to the 1894 patent date, and production began soon after and *243 continued into 1901. This mine was one of the earliest locations in the section and, in a 1906 Geological Survey Bulletin (No. 284, “Report on Progress of Investigations of Mineral Resources of Alaska”) was described as “the greatest gold producer” of the area (p. 32).
(b) Yields were reported for two annual periods, a's follows: $200,000 for the year preceding June 1895, the first productive year; and $125,000 for the year 1896. Total yield for the entire 1894-1901 period was about $460,000 from over 50,000 tons of ore. There are no data in evidence concerning the ratio of operating costs to profits, or the required pre-production investment. While the situation as of the 1894 patent date as to the then value is not entirely satisfactorily disclosed by the evidence, it is apparent that the ore was recognized 'as a rich low-grade type of great depth. The Tread-well development 'had already indicated the possibility of profitably exploiting such a deposit. A fair market value of $50,000 'as of August 1,1894 for the 273.81 patented acres is justified.
170. Jualin Mine,. This mine, located on Johnson Creek, was the second of the two major producing mines in the Ber-ners Bay section (the Comet being the first). Four lode claims, comprising 77.57 acres, were located in 1895 and patented on March 20, 1900, which acreage plaintiffs claim had a fair market value on such date of $100,000. A millsite was patented on October 8,1908.
171. (a) In 1896, the mine was purchased by the Jualin Mines Company which opened the property and operated it until 1901. Thus, on the March 20,1900 taking date, it was operating and producing with a 10-stamp mill, which had been operating over 2 years, and during which time approximately $200,000 in gold ore had been produced, the ore averaging $8.40 in gold to the ton. This was almost as good as the $9.20 ore of the Comet mine. The record contains no data, however, as to the costs or profits. Three parallel veins were exploited. The west vein, exposed for 400 feet in length and averaging 5 feet in width, was the most valuable. It was developed to a depth of 200 feet.
(b) After 1901, it appeared that the greater part of the ore lying near the surface had been extracted, and, according to *244 a 1911 Geological Survey Bulletin (No. 446, “Geology of the Berners Bay Region, Alaska”, p. 45), “Heavy inflow of surface wa/ter impeded the extraction of the ore on the deeper levels, and the mine has been operated only intermittently since 1901.” There is no evidence as to whether the condition could reasonably have been anticipated on the patent date. During 1909, the mine was idle.[30]
172. Although cost and profit data are lacking, as is evidence of knowledge in 1900 concerning the adverse conditions that were encountered shortly after 1901, it seems plain that the property had value as of the patent date. $25,000 would constitute the fair market value of the 77.57 patented acres as of such date.
173. Other Berners Bay Properties. The evidence is insufficient to support the following claimed values, or the finding of 'any significant value, for the following Berners Bay mineralized acreages:
Area: Amount Acres Claimed
Kensington group— 289.12 [31] $50, 000
Johnson mine-59.19 [32] 20, 000
Ophir mine_ 255.31 [33]10,000
Kremming property-110. 33 [34] $5, 000
Indiana group_ 153. 86 [35] 2, 500
Horrible group-83.11 [36]10, 000
Ivanhoe mine_ 130. 86 [37] 5, 000
*245 174. The evidence is sufficient to support a finding that, as set forth above, 351.38 acres (273.81 of the Comet property and 77.57 of the Jualin mine) in the Berners Bay section would have, as of their respective taking dates, enhanced the value of Area 4 by the sum of $75,000.

Hollcliam Bay-Bwmdum

175. Holkham Bay is a wide inlet on the east side of Stephens Passage, 16 miles south of Port Snettisham. The now-abandoned town of Sumdum is located at the head of Sanford Cove on the south side of the Endicott Arm of the *246 bay. The major mining activity in the Sumdum area of the bay centered around property located 2.5 miles inland from Sumdum. The Sumdum Mining Company was the holder of the property consisting of six lode claims and two millsites. Four of these claims and the two millsites were patented on January 18,1899 by their then owner, the Bald Eagle Mining-Company. The Sumdum Chief lode claim, adjoining these claims on the west, was not patented until after the 1909 taking date, but was consolidated with the Bald Eagle property when the claims were merged to form the Sumdum Mini rig Company on February 1, 1899. The Croney claim, adjoining the Sumdum Chief on the west, was patented on March 19, 1902. All of these claims were contiguous and located on the same ledge. The main development was on the Bald Eagle and Sumdum Chief claims, the Bald Eagle group covering the largest portion. The other claims were developed in conjunction with it. Plaintiffs claim $75,000 as the value, as of their respective taking dates, of 500 acres comprising the six lode claims (four patented on January 18, 1899, one patented March 19,1902, and one unpatented as of February 16, 1909) and the two millsites (patented on January 18,1899).
176. (a) The Bald Eagle group, discovered in 1889, was sold in 1894 to the Bald Eagle Mining Company which operated the property until 1899, when the claims, after being patented by the company on January 18, 1899, were, on February 1, 1899, sold to and thereafter operated by the Sumdum Mining Company. From 1894, when operations commenced, to the 1899 patent date, the property was productive, with yields of approximately $17,500 in 1894, $87,000 in 1895, $90,000 in 1896, and $32,000 in 1897. The evidence does not indicate the 1898 or subsequent yields, but the mine was operating, with plans being made for consolidation with the adjoining Sumdum. property, which did take place in early 1899. The success of the Bald Eagle mine led to the erection, in the summer of 1897, of a 10-stamp mill on the Sumdum property.
(b) The- decline in production which commenced in 1897 was apparently due to a shift in emphasis from exploitation *247 of known deposits to exploration for further ore bodies. It must have been realized that the established commercial deposits would be soon exhausted, for actually the last of the developed ore was reached by 1903 and was then being mined while the search went on for other ore bodies. It was found that the new ore bodies discovered after 1899 did not maintain their value at depth. The search for more ore bodies in 1903 failed to reveal anything of further importance. The mine was closed in the autumn of that year and a portion of the plant removed.
(c) It seems plain that, although still producing, production was, when the four Bald Eagle claims and the two millsites were patented on January 18, 1899, on the decline. The owners must have realized that the original deposits were approaching exhaustion. Future success would depend on new ore body discoveries. Obviously the situation was quite speculative. The claim patented in 1902 would appear to have had little value and the unpatented claim plainly had no value as of 1909, with the mine closed since 1903. As of January 18,1899, and March 19,1902, the fair market value of the property patented, together with the unpatented claim, all comprising 500 acres, did not exceed $25,000.

Port Snettisham

17.7. (a) Port Snettisham has its entrance on the northeast side of Stephens Passage, 30 miles southeast of Juneau. There were two producing mines in the Port Snettisham section, the Friday and the Crystal, both of which were the property of the Alaska Snettisham Gold Mining Company, which began operations in 1899.
(b) The Friday mine was the first property developed by the company. However, its ore was not of high grade and operations ceased in 1904. There were no reports of production from this mine 'after this date. The property was unpatented as of the general taking date.
(c) The quartz ledge at the Crystal mine was discovered in 1895. Operations were first undertaken in 1901-1902 and during this time the mine produced approximately $25,000 in gold with a 10-stamp mill on the property. In 1903 the mine was purchased by the company and rapid development *248 commenced, including 1,000 feet of tunneling and a well-equipped 20-stamp mill erected close to the shore at Snet-tisham. In 1904 mining continued. By the end of the year most of the developed ore was stoped out and milled. Early in 1905 the company discontinued operations at the Snettisham mill, the ore from the Crystal mine being treated in the mill located on the property and yielding profitable returns. Production was continued on the Crystal mine each year until September 1910, when operations were suspended. None of the property was patented as of the general taking date.
(d) There were other claims in the Port 'Snettisham section, on four of which fractional interests were allegedly sold on five occasions between 1891 and 1905 for values ranging from $1,500 to $5,000, and five reported as having been sold in 1901, and again in 1907, for $20,000. There is no evidence of any production from or development on these claims. A1956 Bureau of Mines Report (“Studies of Snettisham Magnetite Deposit”) states that “sporadic gold mining was continued in the [Snettisham] area until the early 1930’s” (p. 6). There is no record, however, of when this mining activity took place.
(e) There were 400 acres of mineral land in the Port Snet-tisham section as described above. Plaintiffs claim $10,000 therefor, $5,000 of which is attributable to the remaining mineral potential of the Crystal mine as of February 16,1909, and $5,000 to the properties described in subparagraph (d), such value being predicated principally on the alleged sales, and the reported continued production, thus allegedly indicating value before the taking date.
(f) The only value to this area substantiated by the evidence is attributable to the Crystal property which was still producing in some measure at the taking date. Plowever, since most of the ore was exhausted at such date, and there is no indication that any search for new ore bodies was meeting with any success, it is hardly likely that any prospective purchaser would have paid any substantial amount for the then residual value of the ore body.
The sales of claims on the other properties in unverified amounts is an insufficient basis upon which to predicate value *249 of unproductive, undeveloped property. Plaintiffs themselves value the land at a figure much below what the recorded sums, if accepted as correct, would seem to suggest.
This section would not, as of the taking date, have enhanced the value of Area 4 'by any amount in excess of $1,500.

Thome Arm

178. (a) Thorne Arm is a wide deep-water indentation on the south coast of Revillagigedo Island, approximately 11 miles long and 5 miles wide at its maximum point. Mineral locations, however, were confined to an area extending no more than 2 miles from the coast line, with the major activity in the vicinity of the now-abandoned port of Sea Level. The principal claims in the section were the Sea Level on the northeastern coast of Thome Arm, and the Sea Breeze, a northeast extension of the Sea Level claim and located on the same vein.
(b) 8ea Level Mine. The Sea Level claim, located on May 25, 1897, but unpatented as of the 1909 taking date, was worked only in 1900 and again in 1902-1903, after preliminary development yielded specimens of good gold value. It was, however, after a considerable investment, including a 30-stamp mill and a water power plant, shut down in mid-1903 “probably owing to the lack of sufficient ore to supply the 30-stamp mill and the costly method of handling the ore”, according to a 1905 Geological Survey Bulletin (No. 259, “Report on Progress of Investigations of Mineral Resources of Alaska in 1904”, p. 67). Thereafter, beyond the requisite assessment work, the mine was untouched until 1938. In 1907 the mine was sold at a foreclosure sale to the lien holders for $84,492.77. Plaintiffs claim $25,000 as the Value of the mine and some adjoining claims in 1909 “notwithstanding the owner’s inability to develop it [the mine] profitably”, value being predicated largely upon alleged high offers for the property in 1900 and 1901 and the general optimism about the 'area at that time. However, since the mine lay idle since 1903 presumably because of lack of sufficient ore of commercial quality, it is concluded that the property would have an insignificant fair market value as of the 1909 taking date.
*250 (c) Sea Breeze Mine. The Sea Breeze claim, located on May 25, 1897, and patented on October 2,1902, was a northeastern extension of the Sea Level claim, the vein being traceable continuously through both properties. However, at the patent d'ate, it was recognized that the Sea Breeze ore was less consistent (more “spotted”) in value than the Sea Level claim. Nevertheless, in 1902 the Sea Level claim was justifiably considered to have substantial value. Ore specimens assayed high, and a 1902 Geological Survey Report (Professional Paper No. 1, “Preliminary Report on the Ketch-ikan Mining District, Alaska, 1902”, p. 66) described the mineralization in two parallel veins and the extent thereof, including random fragments chipped by the author-geologist which assayed at $65.12 in gold. The mine was being extensively developed at the time. The 30-stamp mill was installed and being successfully operated in 1902, when the Sea Breeze claim was patented. Since the Sea Level claim then had value, the Sea Breeze, although recognized as being somewhat less valuable, would, as an extension of the Sea Level, also have had value at that time (although in 1909 it too would have not had any significant value). The problem is that the record does not contain evidence of a 1902 value of the Sea Level property, plaintiffs’ claim for such property being predicated on a 1909 taking. Plaintiffs’ claim of $15,000 for the Sea Breeze appears to be related to their $25,000 claim for the Sea Level, plaintiffs conceding the Sea Breeze property was less valuable. However, as shown, plaintiffs’ 'Sea Level valuation was as of 1909, 'after it had been demonstrated as not having significant commercial value. Thus, comparisons are erroneously being made as of different taking dates. As of 1902, when the Sea Level property was considered to have substantial value, plaintiffs’ claim of $15,000 for the adjoining Sea Breeze property is reasonable. Although undeveloped and not productive in 1902, its ore could, as an extension of the adjoining Sea Level property, have been handled by the Sea Level 30-stamp mill which was then in successful operation.
(d) Other Locations. The only evidence regarding the *251 232 other claims in the Thome Arm section (229 lode and 3 placer), for which plaintiffs claim a value of $5,000 as of February 16, 1909, consists of recorded sales prices for 39 of the claims in the years before 1909, the average sales price for five claims appearing to be $192.86. However, value cannot be predicated upon the mere existence of claims or on reported but unverified sales prices.
(e) The fair market value of the 960 acres of mineral lands on Thorne Arm, for which plaintiffs claim $45,000 as of their respective taking dates, was $15,000, all of such value being attributable to the Sea Breeze property as of October 2, 1902.

Brad-field Oanal

179. (a) This canal indents the mainland opposite the southeastern shore of Wrangell Island. Marble deposits were discovered on Ham Island, located at the north entrance of the canal. Plaintiffs claim $5,000 for 400 acres of such deposits.
(b) These marble deposits, exposed for 50 feet high and 100 feet long, were reported by the Geological Survey in 1905 (Bulletin No. 259, “Beport on Progress of Investigations of Mineral Resources of Alaska in 1904”, p. 6) to be favorably situated and of good quality. The marble contained few jointing cracks, and tests indicated suitability for building and ornamental purposes. In 1908, the Survey again reported (Bulletin 347, “The Ketchikan and Wrangell Mining Districts, Alaska”, p. 198) that “wide areas of massive marble have been found directly underneath the soil”, noted the absence of cracks in the deposit, and its good quality for quarrying. It further noted its purity. Much exploratory work had been done by that time. The Survey reported that large blocks of marble had been quarried and used locally, and that “the properties are favorably located both for quarrying and transportation” (p. 198).
(c) These excellent marble deposits clearly had value as of February 16, 1909. Plaintiffs’ claim in the amount of $5,000 for the 400 acres covering the deposits is reasonable.

*252
Other Mineral Lands in Area J¡.a

180. There is insufficient evidence to support the following claimed values, or the finding of any significant value, for the mineralized acreage in the following sections or areas:

Aeres Amount

^rea. claimed claimed
Sheep Creek_ 250 [38] $50, 000
Salmon Creek_ 250 [39] 5,000
Lemon Creek_ 400 [40]10,000
Yankee Basin_ 500 [41]25,000
Windham Bay- 1, 000 [42] 30, 000
*254 Area: Acres clowned Amount claimed
Taku Inlet_ 400 [43] $25, 000
George Inlet_ 550 [44] 27,500
*255 Area: Aeres claimed Amount claimed
Tongass Narrows-300 [45] $20,000
Gravina Island_ 650 [46] 35, 000
Cleveland Peninsula-1,200 [47] 97,000
*257 Area: Acre.s Amount claimed claimed
Woronkofski Island. 300 [48] $2, 500
Weowodski Island-500 [49] 30,000
Stikine River. 100 [50] 5,000
Unuk River-300 [51] 5, 000
Silver Bay_ 1,000 [52] 60,000
*259 Area: Acres Amount claimed claimed
Rodman Bay_ 500 [53] $50,000
Admiralty Island_ 500 •[54]10, 000

*260
Area J¡b

181. (a) The north westernmost part of southeast Alaska, located between Dry Bay on the southeast and Yakutat Bay on the northwest, is designated by the parties as Area 4b. The only claim made by plaintiffs concerning value enhancement of this area by minerals relates to the presence of petroleum therein.[55] Plaintiffs claim a value of $5 an acre for 15,000 acres of oil lands, or $375,000, as the fair market value of such acreage for its petroleum potential on February 16,1900.
(b) A reference to reports 'by natives concerning the existence of petroleum in the area between Lituya and Yakutat Bays was made in the Eleventh Census Report, 1890. Some 10 years later, there appeared a newspaper account (The Skagway News, December 22,1900) of the discovery in such area of “vast oil fields.” During the summer and fall of 1903, many oil claims were located along the coastal area of this region, 459 oil claims of 160 acres each being recorded in the Sitka Recording Office for the area between Yakutat and Dry Bays. However, as of the 1909 taking date, there was no exploration or any informed knowledge or opinion as to the value, if any, of this petroleum acreage. The only technical report of the area appeared in a 1906 Geological Survey Report (Bulletin No. 284, “Report on Progress of Investigations of Mineral Resources in Alaska in 1905”) *261 which concluded that: “There seems little reason to suspect the presence of oil here” and that “Altogether the prospect of finding petroleum here seems very slight” (p. 63). There is nothing in the record to indicate that this 1906 situation was not the same as of the 1909 taking date.[56]
(c) The evidence is insufficient to support the assignment of any value, as of February 16, 1909, to the petroleum de posits of Area 4b.[57]
Summary — Mineral Lands
182. In summary, the fair market value of Area 4 was, as of February 16, 1909, or as of the respective patent dates as above indicated, enhanced by the following several mineral *262 sections in the following amounts (all in Area 4a, the first six being located in the Juneau Gold Belt) :

Section Marlcet value

Douglas Island (finding 151 (b))-$3,439, 032
Gold Greek (findings 158,164)- 609,225
Montana Basin (finding 167(a))- 25, 000
Berners Bay (finding 174)- 75, 000
Holkbam Bay-Sumdum (finding 176(e))- 25,000
Port Snettisham (finding 177(f))- 1,500
Thorne Arm (finding 178(e))- 15,000
Bradfield Canal (finding 179(e))- 5,000
Total_ $4,194,757

Fisheries

183. Plaintiffs claim the fair market value of their exclusive right to exploit the fisheries resources of Area 4 was $10,380,000 as of the taking date, of which $9 million is based on the salmon resource, as represented by canned salmon; $450,000 on such resource as represented by salmon products industries other than salmon canning; $800,000 on the halibut fisheries; $80,000 on the herring fisheries; and $50,000 on the miscellaneous fisheries, including shellfish, whales, and fur-bearing aquatic animals.
184. With its very long coastline and numerous excellent harbors and anchorages, the area incorporated in the Tongass National Forest in February 1909 has consistently accommodated a larger share of the fisheries industries than any of the other additions to the forest reservation. Also, major centers of the industry were located in some of the townsite enclaves in the area, notably Juneau, Ketchikan, Wrangell, Petersburg, and Sitka.

Salmon

185. As throughout southeast Alaska, salmon canning has represented by far the major branch of the fisheries industry in Area 4. In 1908, eight canneries operated in the area with a combined output of 364,003 cases. One of these was located at Yakutat; one on the mainland at Taku, southeast of Juneau; one each at Ketchikan, Petersburg and Wrangell; and three in the general vicinity of Cleveland Peninsula and Behm Canal.
*263 186. (a) In 1908, the eight canneries in the area accounted for 36 percent of the cases packed hi southeast Alaska as a whole. In 1891,1902,1907, and 1909, the corresponding ratios ranged between 40 and 42 percent. (In 1925 the ratio was close to 50 percent.) The value of the salmon pack of the eight canneries in 1908 amounted to $1,162,000 and represented over 37 percent of the southeast Alaska total that year.
(b) By species, the value of canned salmon produced in the Area 4 canneries in 1908 ranged in importance from about 51 percent for kings to 31 percent for chums. As in southeast Alaska as a whole, pink salmon accounted for approximately three-fifths of the physical volume and half of the dollar volume of the total pack of the eight canneries.
187. The same basic method of fisheries resources valuation heretofore described and employed in valuing such resources in the previous areas, particularly Area 2, would reasonably be applicable to Area 4. Its application to the situation in the area as of February 16, 1909 produces the results set forth in the following findings. Because so little of 1909 is involved, the valuation will generally be based on the period ending with the year 1908, data being available on annual bases.
188. The 3-year average price of all species of canned salmon from 1906 to 1908 in southeast Alaska was approximately $3.30 per case. The average rate of return on investment in the salmon canning industry of southeast Alaska during 1907 and 1908 was approximately 20 percent. The average investment per case of canned salmon was about $2.75 per case for 1907 and 1908. Thus, the per-case return on investment was about 55 cents in 1907 and 1908. Allowing for a 10 percent return on investment, or 28 cents per case, as that return necessary to attract capital in the industry, the “excess profit” of the canneries attributable to the fishery resource would be 27 cents per case.[58]
*264 189. For the same reasons as are set forth in finding 94, there should be added to the excess profit which a prospective purchaser of the exclusive fishery resources of the area could expect to realize the excess profits which were also realized by the independent fishermen.
The rapid rise in the number of persons employed in fishing in southeast Alaska during the first decade of the century compels the inference that some excess profit was earned by the fishermen above their costs, including costs of depreciation on gear and the equivalent of salary to the fishermen.
Plaintiffs claim such excess profit as amounting to approximately 7 cents per case, calculated as follows:
The estimated value of the raw fish catch was approximately 20 percent of the value of the final salmon products, mostly canned, in 1908 (as well as 1905, the closest year to 1908 for which the record contains such data). Thus, the cost of the raw fish per case of canned salmon may fairly be estimated at 20 percent of the price per case of canned salmon ($3.80), or 66 cents per case. On this basis, it would be estimated that the fishermen earned an “excess profit” of approximately 10 percent of the value of the raw fish sold, or about 7 cents per case of canned salmon (10 percent X66 cents; actually a 614-cent figure would be more accurate).
However, as noted in finding 94, the difficulties inherent in the making of an accurate calculation of this kind indicate the advisability of reducing the 7-cent result produced by the application of the assumptions upon which the figure is based.
It is concluded that the addition of 4 cents per case as representing the excess profit of the fishermen (i.e., twice the amount found 'as the 1902 fishermen’s excess profit) would 'be reasonable and that such profit, also attributable to the free access to the fishery resource, should be added to the prospective excess profit the exclusive owner of the canneries would reasonably expect to realize.
190. The same considerations set forth in finding 95 pertaining to Area 2 apply to Are'a 4 in the calculation of the amount to be added to the excess profit figure to reflect the reasonably anticipated improved efficiency of a one-owner *265 large-scale cannery fisliing operation making, among other things, greater use of traps. Thus, 'as a basic preliminary estimate, it could here too be estimated that there would be a saving, through improved efficiency in fishing operations, of approximately 25 percent of the total cost of the raw fish catch of 66 cents per case, or 16 cents per case (see finding 95). However, this additional figure is so difficult to estimate accurately and is, necessarily, based on so many estimates that a prudent investor would be justified in reducing it, for the purpose in question, to 10 cents per case.
191. The same considerations set forth in finding 96 pertaining to Area 2 apply to Area 4 in the calculation of the amount to be added to the excess profit figure to reflect the reasonably anticipated additional increment to be derived from the economies of private ownership as compared to common property exploitation of the fishery resource. Using the same formula indicated in finding 96, i.e., 10 percent of the anticipated reduced costs of fishing, results in the addition of approximately 5 cents per case for this factor (cost of raw fish — 66 cents, less 10 cents due to increased fish-catchingefficiency, resulting in a net cost of 56 cents, 10 percent of which is approximately 5 cents).
192. An estimated excess income of approximately 46 cents would thus be reasonably anticipated by the owner of the fishery resource on every case of canned salmon sold, computed as follows:

Gents

Cannery excess profits_ 27
Fishermen’s excess profits_ ,4
Improved efficiency in catch techniques_ 10
Effect of private ownership_ ¡5
Total_ 46
193.To estimate the size of the pack against which the 46-cent profit figure is to be applied, the years prior to 1909 would have to be used as a guide.
From 1898 to 1908 the total southeast Alaska pack had, on an overall basis, increased at the rate of around 15 percent a year. 1908 was a peak year. Although, following the excessively large 1902 pack (finding 98) of approximately 900,000 cases, the pack declined in 1903,1904, and 1905, with *266 only approximately 425,000 cases being packed in 1905, was a recovery commencing in 1906, so that in 1908, over 1,000,000 cases were packed.
A prospective 'buyer in early 1909 would have been justified in projecting a demand for canned salmon in southeast Alaska for the next 10 years based on a rate of increase of approximately 8-9 percent a year. A rate of increase of 8.5 percent a year would project a demand for 1918 of 2,100,000-2,400,000 cases. As was the situation with Area 2 (finding 98), and considering the variations to which the industry was subject on a short-term or year-to-ye'ar basis, such as the quite drastic declines experienced in the 1902-1905 period, the annual increase would, conservatively, not be calculated beyond, and the estimate would again be based on a leveling off thereafter.[59] Area 4’s proportion of the total pack would mean that by 1918, the 'area’s pack would reach 819,000 cases and that such amount would be maintained through 1927 (i.e., 20 years from the taking date). This would result in a 20-year average of approximately 700,000 cases (actually, 702,500). Applying the 46-cent profit figure per case to such 20-year average 700,000 case figure gives a prospective annual average profit of approximately $322,000.
194. A 10 percent capitalization rate would appear appropriate as of the beginning of 1909 (as it was for 1902 and 1891). The situation was not, for this purpose, markedly different in 1909 than it was in 1902. Thus, the value of this aspect of the fishery resources of Area 4, i.e., expressed in terms of the profits reasonably to be expected from operating salmon canneries, would be $3,220,000.[60] The right to take salmon from the waters of the area was the key to the profit *267 able canning industry, and exclusive ownership of that right would reasonably be expected to enable the owner to realize the profits indicated.
195. (a) As in Area 2 (finding 100), there were in Area 4 salmon products industries other than salmon canning. The sales of these industries (pickled, dry-salted, and smoked salmon; fresh, frozen, and mild-cured salmon; and fertilizer and oil products) were, in 1908, 5 percent as great as those of canned salmon.
(b) Five percent of $3,220,000, the February 16,1909 value of the area’s canned salmon fishery resource, would reasonably represent the value of the fisheries used in salmon products other than salmon canning. This would amount to $161,000.

Halibut

196. During the period 1906-1909 the halibut industry was centered in Petersburg, Juneau and Ketchikan, with fish being taken from the waters of the proximate sounds and straits. There were no landings of halibut in 1908-1909 reported outside of Area 4. Accordingly, it would be appropriate to include the entire southeast Alaska halibut catch in this area. The Puget Sound fleet which fished for halibut in Alaskan waters during this period was stationed for the winter fishing season in the Petersburg area and its Catch is also attributed to such area.
19,7. There was a 1906 glut in the halibut market, followed by price declines in 1906 and 1907. As a result, less fish were taken during the October 1906-March 1907 season than that of 190A-1905, and the gross proceeds were less than in any of the two preceding years. However, the period thereafter, including the year 1909, was one of optimistic outlook for the halibut fisheries of the area. In view of the building of a new $250,000 processing plant at Ketchikan, opened in September of that year, the plans for opening additional plants, and the expansion of the halibut fishing fleet, the industry was known to be on the verge of a great expansion. The catch was increasing and prices were rising. The catch in 1908 was approximately 5.5 million pounds, valued at $174,500. (Investment, exclusive of working capital, in *268 creased from $340,000 in 1908 Lo $1,200,000 in 1910. In the same time production and sales quadrupled.)
198. The data do not provide a direct measure of the profitability of the halibut fisheries, but, considering the rate of investment, the inference is reasonable that it was at least as profitable as salmon. The profit on canned salmon which would attract an investor was, as shown, 46 cents per case valued at $3.30, or 13.94 percent of such selling price. On this basis, on February 16, 1909, a prospective purchaser of the halibut resources in and adjacent to the area would similarly anticipate an annual profit of approximately $25,000 ($174,500 X13.94=$24,325.30). Capitalizing such income at 10 percent results in a $250,000 valuation for the exclusive right to take halibut in Area 4 and adjacent waters.[61]

Herring

19,9. Southeast Alaska was a prime fishing ground for herring, and this fish was abundant in the waters in and adjacent to Area 4a, the fish being found in most of the bays, sounds and straits. From 1900 to 1910 the herring was mainly a source of oil and fertilizer. The year 1908 represented a period of recovery of the herring industry from the slump of 1906-1907 to about 80 percent of the previous peak of 1905.
200. (a) At the time here involved, the Alaska Oil and Guano Company was the principal company producing herring products. In most years prior to 1900, the annual herring catch of the company (and its predecessor) varied between 33,000 and 94,000 barrels. In 2 years, 1886 and 1887, the catch reached 110,000-111,000 barrels, but in 1 year, 1896, dropped below 28,000 barrels. The fish was sold fresh for food, as well as salted and smoked. In addition, herring oil was produced and sold largely in San Francisco, New York and England for such purposes as tanning and soap. *269 Also, herring fertilizer, or guano, was being used in the sugar fields and orange groves of Hawaii and California, and there were other miscellaneous uses for herring products. In that period (prior to 1900), 1892 appears to have been the company’s best year, the value of its herring products totaling approximately $116,000. The poorest was 1896, such value being approximately $36,750. Between 1900 and 1910, the herring fishery developed slowly. However, some new firms did enter the industry, although the Alaska Oil and Guano Company continued to be the principal producer and the only manufacturer of oil and guano. The total value of herring production in southeast Alaska declined from $80,000 in 1905 to $46,000 in 1907. However, herring output value in southeast Alaska increased in the next 3 years to $68,000 in 1908, $96,000 in 1909, and $114,000 in 1910. The Alaska Oil and Guano Company’s 1909 total was approximately $75,000 and approximately $95,000 for 1910. The company reported “net revenue” for 1910 estimated at $11,180 on its sales of $95,000. Its investment was variously valued at $60,000 and $100,000. Available data indicated profits of about 12 percent on sales and 12 to 18 percent on investment. However, it was recognized that returns in the herring industry were generally smaller than in the salmon industry so that these percentages were apparently too high. The herring processors caught most of the fish they used and the profits accrued both from taking and processing. Though subsequently the industry became extremely profitable, in 1909 it did not appear to offer exceptional prospects for expanding profits.
(b) As of February 16, 1909, it would have been reasonable for a willing buyer to have projected annual earnings from the herring fishery in Area 4a at about $3,000. Such a buyer would reasonably have capitalized these earnings at 10 percent, thus producing a fair market value of $30,000.

Miscellaneous Fisheries

201. (a) Plaintiffs claim $50,000 as the fair market value as of February 16, 1909 of the miscellaneous fisheries appurtenant to Area 4.
(b) The entire crab catch in southeastern Alaska was taken at Juneau, Ketchikan and Wrangell. The whale fishery in *270 dustry was located on the southern tip of Baranof Island. The fur seal industry during the period to 1909 was centered in Sitka. Substantially all of southeast Alaska’s output of these fisheries may reasonably be attributed to Area 4. In addition other aquatic furs and skins and miscellaneous fish were reported in the area. While it is not possible to determine what portion of the total volume of each species was produced inside or out of Area 4, it would be appropriate to include approximately 90 percent of the reported value for southeast Alaska in the 1909 taking area.
(c) The miscellaneous fisheries, including shellfish, whales, fur-bearing aquatic animals, such as seal, otter, beaver and muskrat, and various species of fish, such as sablefish, cod, trout and flounder, accounted for products in 1908 valued at between $100,000 and $200,000, in a total production of $3.6 million of fish and fisheries products. However, many of these minor fisheries were marginal a't the time and few appeared very vigorous, although the products included some which were thought to have bright future possibilities. A large part of the value of the product originated in whaling, which was a declining industry There do not appear to be reliable data as to the extent of the profits, if any, of these fisheries. Plaintiffs’ claim of $50,000 is expressed in terms of the amount a prospective buyer would have paid for the exclusive right to exploit these resources in Area 4, but no explanation is made as to how this figure is arrived at or upon what it is based.
(d) Plaintiffs’ claim of $50,000 is unsupported. Furthermore, the relevant data contained in the record concerning these fisheries is too insubstantial for the assignment of any value as of February 16,1909.

Smvmary

202. In summary, the fair market value of all the fishery resources in Areas 4a and 4b as of February 16,1909, was as follows:
Salmon (findings 194, 195)_$3,381,000
Halibut (finding 198)- 250,000
Herring (finding 200(b))_ 30,000
Total. $3, 661,000

*271
Townsite and, Settlement Land

203. (a) Within the boundaries of the area added to the Tongass National Forest in 1909 certain defined tracts of land were specifically excepted from the Forest. These excepted tracts included the land of all 12 existing permanent towns and settlements within the forest boundaries, as well as surrounding land which was to be available for future expansion of the towns and settlements. These towns 'and settlements were Juneau, Douglas, Treadwell, Sitka, Wrangell, Peters-burg, Ketchikan, Snettisham, Sumdum, Windham' and Lor-ing, as well as a tract of land which encompassed the town of Skagway.
(b) Subsequently, by the Proclamation of June 10,1925, a part of certain of these excepted tracts (Juneau, Douglas, Treadwell, Sitka, Wrangell, Petersburg, Skagway, and Ketchikan) and all of the other excepted tracts (Snettisham, Sumdum, Windham, and Loring) were added to the Forest. Each of these excepted tracts as originally defined by the 1909 Proclamation, as well as the parts later added to 'the Forest by the 1925 Proclamation, and the townsite and settlement tracts which continued to be excepted from the Forest, are delineated on a diagram which is attached to the 1925 Proclamation.
204. Plaintiffs claim that the eight principal settled areas of Juneau, Douglas, Treadwell, Skagway, Ketchikan, Sitka, Wrangell, and Petersburg, all located in Area 4a, had, as of the pertinent taking dates of the acreage valued therein, special value as townsite and settlement lands which added to the overall value of the area as a Whole. (The four small settlements of Snettisham, Sumdum, Windham, and Loring are considered in connection with the overall valuation of “other land” of Areas 4a and 4b.)
205. The eight principal towns in Area 4a evolved as the natural result of economic development. Their growth in the 1900-1910 period rested largely upon the rising output of the gold and fishing industries in the region. The towns served the trading area of southeast Alaska, including the relatively isolated salmon canning and other fishing centers, mining camps, and fur trading stations. The increased incomes in the area, derived mainly from gold and salmon *272 production, generated increased demands for goods and services in tbe principal towns.[62] The increased economic activity naturally produced a similar growth in population, made up of migrant fishermen and cannery operators, prospectors, entrepreneurs, and settlers. The white population increased from 1,738 in 1890 to 8,707 in 1910, at a rate of about 9 percent per year. During this period, the native Indian population decreased slightly.
206. (a) The growth of the townsites in Area 4 was attributable to a variety of economic factors. The town of Skagway originated and grew instantly at the discovery of gold in the Klondike region of interior Alaska. Its only purpose was to serve as a communications center tying in the ocean passage from the United States with the overland passage (by mule and later by railroad) to the points of access to the gold regions. Its boom was short-lived, apparently ending after the turn of the century when alternative transport routes to the gold fields became available and the original momentum of the first gold discoveries lost its force.
(b) Juneau and Douglas, on the other hand, while originating with the discovery of gold in the 1880’s, developed into well-established communities based on the local gold mining activities, and- grew with that industry. By outracing the other towns in Alaska both in production and promise, Juneau became the new official capital of Alaska in 1898.
(c) The fishing industry was the cause of several new communities, principally Petersburg and Ketchikan, and assisted in the development of the older communities of *273 Wrangell and Sitka. These towns served as locations for salmon canneries and transport and trading centers for outlying fisheries. Ketchikan in particular experienced a relatively sharp rise in population, from 286 to 1,184 between 1900 and 1909. Petersburg, while not attaining the stature of Ketchikan, experienced an increase in white population from 26 to over 400 during the same period. Wrangell, an older community and the site of a United States Army outpost, also experienced a spurt of growth of white population from 71 to 434 during the first decade after the development of the salmon canning industry in Alaska. The oldest of the white communities in southeast Alaska, Sitka, experienced its growth more slowly and sporadically between 1867 and 1900, and declined thereafter.
207. With the growth of the white communities in Area-la, the land in the townsite areas increased in value. The towns were surveyed and in most instances incorporated. Most of the townsites were patented so that title to town lots could be secured. The areas chosen for townsites, being essentially centers of economic activity, located at or near mining, fishing, and fur-trading sites, were preferred locations, in terms of terrain, for townsite growth. They had good port facilities and were close to the most direct oceangoing traffic lanes. The increase in property values in each town reflected the increase in the number of business establishments servicing the growing settled areas. These establishments became the center of town and the demand for the choice locations increased.
208. The act of March 3, 1891, provided for the establishment of townsites and for the survey and sale of plots therein under rules and regulations to be prescribed by the Secretary of the Interior. In order to acquire title to land in townsites, a majority of the persons occupying land in town areas had to petition the General Land Office for the appointment of a trustee and for a survey of the townsite into lots, blocks, streets, alleys, and municipal reservations for public use. The trustee was to set a valuation for each lot and to assess upon each lot an amount sufficient to defray the cost of -the subdivisional survey. Title to the occupied individual lots was to be conferred by the trustee to the *274 bona fide occupants. Unoccupied land included in the town-site survey was to be sold at auction for a price no less than that deemed by the trustee to be the fair market value of the lot.
209. The total area of the tracts excepted from the Forest in 1909 which included the principal settled areas (Juneau, Douglas, Treadwell, Skagway, Ketchikan, Sitka, Wrangell and Petersburg) comprised 142,800 acres. By the Proclamation of June 10,1925,79,440 acres of these excepted tracts were added to the Forest, leaving 63,360 acres of land still excepted as townsite tracts. Of these 63,360 acres, 20,460.56 acres are classified by plaintiffs as townsite and settlement land for purposes of valuation. Of these 20,460.56 acres, parcels totaling 1,417.49 acres were patented prior to February 16, 1909. Value is claimed for each such parcel as of the date of the issuance of the patent. The value of tracts comprising a total of 19,043.07 acres which had not been patented by February 16, 1909, is claimed as of February 16, 1909. The distribution of this land by townsite is as follows:

Ju/neau-Douglas Area

210. (a) Juneau extends over an area about 1 mile long and 34th mile wide on the mainland and on the west shore of Gastineau Channel. Douglas, the twin city of Juneau, is on Douglas Island on the west shore of Gastineau Channel, and extends south and north for a distance of about 3 miles on the east shore of Douglas Island. The two cities are separated by Gastineau Channel and connected by the Juneau-Douglas bridge.
*275 (b) Tlie growth of the town of Juneau is illustrated in the development of its business establishments over the period 1890 to 1905. During the winter of 1880-1881, five general merchandise stores were established and many saloons appeared. Miners and frontiersmen came in from Wrangell and British Columbia. By 1890, Juneau had a good number of sidewalks and the principal streets were graveled. The stores were stocked and there were many residences. There were over 60 -business concerns, including nine general merchandise stores, 20 saloons, hotels, restaurants, a lodging house, drug stores, and miscellaneous other retail, service, and fabricating establishments. There was steam ferry boat communication with Douglas Island and a 400-seat theater. Furs worth $35,000 were purchased annually from the natives. Juneau was the outfitting point for the miners who entered the interior of Alaska every spring via Chilkoot Pass, and from $15,000 to $25,000 was brought to the town in the autumn of each year by the returning miners.
By 1895, Juneau was a seaport and mining town which had 2,000 inhabitants, schools, churches, three newspapers, waterworks, an electric light plant, two substantial whaives, large mercantile houses, hotels, paved streets, and fire and hose companies.
211. The towns of Juneau, Douglas and Treadwell were incorporated between 1900 and 1902. Juneau had two banks, the oldest established in 1895, with deposits of over $300,000 in 1904 and $400,000 in 1905. Six general merchandise stores had stocks of from $15,000 to $80,000 each, and there were several grocery, meat, dry goods, and other retail stores. There were lumber yards, a boatbuilding plant, sawmill, brewery and other industrial enterprises. The Juneau 460-horsepower electric plant was valued at $120,000 and improvements were contemplated. There was a public water supply system and a fire department. Douglas and Tread-well, while smaller than Juneau, were similarly quite active. The Treadwell store in 1902 did business of over $1 million. During the later 1890’s the Treadwell mines were the largest gold mining operation in the world. For a decade and a half the Treadwell drew prospectors northward.
*276 In 1904, Juneau had nine hotels and lodging houses with 287 rooms and capacity for 431 persons, all provided with electricity and some with heat. The Juneau Packing Company, owning a four-ton launch, five lighters and two traps, opened in Juneau in 1905 and salted salmon through 1907.
Merchandise shipped from the United States to Juneau, Douglas and Treadwell, reported at $536,438 in 1890, rose to $858,061 in 1903, and reached $2,256,846 in 1910. The assessed value of property rose from $1,057,340 in 1900 for Juneau to $1,287,000 in 1909, and from $1,565,020 for Juneau and Douglas in 1904, to $1,687,000 in 1909.
212. (a) After the incorporation of Juneau, its voting population, according to the city election returns of 1902, was 2,480, not including about 250 natives. The Governor of Alaska, in his 1904 Annual Report, optimistically stated that the population of Juneau should rise to 15,000-20,000 in the nest 10 years.
(b) The population of Juneau and Douglas was reported in the Census of 1890 as 1,655, of which 1,027 were white. The population of Juneau-Douglas and suburbs rose to 3,211 in 1900, and to 4,588 in 1910.[63]
(c) Many Indians moved into the new white settlements. After the founding of Juneau in 1880, and Douglas in 1887, all Auk settlements (except one at Auk Bay) and all Taku settlements (except Sumdmn) disappeared between 1880 and 1890, their inhabitants reappearing as residents of Juneau and Douglas.
213.- (a) Juneau was the first town in southeast Alaska to take advantage of the act of March 3, 1891, providing for the issuance of patents for townsite lands. (Up to the date of the passage of this act, legal title to land in Alaska could be secured only for mineral claims.) Under U.S. Survey No. 7, the townsite was surveyed between October 1893 and February 1894 and included approximately 119 acres. Most of the townsite, i.e., 108.49 acres, was patented in 1897 (10.10 acres were patented in 1902, 0.67 acres in 1905, and 0.11 acres in 1907.) Within the original patented area, 48 *277 acres were described as “liigli land unfit for building purposes.” The remaining area of approximately 71 acres (70.88 acres) was valued as townsite land by the townsite trustee at $102,450 in 1894. This valuation was made by classifying the lots into three categories and setting the value of all lots in each category at either $50, $250 or $400 per lot. The almost uniform lot size is 5,000 square feet. The higher value lots cover the center part of the town extending from the waterfront to 4th Street, between Main and Gold Streets. The $250 lots lie immediately beyond the area of the higher value lots and extend from 5th to 7th Street, between Main and East Streets. The $50 lots cover the remainder of the town. There were 121 — $400 lots with a .total value of $48,400; 1721/2 — $250 lots with a total value of $43,125; and 218% — $50 lots with a total value of $10,925, totaling in all, as stated, $102,450.
Of the total 119 acres included in the 1893-1894 survey, the area of the 512 lots valued by the trustee was 58.8 acres. Thus 48.04 acres surveyed were not valued. However, the area occupied by streets and alleys was 12.08 acres. Thus, the total area occupied by the valued lots is actually 70.88 acres. The average value of the land occupied by 'all the lots, streets and alleys was, at the trustee’s valuation, $1,445 per acre. The value of the acreage making up the $50 lots alone (including allocating to these lots of 5,000 square feet about 1,000 square feet for streets and alleys (17 percent of the entire valued area being taken up with streets and alleys)) was $363 per acre. The trustee’s 1894 valuation of $102,450 is the best evidence contained in the record as to then fair market value of the lots patented in 1897.[64] The record does *278 not indicate any significant change in value between 1894 and 1897.
(b) The three additional townsite parcels surveyed under U.S. Survey No. 7, comprising 10.88 acres, were, as set forth above, patented in three separate parcels in 1902, 1905, and 1907. The bulk of this additional acreage was the 10.10 acres patented in 1902. Between the years 1894, when the trustee made his original valuations, and 1902, Juneau grew, as the above findings show, and property values naturally increased. The 1902 patented parcel was equivalent to 9 percent of the entire area of Survey No. 7. It is reasonable to conclude that the parcel increased in value by approximately 50 percent between 1894 and 1902, thus adding 4.5 percent to the 1894 total value, or $4,610 ($4,610.25).
(c) No claim is made for the small parcels (totaling less than an acre) patented under Survey No. 7 in 1905 and 1907.
(d) The total fair market value of the parcels patented under U.S. Survey No. 7 was $107,060.
214. In addition to the lands patented under U.S. Survey No. 7, three additional patents for 357 acres which plaintiffs claim had value as townsite land were issued prior to February 16,1909, as follows:
(a) On June 30,1904, a patent was issued for 32.87 acres under U.S. Survey 580. However, this was a mineral patent, and not a townsite patent (although this land was, at some undisclosed subsequent time, to become the Casey Shattuck townsite addition). This land adjoins the original Juneau townsite on the west, bordering the Gastineau Channel. Based on the rise in property values between 1894, when the townsite trustee made his original valuations, and 1904, plaintiffs claim $20,000 for this acreage, or about $600 per acre. This land was not valued by the trustee in 1894 since it lay beyond the town, as it did in 1904. Its 1894 value, if any, is not shown. The 1904 patent itself was a mineral one and its basis for valuation as townsite land as of that date is not apparent. The record is not sufficient to support plaintiffs’ claimed value, or the assignment of any value to this acreage as townsite or settlement land in 1904.
(b) On August 2, 1905, a patent for 320 acres was issued under U.S. Survey 381. This land was located near the *279 mouth of the Mendenhall Eiver, north of Juneau. This was a homestead patent. Plaintiffs claim $3,200, or $10 per acre, for this land. This acreage too was not valued by the town-site trustee since it was located outside the town, as it was in 1905. However, this valuation for homestead land as of 1905 is reasonable.[65]
(c) A townsite patent was issued on January 18, 1909, to the Alaska Electric Light & Power Company under U.S. Survey 574 for an area of 4.34 acres along the waterfront immediately adjoining the original townsite. Plaintiffs claim $10,000, or approximately $2,500 per acre for this land. However, the basis for this figure is not shown.
Since this land lay beyond the original 1894 town survey limits, it was not valued by the town trustee. As townsite land, it was then presumably worth less than the lots in the lowest valued $50 zone. These lots, as above indicated, were worth $363 per acre. Assuming the rise in Juneau real estate values between 1894 and 1909 imparted a value of $363 per acre for this acreage as of January 18, 1909, this land would have a value as of such date of $1,575 ($363X4.34 =$1,575.42).
215. (a) In addition to the 476 acres of land patented prior to February 16, 1909 (and within the 31,760 acres of land in the Juneau region that was continued to be excepted from the Tongass National Forest by the Proclamation of June 10, 1925), plaintiffs claim value for an area of 4,539 acres as townsite and settlement lands as of February 16, 1909. This area includes 24.27 acres of the incorporated town of Douglas located 1 mile north of the Treadwell Mine, first surveyed and platted in 1888 (and valued by the town-site trustee at approximately $63,000 ($62,928) in 1917), an area of 53 acres near Juneau (which was surveyed as additions to the town of Juneau between 1913 and 1917), and certain flat strips of land on the mainland and on Douglas Island along both sides of Gastineau Channel which plaintiffs claim were suitable for potential development either as commercial or residential acreage.
*280 (b) Plaintiffs claim the 24.27 acres of Douglas would have had a value of $50,000 as of February 16, 1909, or approximately $2,000 an acre. This claim is predicated on the $68,000 valuation for this acreage fixed by the townsite trustee in 1917, or $2,593 per acre. Plaintiffs estimate the 1909 value to have been approximately 20 percent less than the 1917 appraisal. However, the process of working back from a subsequent valuation which would not have been known in 1909, and without showing that the 1917 value was not importantly attributable to events occurring after 1909, is improper.
As set forth above, the townsite trustee valued Juneau, as of 1894, at an average of $1,445 per acre. It would be reasonable to assume that these 24.27 acres of Douglas were, at that time, worth approximately one-half as much, and that by 1909 the value doubled, bringing the value to the same figure of $1,445 per acre. Thus, the February 16,1909 value of the 24.27 acres was $35,000 ($35,070.15).
(c) Plaintiffs claim $9,000 for 15 acres ($600 per acre), $50,000 for 500 acres ($100 per acre), and $80,000 for 4,000 acres ($20 per acre), all such acreage constituting land in the vicinity of the patented parcels of Juneau. Plaintiffs contend that such acreage would have been of interest to a prospective investor because of the growth trends of the Juneau and Douglas communities, and that such an investor would have paid $139,000 for such acreage as of February 16, 1909. However, the record is not sufficient to support this claim. While the Juneau area was growing, it was not of such nature as would warrant purchasing in 1909 such huge additional acreage as approximately 8 square miles to provide for large expansion. Juneau was still a small town in 1909. It would appear that at the most a purchaser of the townsite would acquire an additional 500 acres for possible future expansion. At $20 an acre, which would appear reasonable (considering the lowest valued area of the town was valued at $363 per acre), this acreage would have had' a fair market value of $10,000 as of February 16,1909. The area involved was suitable for expansion, constituting a strip of flat land bordering the water’s edge, and would have had the indicated value as townsite land on such date.
*281 Findings of Fact
216. The total value of the patented and nonpatented townsite and settlement lands in the Juneau-Douglas region was:
Juneau Townsite — -Survey No. 7-$107, 060
Homestead Patent — Survey No. 381- 3,200
Juneau Townsite — Survey No. 574- 1, 575
Douglas Townsite- 35,000
Additional area in Juneau-Douglas Region- 10,000
Total_$156, 835

Skagtoay

217» The town of Skagway was established in 1897 as a result of the rush of prospectors heading for the Yukon. Its principal function has been as a transportation center serving interior Alaska and British Columbia. It served through the first decade of the century as a departure point for the Klondike gold region which ivas reached by over 60,000 persons in the late 1890’s. Skagway was incorporated in 1900 with a population of 1,500. It was first surveyed in 1905 and the subdivisional survey was completed in 1907. The area of the townsite as patented May 4-, 1909 was 192 acres.
218. Maritime transport expanded rapidly, with five United 'States companies and a few independent one-vessel enterprises serving the Klondike region from the west coast of the United States. The value of merchandise shipped to Skagway from the United States was about $550,000 per year for the -period 1903-1908, dropping to $375,000 in 1909. The entire townsite area had been -occupied since the late 1890’s by a number of substantial buildings. The town was bounded by the base of high mountains on the east and by the Skagway River at the northwest. The area was nonmineral and there was no timber left in -the townsite.
The White Pass and Yukon Railroad was established about 1900 between Skagway and Whitehorse Rapids in the Yukon and was the only railroad giving access to the interior of Alaska for 20 years.
219» The population of Skagway for June 1, 1900 was reported by the Bureau of the Census at 3,117, of which an estimated 2,845 were whites. The population declined *282 sharply to 802 whites in 1909 (and again declined to 465 in 1920). However, much of the enumerated population for Skagway in 1900 probably was en route to the Klondike.
220. Survey 435 of the exterior boundary of the townsite of Skagway was conducted between 1905 and 1907. The surveyed area was 192.29 acres, of which 172.8 were subdivided into lots, blocks, streets, and alleys. The value of the town-site lots shown on the plat of the subdivisional survey, approved in 1909, was $128,230. These lot values represent the best available evidence of fair market value as of February 16,1909. The value of the lots ranged from $25 to $300 per 5,000 square foot lot, the highest valued ($250 and $300), 67.4 in number, being located along Main Street (from Second Avenue to Eighth Avenue), State Street, and Broadway Avenue (from Sixth Avenue to Eighth Avenue). Other lots were valued at $200 per lot (258 in number), $150 (4.8 in number), $100 (555 in number) and $50 (28.4 in number). 1.6 lots were valued at $25.
The average value of the 172.8 acres of subdivided land was $742 per acre.
The least valuable 30 lots ($25 and $50) had an average value of $261 per acre.
221. No land in the area of Skagway was patented as townsite land until May 4,1909, the date of the townsite patent for Survey 435. However, three parcels of land1 were patented in the Skagway area prior to February 16,1909, for which plaintiffs claim value as townsite lands as of their dates of patent, as follows:
(a) Adjacent to the Skagway townsite as shown by Survey 435 was a 58.44-acre tract patented in 1902 under U.S. Survey No. 13. Approximately 34.7 acres of the area appear from the 1902 tax rolls to have been subdivided into blocks, streets, and alleys, and formed an integral part of the town of Skag-way. The value of these lots as of the 1902 date of patent was, based on the assessed value of the lots as shown by the 1902 tax rolls of the town of Skagway, $88,375. Including streets and alleys, the total area encompassed by such valued *283 acreage is 41.3 acres, giving a value of $2,140 per acre for such 41.3 acres.
Plaintiffs also claim $10,000 for tlie remaining unvalued 17.2 acres under Survey No. 13, or about $600 per acre. However, this estimated value is insufficiently supported.
(b) On June 28, 1901, 19.61 acres were patented under Survey 174, and on April 20,1903,80 acres were patented under Survey 176. The former acreage is located on the southeasterly shore of Olga Bay around the mouth of Salmon River. The latter is on the right bank of Skagway River about 11/2 miles northeast of Skagway. Both parcels were patented as homesteads and are located outside the town boundaries. Plaintiffs claim a combined value of $2,000 for the approximately 100 acres involved, or about $20 an acre, as of their respective dates of patent. At $10 an acre, the same value found for the homesteaded land near Juneau, the value of this acreage as of the patent dates was $1,000.
(c) In addition, plaintiffs claim $25,000 for 2,500 nonpat-ented acres (approximately 4 square miles), or $10 per acre, which plaintiffs contend an interested buyer would, as of February 16, 1909, have purchased as acreage bordering on the townsite in order to provide for future development of the town. Bordered on the west and south of the Skagway River and on the east by high mountains, the terrain adjacent to the town that was suitable for townsite development was relatively limited. Plaintiffs contend a purchaser would reasonably have acquired these 2,500 acres which were suitable for such purpose. While it is true that between the founding of Skagway in 1897, as a result of the Klondike gold discoveries, and February 16, 1909, the date of valuation, Skag-way became an established town serving as a transport center for the gold rush boom, nevertheless, in view of the sharp decline in the town’s population and importance between 1900 and 1909, and the seeming lack as of 1909 of favorable prospects for future growth, it seems clear that at that time there would have been little need to purchase large acreage outside the town’s boundaries as expansion space. This claim is insufficiently supported.
*284 222.The townsite and settlement land in the Skagway region would, as of February 16, 1909, have enhanced the value of Area 4 by a't least the sum of $217,605, as follows:
Parcels covered by Survey 435-$128, 230
Parcels covered by Survey 13- 88, 375
Homestead Patents — Surveys 174, 176- 1,000
Total_ $217,605

Ketchikan

223. (a) The town of Ketchikan, incorporated August 8, 1900, had its origin with the establishment of a salmon cannery in 1886. An excellent salmon stream came into the narrows on the south of the town. During the running season, the salmon ascended the stream in great numbers. The town’s growth paralleled that of the salmon industry in southeast Alaska. The town was also on the principal channel of Alaskan steamers. The white population of Ketchikan increased from 286 in 1900 to 1,184 in 1909. At that time there were also 1,613 natives in the town, the native population having increased from 460 in 1900. The town had an 'assessed valuation (i.e., land and improvements) of $365,000 in 1904, which rose to approximately $642,000 in 1909. The value of merchandise shipped from the United States to Ketchikan rose from $360,856 in 1903 to $724,370 in 1906, but fell to $429,170 in 1909, a poor fishing year. In 1904, Ketchikan had three churches, two hospitals, three doctors, and five lawyers.
(b) The first survey of the Ketchikan townsite (U.S. Survey 437) was conducted between September 1910 and June 1911. The area included was 68.21 acres. The townsite patent was issued November 3,1910. There were no parcels of land in the Ketchikan townsite area patented as townsite land prior to February 16, 1909. The townsite trustee’s valuation of 46 of the acres surveyed was $171,328. This was the value approved by the trustee in February 1913.
224. On the basis of the 1909 lot values indicated in the Ketchikan tax office assessment rolls for unimproved lots, the fair market value of the Ketchikan townsite area, compris-
*285 ing approximately 68 acres, was $150,000 as of February 16, 1909.[66]
225. There were two mineral patents issued prior to February 16,1909, for land adjacent to what was then considered the town boundaries (and the original townsite survey of 1910-1911). One was the Ingersoll patent (Afterthought Lode No. 1) for 11.89 acres, issued November 18, 1904, and the other, the Sutler patent (the Black Swan Lode) for 18.48 acres, issued November 2,1902. Plaintiffs claim both parcels would have had value as townsite land, as of their patent dates, the Ingersoll patented acreage bordering the center of the original townsite, and the Sutler patent bordering the original townsite on the east along the waterfront. A value of $2,000 for each parcel, or about $100 per acre, is claimed for each as of their patent dates, making a combined value claimed of $4,000. However, the record is insufficient to support such claimed 1902 and 1904 values as townsite land for these mineral patents.[67]
*286 226. Plaintiffs also claim that if land near the townsite had been offered for sale as of February 16, 1909, 100 acres in the immediate vicinity of the original townsite would have had a value of $25,000 ($250 per acre), an additional 400 acres would have had an estimated value of $40,000 ($100 per acre), and a still additional area of 10,000 acres would have had an estimated value of $200,000 ($20 per acre). Thus, plaintiffs claim $265,000 for such adjoining 10,500 acres. The claim is based upon the growth that Ketchikan experienced in the decade prior to 1909, the nature of the bordering terrain, which was favorable to expansion, and the trustee’s 1913 values, averaging $3,125 per acre (with a minimum average for the lowest valued lots of $359 per acre). However, the record fails to support this claim in such amount. The growth this town had experienced in the past would hardly have warranted the preemption of such a vast area for future expansion purposes. (Even as to the trustee’s subsequent valuation, some of the lots within the relatively small area of the 46 acres valued were considered by the trustee to be of very little value. See n. 66.) At the most, it would appear that the purchase of approximately 500 acres of adjoining land at $20 per acre would have been reasonable, thus adding $10,000 to the value of the entire townsite region.
227. The town of Ketchikan, plus 500 adjoining acres, would have enhanced the fair market value of Area 4 as of February 16, 1909 by the sum of $160,000.

/Sitka

228. (a) Sitka was the first foreign settlement in southeast Alaska. It was established by the Russian, Alexander Baranof, in 1804, at the site of an Indian village on the west coast of Baranof Island. At the time of the transfer of Alaska to the United States in 1867, Sitka was the headquarters of the Russian American Fur Trading Company and the capital of Russian America, with a population that reached 2,500. In 1870, the townsite was about a half-mile long at the head of a protected mile-long harbor, bordering the Sitka Indian village of approximately 1,000 natives and 50 lodges. Fifteen vessels with a total tonnage of 2,200 tons, including four steamers, four schooners and seven smaller *287 vessels, were registered at tbe port of Sitka at tbe time of transfer.
(b) A U.S. military post was established at Sitka upon tbe transfer of Alaska to tbe United States on October 18, 1867. It served as tbe first administrative headquarters of tbe United States in Alaska until 1898, when the capital was transferred to Juneau. For a good part of this 30-year period, Sitka was tbe largest white settlement in tbe region. In 1878, Sitka bad a population of 336 whites and 1,000 natives. However, by 1890, tbe population bad fallen to 280 whites and 910 Indians. Between 1890 and 1900 the white population of Sitka reportedly bad increased from 280 to 713, partly accounted for, however, by the seasonal increase at tbe time of tbe June 1900 Census.
229. The white population was again reported at slightly under 300 in 1909. Sitka was off tbe main inland passage route which connected Juneau, Petersburg, Wrangell, and Ketchikan to the United States. Despite the declining relative importance of Sitka and the decrease in population from 1900 to 1909, the value of merchandise imports showed a rising trend between 1905 and 1909. However, neither its mining nor fishing industries experienced the growth of other centers in the region. (It was not until the 1930’s that the population of Sitka doubled, reaching 2,000, and Sitka became the third largest city in the region.) Beginning in the early 1880’s, Sitka began to show some growth based on the salmon cannery industry and gold discoveries. However, the growth was sporadic. With the transfer of the capital from Sitka to Juneau, the future of the town was not promising. The decline of the population between 1900 and 1909 was also due to the cessation of some gold mining and salmon canning operations.
230. Since the town of Sitka was not surveyed until 1923-1924 (U.S. Surveys Nos. 1473 and 1474 (Tract A) surveying an area of approximately 125 acres), there are no specific data indicating the value of property in the Sitka townsite area as of February 16, 1909 or prior thereto. (The total area of the townsite for which lots were appraised under the 1923-1924 Surveys constituted 49.8 acres. Thus, the nonvalued portion, consisting of reserved, unoccupied, and *288 city land, is 74.49 acres. The 49.8-acre appraisal, made in 1925, was $58,050, resulting in an average value of $1,165 per acre. The lowest valued area was valued at $1,000 for 7.22 acres, being equivalent to $139 per acre.)
231. The acreage constituting the town of Sitka unquestionably enhanced the value of Area 4 to some degree in 1909. Lacking anything in the nature of specific evidence as to the amount of such enhancement, it would appear reasonable to use the town of Skagway for comparative purposes. As shown, Skagway was also a town that was declining in importance as of 1909. The average value of the subdivided 172-acre Skagway area as of 1909 was $742 per acre. However, as of that time, Skagway’s white population of approximately 800 was more than double Sitka’s white population of only approximately 300. It would appear reasonable to value the Sitka acreage as of 1909 at somewhat less than half the average value of the Skagway acreage of $742 per acre, or approximately $300 per acre. On this basis, the approximately 125 acres making up the town of Sitka would have had a fair market value as of February 16, 1909, of $37,500.[68]
232. Five parcels of land, containing a total area of approximately 176 acres in the Sitka townsite area, were patented in 1901, 1902, and 1903, for which plaintiffs claim a fair market value of $20,000, or about $115 per acre, as of their dates of patent. There are no records available which show the value of property in the Sitka townsite area as of the date of patents, the earliest records available showing the value of identifiable lots in Sitka being the townsite trustee’s valuations made in 1924 (from which value plaintiffs’ claim of $20,000 is derived). Only one of these parcels, which constitutes only 0.48 acres, patented on June 26, 1902, lies within the original townsite area. All the others lie outside of and some distance from such boundaries. The evidence is insufficient to show what, if any, value these patented areas had as of their patent dates.
*289 233. Plaintiffs also claim $5,000 for an additional 500 acres, or $10 per acre, as land that a purchaser of the townsite would have acquired to provide for growth and expansion. This claim is insufficiently supported. The town, as of February 16, 1909, was declining in importance and population. Growth and expansion were not promising. An additional outlay for land beyond the town boundaries would not appear to have been warranted.
234. The fair market value of the 125 acres making up the Sitka townsite was, as of February 16, 1909, $37,500.

Wrangell

235. Wrangell, at the northern end of Wrangell Island, is situated along the waterfront of Etolin Bay near the mouth of the Stikine Eiver. It was an early permanent white settlement founded in 1834 as a fur trading post and Eussian Army outpost. Wrangell became the shipping point to the Cassiar District of British Columbia, via the Stikine Eiver, following the rich placer gold discoveries there in the 1870’s, and the winter quartering place for the miners. In 1890, the largest sawmill in Alaska was located in Wrangell. In the late 1880’s Wrangell became an important center of the salmon canning industry. The Wrangell cannery joined the Alaska Packers’ Association in 1893 and was operated as one of its principal canneries until 1926, operating every year except 1905.
236. In 1890, in addition to the fort buildings, the town had six stores, two churches, a school, and the houses of the residents. The industries of the town included the sawmill, having a capacity of 30,000 feet per day, an active trade in furs and curios, a salmon cannery built at a cost of $40,000 with a capacity of 15,000 cases annually, and the only poultry farm in southeast Alaska. Wrangell was incorporated in 1903. Its white population had grown from 71 in 1890 to 434 in 1900, with a total population of 868 reported in 1900. However, between 1900 and 1909 the population remained relatively constant. The assessed valuation of the incorporated town was first reported in 1907 at $103,484; $122,203 in 1908; and $140,000 in 1909. Despite the quite constant population from 1900 to 1909, the importance of Wrangell as a trading center grew. The period preceding 1909 was *290 one of rising trends in merchandise imports (almost tripling from $86,265 in 1903 to $243,831 in 1908) and in assessed valuation. The first decade of the century witnessed a very high rate of growth in the salmon fishing and canning industry in all of southeast Alaska but particularly in the Wrangell area.
237. As first surveyed in 1900 (under U.S. Survey No. 125), the townsite of Wrangell included an area of 378.23 acres.[69] An area of 327.46 acres within the original survey was patented June 13,1906 as the Wrangell townsite. About a year earlier, a patent had been issued to the Aberdeen Packing Company for 43.4 acres (under U.S. Survey No. 9) located north of the townsite on the tip of Wrangell Island facing Labouchere Bay.
238. The tract books containing the trustee’s valuation in connection with the townsite survey were either lost or destroyed. The earliest specific data now available relating directly to unimproved lot values in the town of Wrangell are the tax rolls of 1931.[70]
239. Plaintiffs claim $123,000 as the fair market value of the 327.46 acres covered by the original survey and patented in June 1906, made up as follows: (a) 100 acres in the center of the townsite with a claimed value of $100,000, or $1,000 per acre; and (b) the remaining 227.5 acres, with a claimed value of $23,000, or about $100 per acre.
While these per acre valuations, compared with the other towns in Area 4a set forth above, appear to be generally reasonable, it would seem that, considering a white population in Wrangell of only about 430 at the date of patent, and an assessed valuation in 1907 of only approximately $100,000, which would include improvements as well as the land, too much acreage is being allocated to the valuable town center. *291 A rather large acreage appears to have been surveyed for this townsite. A more realistic allocation would appear to be as follows: 50 acres in the center, with a value, at $1,000 per acre, of $50,000; 100 acres of the remaining 277.5 acres with a value, at $100 an acre, of $10,000; and the remaining 177.5 acres with a value, at $50 per acre, of approximately $8,900 ($8,875), making a total valuation of $68,900.
240. Plaintiffs also claim $1,000, or about $23 per acre, for the 43.4 acres patented as a cannery site on August 24,1905. This claim for this industrial site is reasonable.
241. Plaintiffs further contend that a purchaser, as of February 16,1909, would have purchased at least 200 additional acres of land within the region of the townsite 'and which was within the 3,200-aore Wrangell tract excepted from the Ton-gass Forest by the 1909 Proclamation. Land along the northwestern shore of Wrangell Island, north of the townsite, was especially suitable for development. At $20 per acre, plaintiffs claim $4,000 for such 200 acres.
Considering' the history of the town, and the economic trends, the purchase of 200 additional acres would appear to be reasonable. However, further considering the already relatively large acreage in the townsite and the leveling off of population, it would seem that growth to and development of such additional acreage would be considered to be far from imminent, so that $10 an acre would be more realistic. Thus, such 200 acres would have had a value of $2,000 as of February 16,1909.
242. The total fair market value of the Wrangell townsite and adjoining areas as set forth above was, as of the pertinent valuation dates, $71,900.

Petersburg

243. Petersburg is located on the northern end of Wrangell Narrows, on Mitkof Island, about 110 miles north of Ketchikan and 110 miles south of Juneau. West Petersburg faces Petersburg on the opposite side of Wrangell Narrows on Lindenberg Peninsula of Kupreanof Island. Peters-burg was founded 'as a cannery site in 1897. The white population increased from 26 in 1900 to 424 in 1909 and the indications at that time were that it would continue to grow slowly *292 but steadily (as it lias). Fishing has been the basic industry of Petersburg, with salmon fishing and canning of prime Importance, followed by halibut and shellfish. Several salmon canneries were located at or near Petersburg during the first decade of the century. It has also served as the center for a local fur 'farming industry and as a regular port of call for ocean traffic moving through southeast Alaska, which gave it importance as a trading center.
The value of merchandise shipped from the United 'States to Petersburg rose from $37,600 in 1905 to $151,000 in 1909. No Indians resided in the town in 1900 but by 1910 the Indian population was approximately 150.
244. The town of Petersburg was incorporated in 1910. The exterior boundaries of the townsite were established by U.S. Survey No. 1168 in 1917 and included an are'a of approximately 561 acre's. However, the town was subdivided in 1918 under Survey No. 1252 and included an area limited to approximately 126 acres, an area considered by the trustee as “amply sufficient to cover the needs of the townsite for several years hence.” The townsite patent was issued October 2, 1919.[71] Three tracts of land patented prior to February 16, 1909, totaling approximately 200 acres, lay adjacent to the original townsite surveyed area.
245. The three tracts of land patented prior to February 16,1909, were as 'follows:
(a) On October 13 and 23,1903, respectively, two 80-acre tracts adjacent to the town were patented as homesteads. One tract was located along Wrangell Narrows, to the southwest of the town. The other also was to the southwest and below the first tract. Plaintiffs claim $100 an acre for these 160 acres, or $16,000. The record is insufficient to support such amount.[72] In 1903, the town was only around 6 years old. Population was small. These tracts were outside what *293 was then considered the town area, and presumably sueli land was plentiful. A value of $10 per acre, or $1,600, would appear reasonable at that time for such homestead land.
(b) A tract of land containing 39.93 acres was patented on January 20, 1908, as an industrial site under Survey No. 282. This tract was surrounded on three sides by the town and may properly be considered as forming an integral part of the townsite.
246. For such 39.93 acres, plaintiffs claim $20,000, or approximately $500 per acre, as of the date of the January 20, 1908 patent (based in large part on the trustee’s 1919 appraisal).
There is no specific data prior to 1909 concerning values of particular town lots or acreage. No official appraised value of lots could be calculated until the township trustee’s report in 1919 concerning the area included in the 1918 subdivision survey.[73] The earliest tax rolls available showing the value of specific unimproved lots are those for 1923 (which values were considerably below those derived from the trustee assessments).
Considering the value of land in the other Area 4 town-sites at about the time of this patent, as well as the town’s growth and the relative stability it had reached by 1908, and the fact that this tract was unquestionably well suited as industrial property, a value of approximately $300 per acre would appear reasonable for these 40 acres, totaling $12,000.
247. Plaintiffs claim $60,000, or approximately $700 per acre, as the fair market value as of February 16,1909, of the *294 85 acres of land constituting the part acres the town (as delineated by Survey No. 1252), which was valued by the trustee in 1919. This value is derived from the trustee’s valuation ($968 per acre overall average, and $697 per acre for the area of the low value lots), and is based on the supposition that there was no difference in the value of Petersburg land between 1909 and 1919 (the white population having increased by only 151 between the two dates), although plaintiffs do allow for some value appreciation between 1909 and 1919. For the reasons previously indicated, this method of valuation is not considered proper.
On the basis of the factors previously indicated, it is concluded that such 85 acres reasonably had a fair market value as of February 16, 1909, of an average of at least $500 per acre, totaling $42,500.
248. Survey No. 1252 covered approximately 125 acres. The townsite trustee valued only 85. Plaintiffs claim $15,000, or about $875 per acre, as the value, as of February 16, 1909, of this remaining tract of approximately 40 acres which lay within the town. This acreage was not valued or assessed by the town trustee because it was town property, and not privately owned. It would appear that this land would have at least the same value as the industrial tract of 40 acres adjacent to the townsite which was covered by Survey No. 282. That land was worth $800 per acre at about this time. At this same value, the 40 acres here involved had a fair market value of $12,000 as of February 16, 1909.
249. Plaintiffs also claim $5,000, or approximately $15 per acre, as the fair market value as of February 16,1909, of the 335 acres of nonsubdivided land that were included within the exterior boundaries of the townsite established by Survey 1168. As shown, Subdivision Survey No. 1252 included only around 126 of the 561 acres covered by Survey 1168. Plaintiffs claim only this relatively nominal value for town-site land principally because, even as late as 1919, the townsite trustee stated that the subdivided area of 126 acres was “amply sufficient to cover the needs of the townsite for several years hence.” This $5,000 claim is reasonable.
*295 250. Tbe total fair market value of the Petersburg town-site area as set forth above was, as of the pertinent valuation dates, $13,100.
251. Summary. The townsite and settlement acreage above enumerated would, as of their respective taking dates, have enhanced the fair market value of Area 4a by at least the sum of $716,940, comprised as follows:
Juneau-Douglas_$156, 835
Sltagway- 217,605
Ketchikan_ 160, 000
Sitka- 37, 500
Wrangell- 71,900
Petersburg- 73,100
Total- $716,940

Other Lands

252.The remaining land of Area 4 thus far not considered comprises 3,804,793 acres which plaintiffs claim had a value of $570,000, or approximately 15 cents per acre. Between 15 and 20 percent of this remaining land is covered by glaciers and permanent snowfields, substantially all located on the mainland. Much of the rest comprises mountainous lands with elevations rising above 2,000 feet, or scrub, shrub and muskeg.
253,. Plaintiffs’ claim of value for this acreage is based upon the following factors and considerations:
(a) The area contains many streams and lakes, including mountain lakes capable of producing sizable quantities of low cost electric power.
(b) On the mainland, the Stikine, Whiting, Taku and Lace Rivers run into the water amid alluvial deltas, some of which are suited for limited agriculture, such as garden crops and bush fruits. Also, there are other scattered tracts of tillable land suitable for producing vegetables and other agricultural commodities, as well as land capable of providing fodder for stock.
(c) The area contained (1) thermal and mineral springs considered to have hygienic value, (2) hunting facilities, (3) sport fishing, (4) other recreational resources, and (5) *296 many tourist attractions, including tire great Glacier situated north of Juneau.
(d) Tracts of land comprising a total of 5,360 acres within Area 4a in the vicinity of Loring, Windham, Sumdum, and Snettisham were excepted from the Tongass Forest by the Proclamation of February 16,1909. None of these areas was a principal town in southeast Alaska as of February 16,1909. However, each of them became for a time a mining or fishing settlement and certain lands in some of them were patented. Some pertinent considerations relating to these settlements are as follows:
(1) Loring, situated on Naha Bay on the west side of Bevil-lagigedo Island, was one of the earliest salmon canning centers. It was established in 1888 by the Alaska Salmon Packing and Fur Company, and while operating produced some of the largest salmon packs in Alaska. A saltery was operated prior to the opening of the cannery. The 1890 Census described Loring as the oldest and largest fishing station in southeast Alaska. It also stated that permanent improvements, including a general merchandise store, had been established in Loring and that there were other sites where fishing was combined with trade. The population of Loring was reported as 200 in 1890 and 168 in 1900. As stated in the 1890 Census, the Loring cannery also engaged in fur trading, especially deerskins, and had an investment of about $50,000. Imports to Loring from the United States were reported at $14,285 in 1905; $122,265 in 1907; and $111,182 in 1909. The Alaska Salmon Packing and Fur Company patented 65 acres at Loring in 1900 under U.S. Survey No. 8.
(2) After early mining activity, Windham and Sumdum appear to have passed out of existence as settlements by 1909.
(8) Snettisham was the “third camp” on the mineral belt described in the 1890 Census, a very promising quartz vein being reported there. In 1900 the Taku Fishery Company built a cannery on the southern side of the entrance to Port Snettisham and made a pack in that year. In 1901 the Pacific Packing and Navigation Company was organized and acquired the Taku cannery. The plant closed in 1902 and did *297 not reopen. In 1908 the Northwestern Fishing Company patented 10 acres at Snettisham.
(4) Other small settlements in Area 4a were in an incipient stage of growth prior to February 16, 1909. The future of these communities depended in most instances on the success of their mining and fishing operations. The possibility of future growth was not known.
(5) The fur-bearing land animals of southeast Alaska were the region’s principal source of wealth prior to the development of gold mining and fisheries industries. By the end of the first decade of the century the supply had dwindled. Exports from southeast Alaska were reported at $36,000 in 1910, including bear, ermine, fox, lynx, mink, and marten. What part came from Area 4 is not shown by the record.
254. The record fails to indicate that, as of February 16, 1909, the great hulk of these other lands had any substantial economic significance. Some acreage in the Boring area may well have had more than nominal value. Agriculture was of little significance as a business, no large areas being suitable for field crops, although it was thought that within 20 miles of Sitka, some 3,000 to 4,000 acres would, if properly drained, make fair agricultural land. In some places, vegetables and fruits could, on small areas, be grown primarily for homestead purposes. The value of the area as a hunting and fur resource was small. Based on these considerations, it is concluded that the remaining area of over 3,800,000 acres would, as of February 16, 1909, have enhanced the value of Area 4 by the sum of $50,000.

Svmmary

255,o The fair market value of Area 4 as a whole, taking into consideration the contribution thereto made by its forest lands ($747,099.20 (finding 129)), its mineral lands ($4,194,-757 (finding 182)), its fisheries resources in its surrounding and appurtenant waters ($3,661,000 (finding 202)), its town-site and settlement lands ($716,940 (finding 251)), and its other lands ($50,000 (finding 254)), was $9,369,796.20 as of the respective taking dates. Each separate classification of land and resources could be exploited in accordance with its highest and best use without significant interference with or reduction of the value of any other.
*298 Act,as 5a and 5b — Valuation as of June 10,1925 and euaet 26, 1925, Eespechvelt, Except poe Parcels Patented Prior to Such Dates

General

25,6. (a) Area 5a includes the Mansfield Peninsula on the north end of Admiralty Island, a large portion of the peninsula separating Glacier Bay on the west from Lynn Canal on the east, and a comparatively narrow strip of land fronting on Icy Strait and the Pacific Ocean. A number of small islands, including Sullivan and Pleasant, are within this area, which is primarily mainland. It extends 90 miles east and west and 60 miles north and south at its extremities. The portion of the area lying between Glacier Bay and Lynn Canal, of which the Chilkat Eange is the principal feature, measures 60 by 75 miles. This part of Area 5a includes the major acreage of its commercial forest land. The balance of Area 5a is a strip of land 5 to 15 miles wide, broken by numerous peninsulas, bays and inlets, which extends along the south end of the Fairweather Eange from Glacier Bay to a little beyond Lituya Bay and fronts on Icy Strait, Cross Sound and the Pacific Ocean. Although supporting stands of commercial timber, the exposure of this strip to the sea makes it largely inaccessible.
(b) Area 5b comprises the Glacier Bay National Monument as originally established by the Presidential Proclamation of February 26, 1925 (plus an additional strip running along the south and west sides of the original Monument, which was added to the Monument by Proclamation of April 18, 1939). The area is made up of a body of mainland at the north end of the archipelago west of Lynn Canal. The mainland is indented by Glacier Bay, an irregular shape of icy waters dotted with many small islands.
257. The topography of Area 5a is variable. Practically flat to gently sloping l'and characterizes the terrain on either side of the entrance to Glacier Bay. The west end of the area is partially flat, but generally steep, rough, rugged, Pacific Ocean front. Lying at the foot of the glaciers emanating from 10,000 to 14,000 foot mountains in the Fair-weather Eange, this portion of Area 5a is under 5,000 feet and averages about 1,500 feet above sea level.
*299 The largest segment of Area 5a, which lies east of Glacier Bay, is less broken in outline but has a higher average elevation of about 2,000 feet above sea level. Steeper and more variable topography is found in this area. Koughly 80 square miles of flat glacier-deposited land borders the east side of Glacier Bay from Gustavus to Beartrack Cove. Fish canneries have operated for many years at Funter Bay and Hawk Inlet, two of the protected harbors of Mansfield Peninsula. Although liobert Barron Peak, near the center of the peninsula, rises over 8,000 feet elevation, the average elevation is near 700 feet.
258. (a) Forest land occupies 54.80 percent of the 1,022,200 acres in Area 5a. The great bulk of the nonforest land is located in a band of land which makes up the southern and western borders of the Glacier Bay National Monument as presently constituted. Virtually all of this was made a part of the Tongass National Forest by the Proclamation of June 10,1925. (However, by the Proclamation of April 18,1939, it was removed from the Forest and added to the Glacier Bay National Monument.)
(b) Approximately one-third of the 1,536,046 acres in Area 5b is covered by glacier or permanent snowfall. Over 10 percent of the area appears to be forested. However, virtually all the timber is in inaccessible and noncommercial stands.

Forest Lands

259. Of the total of 560,121 acres of forest land in Area 5a, 68.49 percent, or 383,615 acres, were noncommercial forest land and 31.51 percent, or 176,506 acres, commercial. Of the commercial lands, 97,525 acres were accessible and 78,981 acres inaccessible.
260. The timber quality of Area 5a was somewhat lower than that in the other areas of southeast Alaska and in western Washington. Logging conditions, however, were good. All logging methods and techniques available in the other areas could be used here with the added advantage that the crawler-type tractor could be used in Area 5a to remove young growth spruce from glacial moraine flats around Glacier Bay. The advanced logging knowledge, which had been acquired by the logging industry on the *300 Pacific Coast by 1925, to the crawler-type tractor, by 1925 heavy logging machinery and gasoline and diesel fuels for logging equipment were also available. As in the other areas, the timber in Area 5a was favorably located with respect to transportation.
261. (a) During the 15-year period 1910 to 1925, the volume of lumber production of western hemlock in the United States had increased more than sixfold, rising from about 200 million board feet to over 1,200 million board feet. During the same period, pulpwood consumption of western hemlock had increased almost fivefold, rising from 60,000 cords in 1910 to nearly 300,000 cords in 1925. Lumber production of Sitka spruce in the United States reached a peak of 500 million board feet in 1918 because of the war demand for construction of airplanes. Production decreased after the war, falling to about 240 million in 1921, but rose again to about 375 million in 1925. By 1910 spruce and hemlock had become the leading species consumed for pulpwood in the United States. They continued to hold this position throughout the second decade. In 1925 the overall consumption of spruce (both domestic and imported) for pulpwood was over 3 million cords and the consumption of hemlock (both domestic and imported) for pulpwood was 1 million cords.
In the British Columbia coastal region, primary forest production of the hemlock species was 74.7 million board feet in 1915 and by 1925 reached a level in excess of 300 million. Primary forest production in the British Columbia coast of spruce was 52.2 million in 1915 and in 1925 the production was 101.9 million board feet.
(b) Average prices for standing timber of the four leading species of western Washington were at higher levels in 1925 than the prices paid in 1910. For Douglas fir the average price was $2.30 per MBM in 1910. During the next 15 years the peak price of $3.60 was reached in 1922. In 1925 the price was $3.34. For Sitka spruce, the average price was $2.22 per MBM in 1910 and $3.54 in 1925. The 1910 average price for western hemlock was $1.02 per MBM. The 1925 price was $1.25. Western red cedar had an average price in 1910 of $2.18 and in 1925 of $4.04. On the basis of these *301 prices, the average price for standing timber of all species in Area 5a would liave been $2.33 per thousand board feet. For the year 1925 the Forest Service reported the sale of 53,123,000 board feet from the Tongass National Forest for $93,233, or an average price of $1.74 per thousand board feet. This lumber was predominantly Sitka spruce.
262. Plaintiffs claim $2,548,651 as the fair market value of the 560,121 acres of forest land in Area 5a as of June 10,1925 (no claim is made for the forest land in Area 5b), as follows:
(a) There were 2,135,805 MBM of live commercial accessible sawtimber, principally hemlock and Sitka spruce (i.e., 1,127,705 hemlock, 984,606 Sitka spruce, 17,514 Alaska cedar, and 5,980 other) standing on 73,144 acres. Such timber is valued at $1.10 per MBM, totaling $2,349,385.
(b) There were 103,362 acres of forest land which contained timber of commercial quality but which were inaccessible. This acreage contained 2,843,154 MBM of hemlock, Sitka spruce and other species (1,502,096 being in hemlock and 1,311,149 being in spruce). Plaintiffs claim $1 per acre therefor (the same as was claimed for Area 4 acreage of such classification), totaling $103,362.
(c) There were 383,615 acres, both accessible and inaccessible, of noncommercial timber of unestimated volume for which plaintiffs claim 25 cents per acre (again the same as was claimed for Area 4 acreage so classified), totaling $95,904.
263. (a) Despite the increased demand in the United States for lumber and the increased use of hemlock and spruce as pulpwood, the situation with respect to Area 5a lumber in 1925 would not have been significantly different than it was for Area 4 lumber in 1909. Compared with the demand, there was still huge hemlock and spruce acreage available elsewhere which was more favorably located. As late as 1945, the Department of Agriculture reported that in 1923 there were approximately 63 million MBM of western hemlock in Alaska, 60 million in Washington, 25 million in Oregon, and 1 million in Idaho, Montana, and California, and that “Comparatively little cutting had been done in the original stands of western hemlock largely because lumbermen’s operations have been directed to the forests containing the largest percentage of Douglas fir, Sitka spruce, and western *302 red cedar. Western hemlock in close proximity has been left standing. In the State of Washington western hemlock makes up about one-third of the stand of merchantable timber.” At this time, the State of Washington had long been the principal pulp production area in the United States. Furthermore, situated far in the northern part of southeast Alaska, the transportation costs involved in moving Area 5a lumber to the States would even be more of a problem than in the other areas. Considering such factor, and the fact that the area timber was of lower quality than that of the other areas, the Area 5a forest land would be worth, as of 1925, approximately the same as the Area 4 forest land was worth as of 1909.
(b) The hemlock stumpage prices hereinabove set forth were, as was true of such stumpage prices relating to the other areas, based on only a relatively small portion of the best trees because, prior to World War I, only the best part of the larger hemlock trees was ordinarily removed in the usual logging operation. During the war and for a time thereafter, hemlock lumber in pure stands could be sold profitably in the United States. However, after the 1920’s the price of hemlock products greatly decreased and hemlock operations reverted to prewar conditions. As late as 1937 the Forest Service reported that “Very little hemlock is being cut in Alaska because it cannot profitably be shipped to the general markets in competition with Puget Sound hemlock.”[74]
(c) Attempts by the Forest Service between 1910 and 1925 to sell Alaska lumber were for the most part unsuccessful. In 1913 the Forest Service offered for sale 300,000 MBF on the Stikine River (Area 4a) with a period of 20 years for removal, and an additional 300,000 MBF as a future supply. The initial pulpwood price was to be 50 cents per cord for spruce and 25 cents per cord for hemlock and cottonwood.[75] Sawtimber prices were advertised at the following rates per MBF: Alaska cedar, $2.50; western red cedar, $1; Sitka spruce, $1. The terms were accepted by the interested parties *303 but they failed to carry out the enterprise, being unable to finance it. In 1917 the Forest Service offered 1 billion board feet in the Behm Canal area (Area 4a) at the same prices. Again the applicant was unable to finance the operation. On December 8, 1920, the Alaska Pulp and Paper Company entered into a contract with the Service (the company had been the sole bidder) to purchase 100 million board feet from the Port Snettisham and Glass Peninsula areas (Area 4a). The price was $1 per MBF for spruce and cedar, and 50 cents for hemlock. The company built a small mill on the Speel Biver near Juneau and shipped 100 tons of pulp in 1921 at the rate of $5 per ton of “wet pulp”. However, the mill was closed shortly thereafter because of the low pulp price and the high freight charges. The plant finally closed in November 1923 and the agreement with the company was canceled in August 1925. The company had produced only 300 tons of pulp and 69,890 board feet of spruce sawtimber.[76]
None of the above lumber was from the less favorably situated Area 5.
Throughout the 1920’s pulping interests continued to investigate the possibilities of establishing processing plants in the Forest. Two sales were conditionally awarded, one near Juneau and one near Ketchikan, but never materialized because of the depression.[77]
*304 264. The fair market value of the forest lands situated in Area 5a was, as of June 10, 1925, $39,899.80, computed as follows:
(a) There were 6,179 acres of essentially pure Sitka spruce stands of commercial grade in the accessible forest area. The value thereof was $2 per acre, totaling $12,358.
(b) There were 638 acres of essentially pure cedar stands of commercial grade within the accessible area. These too would have had a value of $2 per acre, totaling $1,276. .
(c) There were 21,875 acres of mixed spruce-hemlock of commercial quality within the accessible area in which approximately one-half the stand was spruce. This acreage would have had a value of $1 per acre, totaling $21,875.
(d) There were 43,908 acres of predominantly hemlock timberlands of commercial grade within the accessible area. This acreage would have had a value of 10 cents per acre, totaling $4,390.80.
(e) The record does not substantiate any value for the balance of 544 acres of other species of commercial quality in the accessible area.
The above comprises the 73,144 acres making up the commercial accessible part of the forest lands in the area.
The balance of the forest lands, consisting of 103,362 acres of commercial but inaccessible timberlands, as well 'as 383,615 acres, 'both accessible and inaccessible, of noncommercial timber would not, as timberlands, have made any contribution to the value of the total tract.

Mineral Lands Area 5a

265. Mansfield Peninsula, Admiralty Island, (a) Mansfield Peninsula, the northernmost extremity of Admiralty Island, is approximately 15 miles due west of Juneau. Four claims in the Mansfield Peninsula section were patented prior to June 10, 1925. The Irvington claim, patented December 11, 1903, is located at the town of Funter at the head of Funter Bay. There was no published information regarding this claim and no indication of its being exploited for its mineral value. No amount is claimed for this claim. Three claims, comprising the War Horse Mine, located near the en *305 trance of Funter Bay and owned by tibe Keystone Gold Mining Company, were patented on March 27, 1907, for which plaintiffs claim $10,000 for an area of 50 acres.
(b) Value for the War Horse Mine is predicated on a favorable newspaper account of November 6, 1895 and a 1906 Geological Survey Bulletin (No. 287, “The Juneau Gold Belt, Alaska”) which described the quartz ledge as averaging 2 feet in width and as being “rich in free gold finely disseminated throughout the quartz” (p. 149). It further stated that “shipments of sorted ore are said to have yielded over $100 per ton.” (Id.) However, the bulletin further stated that, since the initial developments of 1897 and 1900, no important improvements had been made on the property. Thus, as of the valuation date, the property had lain idle for some 7 years.
(c) The evidence is not sufficient to conclude that the acreage involved enhanced the value of Area 5a in any significant amount as of March 27,1907.
266. (a) There were certain unpatented claims located on Mansfield Peninsula as of June 10, 1925, covering a miner-alized zone of 750 acres, for which plaintiffs claim $50,000. In the early years there was a large number of such claims. Sporadic development took place through the years with the properties changing hands frequently. There was very small production from these areas prior to 1905, and none thereafter. By 1918, four groups of claims existed, on only one of which, however (the Alaska Willoughby Mining Company’s holdings), had development progressed beyond the prospecting stage. As to such property, there were some operations in 1895-1896. However, the property thereafter remained idle until 1915, when, after 8 months of operations, it was again shut down. The Geological Survey reported in 1918 (Bulletin No. 662-B, “Mining Developments in the Ketchikan and Wrangell Mining Districts”, p. 87) that the property was “very poorly developed, considering that 30 years had passed since the original discovery was made”, and that little ore was in sight above tide level, so that future development “must look to the extension of veins below tide level”, which, however, would involve pumping. No further production was had from this property prior to 1925.
*306 In 1919, a new property containing almost 100 claims, known as the Charles Williams property, was located at the head of Hawk Inlet, but, up to the taking date, it never extended beyond the prospecting stage.
In 1923, it was reported that a nickeliferous pyrrhotite deposit had been uncovered on the War Eagle Extension No. 2 claim of the Admiralty-Alaska Gold Mining Company’s group of claims, but no production occurred prior to the taking date.
(b) The evidence is insufficient to indicate the extent, if any, to which any of the aforementioned unpatented claims would, as of June 10, 1925, reasonably have been regarded to be potentially commercially profitable.
267. Lituya Bay. (a) Lituya Bay indents the mainland coast approximately 50 miles northwest of Cross Sound. Before 1900 there were small yields from the beach sands in the bay region ($15,000 reported in 1891, and $39,000 in 1896). However, none was reported thereafter. The Geological Survey reported in 1905 that “During late years many locations have been made and companies formed to work these deposits, but their attempts have apparently not been successful” (Bulletin No. 284, “Report on Progress of Investigations of Mineral Resources of Alaska”). In 1918, the Survey reported that some beach miners had worked the region in 1916, and that some gold-bearing gravels had been reported in some streams tributary to Lituya Bay, but no successful mining results were reported. The Survey also reported that some of the beach sands “carry a little platinum” and that “further prospecting is justified.” (“Mineral Resources of Alaska, 1916”, Bulletin No. 662-A, 1918, p. 42.)
(b) On the basis of the above, plaintiffs claim $10,000 for the mineral potential of 200 acres in the Lituya Bay section as of June 10,1925. However, the evidence referred to fails to support the conclusion that the acreage would have enhanced the value of Area 5a in any significant amount as of such taking date.

Area 5b

268. (a) Plaintiffs claim $75,000 as the value, as of February 26, 1925, of 500 mineralized acres, encompassing two claims patented in 1895 and numerous unpatented claims.
*307 (b) A number of locations were made in Area 5b prior to tbe turn of the century, the majority of which were in the vicinity of Muir Gl'acier and Willoughby Island. There were no reports of development in the Muir Glacier region. There was one 1895 newspaper account of some activity on certain property on Willoughby Island allegedly containing ore of principally silver and lead content, ¡but apparently development work was discontinued after 1895 since there is no further information.
(c) Another 1901 newspaper account referred to an alleged good body of copper carbonate undergoing development in Glacier Bay. However, there are no official reports concerning this deposit, and there is no further information of any kind after 1901. Such lack of information indicates a discontinuance of such operations as m'ay have been undertaken.
(d) Two claims in the Glacier Bay region were patented on December 19, 1895. Apparently there are no references in official reports to these claims, the only references thereto being press accounts, prior to the patent dates, of some good silver ore, and of sales of the claims.
(e) A mineralized zone, consisting of a gold-bearing area near the head of Glacier Bay, was discovered in 1924. However, the closing of the Glacier Bay National Monument to prospecting and mining in 1925 prevented any development. All that occurred prior to the 'taking date was the staking of claims. The Monument was again opened in 1936, and development of the area did take place, but the Geological Survey reported in 1959 (Bulletin No. 1058-B, “Geology and Ore Deposits in the Reid Inlet Area, Glacier Bay, Alaska”, pp. 33-39) that information concerning the amount of gold recovered from the area was incomplete, nor is there any indication of profitability, although the bulletin did state that “From 1938 to 1950 at least 2,500 tons of high-grade ore, with a recovery of about $100 per ton, has been mined and milled from the several mines in the area.” It also stated, however, that “About the only mining activity before 1937 consisted of sluicing some of the partially decomposed rock from the surface of some of the veins.” This was the state *308 of the knowledge and activity at the time of the taking. The Survey described the ore as “spotty” and its “location to be unpredictable”.
(f) Except for the 1924 Glacier Bay discovery, none of the evidence indicates, as of their respective taking dates, any significant value for the two patented claims or the unpat-ented claims. And as to the 1924 Glacier Bay area, it seems clear that, as of February 26,1925, there was such little development and, therefore, knowledge, as to preclude a finding that the zone would have enhanced the value of Area 5b in any significant amount. The character of the ore as described by the Geological Survey could not be considered overly promising. The difficulty of access, heavy snowfall, and shortage of timber were detriments to mining in Area 5b.

Other Lands Area 5a

269. (a) The balance of the land in Area 5a not heretofore considered consists of 461,079 acres for which plaintiffs claim 15 cents per acre, or $69,000 ($69,161.85).
(b) Within Area 5a there were 35 parcels comprising 1,824 acres which had been patented (other than mineral patents) at various dates between 1908 and 1925. These were for the most part homestead entries, but also included several cannery sites. About 15 percent of the 461,079 acres is covered by glaciers and a large part of the remainder is mountainous with elevations exceeding 2,000 feet. All such lands would have little economic significance. However, the part of Area 5a which is included in the Glacier Bay National Monument would have some recreational potential, containing extraordinary displays of glaciers, beautiful scenery and abundant wildlife. Its profusion of wildlife includes Alaska brown bears, grizzlies, black bears, marten, mink, red fox, beaver, wolverine, and Sitka black tail deer. Some land in the Gustavus area is suitable for tillage and pasture.
(c) The 461,079 acres would not have enhanced the fair market value of Area 5a as of their respective taking dates by an amount in excess of $10,000.

*309
Area 5b

270. (a) The balance of the land in Area 5b not heretofore considered consists of 1,535,546 acres and also includes a part of the Glacier Bay National Monument. Plaintiffs also claim 15 cents an acre for this acreage, or $230,000 ($230,406.90).
(b) Approximately one-third of Area 5b is covered by glacier or permanent snowfield. However, plaintiffs here too emphasize the hunting, tourist and recreational value of the lands within the Monument, the situation with respect to such lands being similar to that described in Area 5a, This Area 5b acreage would have little economic significance. Area 5b is not of easy access and has heavy snowfall. There were no patented lands in this area.
(c) The 1,535,546 acres would not have enhanced the fair market value of Area 5b, as of February 26, 1925, by an amount in excess of $15,000.
271. The total of 1,996,625 acres in Area 5 as “other land” had a fair market value as of their respective taking dates of $25,000.

Fisheries

272. Plaintiffs claim the fair market value of their exclusive right to exploit the fisheries resources of Area 5 was, as of June 10, 1925,'$3,850,000 (all attributable to Area 5a). All of this value is based on the salmon resource, $3,500,000 being for- canned salmon, and $350,000 being for salmon products industries other than salmon canning.
273. Icy' Strait and Lynn Canal have always been important fishing grounds in terms of southeast Alaska’s fishing economy. In 1925, four salmon canneries were located in Area 5a, two at Excursion Inlet, one at Dundas Bay, and one at Funter Bay. There were none in Area 5b. These canneries had a total output in 1924 of about 167,300 cases, or 6 percent of the southeast Alaska total of some 2.8 million cases. The value of the output was about $961,500, or 7 percent of the entire canned salmon product of southeast Alaska, which the Bureau of Fisheries valued at about $14,712,000.
*310 274. The same basic method of fisheries resources valuation heretofore described and employed in valuing such resources in the previous areas, particularly Areas 2 and 4, would reasonably be applicable to Area 5. Its application to the situation in the area as of June 10,1925 produces the results set forth in the following findings.
275. In 1924, the average price of all species of canned salmon in southeast Alaska was approximately $5.27 per case, with an average profit margin of 81 cents per case, being 15 percent on price and 18 percent on production costs.
In 1925, the profit margin rose to $1.10 per case, being 20 percent on price and 24 percent on costs.
The postwar years were dominated by the depression of 1921. The salmon industry was hit severely by the 1919 break in prices following termination of the war. Many canneries failed and it was not until 1924 that the industry recovered. The earnings record of the Alaska salmon industry during these years was unfavorable. Heavy losses were reported in 1920-1921. The net aggregate profits in 1922 were small. The better profits of 1923, 1924 and 1925 were still insufficient to wipe out the previous aggregate deficit. 1924 was 'a better year than 1925.
However, the 1925 data on the four canneries in Area 5a reveal a higher profit margin for them than for the average of southeast Alaska. In that year, the four companies produced 137,857 cases valued at $1,023,231, or $7.46 per case, with a profit of $1.83 per case, being 24.5 percent on selling price and 32.5 percent on production costs (of $5.63 a case). One reason for this was their higher percent of the more valuable red sahnon output as compared with southeast Alaska as a whole. The profit margin was equivalent to about 22.5 percent on current investment.
In 1925, investment in salmon canning in southeast Alaska was almost $22 million for about 2,800,000 cases packed, or approximately $8 per case. Thus, the per-case return on investment was about $1.60.
Allowing for a 10 percent return on investment, or 80 cents per case, as that return necessary to attract capital in the industry, the “excess profit” of the canneries attributable *311 to the fishery resource in 1925 would be 80 cents per case. This is the amount for which plaintiffs contend.
However, because of the recent adverse experience the industry had suffered, a purchaser would not reasonably have concluded that such 1925 excess profit could safely be calculated for the indefinite future. Indeed, on an aggregate basis, the industry’s 1920-1925 operations showed a net loss. On both 5-year 1920-1924, and 6-year 1920-1925, averages, there were no profits at all, let alone “excess” profits. Although economic recovery was currently being experienced, it seems reasonable to conclude that a purchaser would, using overall southeast Alaska figures, conservatively base his “excess” profit calculations on approximately one-half of that being currently experienced in 1925, i.e., 40 cents, instead of 80 cents. He would, however, note the large amount of the higher priced red salmon being handled by, and the above average profitability of, the Area 5a canneries, and would reasonably, therefore, adjust the figure to approximately 45 cents per case.
27,6. There should, similarly, be added to the cannery excess profits, the additional profits a purchaser could fairly anticipate as a result of (a) preempting the independent fishermen’s excess profits, (b) realizing on the benefits of improved efficiency in catch techniques, and (c) the benefits of a controlled private exploitation. For instance, about 60 percent of the fish for southeast Alaska canneries were being taken by traps, most of which were operated by the canneries themselves. This supply was being made at lower costs than the fish purchased by the canneries from independent fishermen. The cost of raw fish had risen to about 25 percent of the total production costs of canned salmon. Since the canneries took, at lower cost, about 60 percent of the fish through their own operations, some cost reduction would be possible through improved efficiency applicable to 100 percent of the catch. On Area 4, the factor of improved efficiency in catch techniques was the largest of the three additional factors contributing to an increase in the cannery excess profits (see finding 192).
However, a smaller part of the total potential return (i.e., considering also fishermen’s excess profit, improved efficiency *312 in catch techniques, and the benefits of private exploitation) probably went unrealized in 1924 than in 1908 (Area 4) because overall efficiency had been improved over the years. The “excess profit” actually earned by the canners in 1908 was about 60 percent of such potential total returns (27 -5- 46; see finding 192). It may be estimated, therefore, that the “excess profit” of the canners in 1924 was equivalent to about 80 percent of the total potential returns that could have been realized in that year if the fisheries had been efficiently operated as a private property. The total potential returns were, accordingly, about 56 cents per case (being an ll-cen!t addition to the 45-cent canners’ excess profits, instead of 19 cents added to such profits for Area 4). On the basis of a complete year’s 1924 pack of 167,000 cases, which pack would, for the purpose here involved, reasonably be considered as the average annual amount for the foreseeable future, the annual excess profit returns to the canneries would thus reasonably be estimated at about $93,500.
277. Plaintiffs contend that a rate of capitalization of 5 percent would be conservative and proper since returns from such an investment, in view of the long history of profitability of the salmon industry, would not be considered very risky or uncertain. However, considering the very recent disastrous period for the industry from which it had only recently recovered, it would seem that the application of a 10 percent rate would again be more appropriate. Thus, the value of this aspect of the fishery resources of Area 5, i.e., expressed in terms of the profits reasonably to be expected from operating salmon canneries, would be $985,000 as of June 10,1925.
278. (a) There were also in Area 5 salmon products industries other than salmon canning. In 1924, the value of such products was approximately 10 percent of the value of the canned salmon industry.
(b) Ten percent of $935,000, the June 10,1925 value of the area’s canned salmon fishery resources, would reasonably represent the value of the fisheries used in salmon products other than salmon canning. This would amount to $93,500.
279. Based only on the salmon resource, the fair market value of the fishery resources in Area 5 as of June 10,1925, *313 was $1,028,500 ($935,000 (finding 277), plus $93,500 (finding 278)). Plaintiffs make no claim for suck halibut, herring, or minor fisheries activities as may have been carried on in the waters of the areas included in Area 5.

Valuation Summary

280. The fair market value of Area 5 as a whole, taking into consideration the contribution thereto made by its forest lands ($39,899.80 (finding 264)), its other lands ($25,000 (finding 271)), and its fisheries resources in its surrounding and appurtenant waters ($1,028,500 (finding 279)), was $1,093,399.80.
Area 6 — Valuation oe Parcels Patented Peioe to June 19,1935 (the Date oe the Enactment oe the Special Act Herein Involved)
281» Area 6 includes five tracts designated as 6a, 6b, 6c, 6d and 6e. The parties have agreed that Area 6 comprises 2,634,744 acres of land, none of which was included in the Tongass National Forest, the Glacier Bay National Monument, or the Metlakahtla Eeservation.
282. (a) Patents were issued for a total of 71 parcels comprising 6,020.661 acres within Area 6c prior to June 19,1935. Also, by Executive Order issued January 4, 1901, a parcel comprising 516.10 acres was set aside as a United States light, house. The balance of Area 6, comprising 2,628,207.24 acres, was not taken by the United States at any time prior to June 19,1935, and the Indian title of the plaintiffs to such remaining part of Area 6 survived that date.
(b) The parcels comprising the 6,020.661 acres of land are as follows:
Townsite and settlement lands (seven parcels patented between February 14, 1910 and July 15, 1918)_ 782.665
Mineral lands (eight parcels patented between May 3, 1904 and July 18,1934)_ 367.190
Other land (including lands patented for homesteads and ether purposes) (56 parcels patented between April 6,1901 and September 4,1934)_ 4, 870. 800
Total. 6, 020. 661

*314
Mineral Lands

283. (a) Plaintiffs claim $50,000 as the fair market value, as of tbeir respective taking dates, of 'the eight mineral patents. The claim is predicated upon the fact that all of these patents were located in the Porcupine Placer District located at the northern extremity of southeast Alaska, and the fact that a substantial amount of placer gold was, through the years, produced from the district.
(b) Placer gold was first discovered in the district in 1898. The Porcupine gold field was described by the 'Geological Survey in 1904 as “one of the most important placer districts of southeastern Alaska” (“The Porcupine Placer District, Alaska”, Bulletin No. 236,1904, p. 9). Up to the date of the report, the output of gold from Porcupine Creek and its tributaries aggregated $460,000. Later bulletins described continued production from these creeks up bo 1906 at a rate of about $150,000 a year. In that year, 'however, a destructive flood occurred. Production in the district was resumed in 1910 with an average yearly production of about $50,000 until 1915, when another flood occurred. Total production from 1898 to 1916 was estimated by the Survey at about $1,200,000. Production after 1916 was at a much lower level. A 1929 Survey bulletin Stated that in each of the years 1928 and 1929 the entire placer production from southeast Alaska was worth only $10,000, principally from the Porcupine River and another district. This is the last available report on the Porcupine District. While there was probably a limited amount of production after 1929, there is no evidence that it ever again became a 'highly productive area.
(c) Although it is plain that the district did, as a whole, produce, during certain periods, significant amounts of placer gold, there is no evidence of where the eight mineral patents here involved fit in the total picture as of their respective patent dates. For instance, one patent, covering over 60 acres, was issued March 27,1907, at a time when production in the district had ceased due to flooding, as was 'also true of another, covering about 20 acres, issued in July 1908. Although production was insignificant after 1915, when another flood occurred, another of the patents here involved, covering about 60 acres, was issued in January 1916, and still another, *315 covering 160 'acres, was not issued until July 1934. Thus, four of the eight patents were issued at times when there was insignificant production or none at all. As to the other four, there is no way of knowing what, if any, value they had, since not all of the district was of equal value.[78] There is no way of telling, from the generalized data presented concerning the entire district, whether the eight specific patents herein involved had any value or, if so, how much. Consequently, plaintiffs’ claim cannot be allowed in any amount.

Townsite and Settlement Land

284. (a) Haines townsite is located at the north end of Lynn Canal, on the west shore of Chilkoot Inlet facing Portage Cove, south of Lutak Inlet. It was founded in 1878 with the establishment of a Presbyterian mission station. The population of Haines and nearby Port Chilkoot reached its peak of 700 in the 1909 census year, with the white population reported at 464. The area around Haines was an active center of salmon canning at the turn of the century. The townsite was patented on July 15, 1918, for an area of 70.8 acres, of which 2.6 acres were reserved for schools. By that time its total population had fallen to around 500, with a white population of around 320. One cannery was still operating in the area. Based upon the valuation of lots by the townsite trustee for deeds delivered in 1918, 64 acres of this area, including streets and alleys, had a value of $54,374 at the date of patent. The average value per acre of the valued townsite area was $849 per acre. The least valuable lots were $13 per 1,000 square feet, which results in a value of $357 per acre for such lower value townsite land, including streets and alleys. This $54,374 valuation is the best evidence of the amount by which the townsite enhanced the value of Area 6 as of the patent date of July 15,1918.
(b) Six parcels of land aggregating approximately 712 acres adjoining or close to the Haines townsite were patented between 1910 and 1913 prior to the issuance of the townsite patent. In view of the average value of $357 per acre in the *316 lower value area of Haines townsite in 1918, and considering the growth, of the fishing industry, which was the economic base of the Haines region, plaintiffs claim that the 712 acres of patented land near the Haines townsite had a fair market value, as of 'the 1910-1913 patent dates, of $15,000, or about $20 per acre. However, the record does not indicate the nature of these patents or any special value of the acreage involved. These lands were patented during a declining period of economic importance in the life of the town. As land located adjacent to the town, the parcels would not appear to have been too attractive viewed in light of future town growth prospects. A value of about $10 per acre would appear to be more realistic, totaling $7,120.
(c) The fair market value of the 783 acres comprising the patented Haines, townsite area and the surrounding-patented area was $61,494 as of the respective patent dates.

Other Lands

285. Three patents involving a total of 50 acres, two in 1901 and one in 1908, were issued to salmon canneries in the Haines region. This was during a period when the town was growing in population and economic importance. In addition, 4,820 acres of land in Area 6c were patented prior to June 19, 1935, for homestead and other purposes. Chil-koot Valley, where a number of the homesteads are located, was one of the best agricultural sections in Alaska, and was well known for its fine strawberries, vegetables and root crops. Plaintiffs claim that the 4,870 acres of patented “Other Land” in Area 6c had a fair market value, as of their respective dates of patent, of $25,000, or an average of about $5 an acre. This claim is reasonable.

Valuation Summary

286. The fair market value of the 6,020.661 acres of separately patented parcels in Area 6 was $86,494 as of the respective dates of patent, $61,494 being the contribution thereto made by the Haines townsite area lands, and $25,000 by the other lands.
Valuation Summary — All Areas •
287. On a fair market value basis, the lands and appurtenant waters which defendant took (and for which plaintiffs *317 claim tlie sum of $77,543,000) bad a value, as of tbe respective dates of taking, as hereinabove set forth, totaling $14,034,953.80, as follows:
Areal_ $111,556.00
Area 2_ 3,242,481.30
Area 3_ 131,226. 50
Area 4_ 9, 369,796.20
Area 5_ 1> 093,399. 80
Area 6_ 86,494. 00
Total_$14, 034,953. 80[79]
*? Damages fob Failube and Refusal to PRotect (Losses Suffered Prior to Dates of Actual Takings)
Areas 1, 2, 3, 4, and 5

Fisheries

288. Commercial exploitation of the fisheries of southeast A laalrn. on a major scale, which antedated ¡by many years the taking of the Tlingit and Haida territory, commenced in 1878 with the establishment of salmon canneries near Klawak on *319 Prince of Wales Island and at Sitka. Thereafter, the salmon canning industry expanded rapidly. Salmon accounted for the overwhelming bulk of the fisheries output of the area. However, halibut, herring 'and other minor species were also taken for commercial production.
289. In the 7-year period from 1896 to August 20, 1902, the date of the establishment of the Alexander Archipelago Forest (later incorporated into Tongass National Forest), the value of the final products of fish taken from the waters of southeast Alaska was ‘approximately $10,153,000. The value of fisheries products for the period from 1896 through 1908 was approximately $27,529,000. While these figures do not encompass the entire range of the taking dates, they do show that substantial values of fish were removed from the waters of the Tlingit 'and Haida territory by the fishing industries and canneries before the actual major takings in 1891, 1902, 1907,1909 and 1925.

Area 1

290. One of the first steps undertaken after the arrival of the Tsimshian Indians on Annette Island in 1887 was the construction of a salmon cannery. Operations commenced on an experimental basis in 1890 when 500 cases were produced. Since the establishment of the Annette Islands reservation, which constituted the taking of this area, occurred on March 3,1891, plaintiffs do not consider that the fishing operations in the area prior to the actual taking were sufficiently substantial to warrant a determination of their lasses. Accordingly, plaintiffs make no such claim with respect to Area 1.

Area %

291. (a) During the period 1883-1902, the total market value of the raw salmon caught in all of southeast Alaska (based on average representative prices paid for the number of fish caught of the various species) was approximately $1,480,000.
(b) The market value of the canned Salmon pack of Areas 2a and 2b for 1902 was approximately 32 percent of the value of the total southeast Alaska pack (finding 92). On this basis, the market value of the raw salmon caught in Areas 2a *320 and 2b during the 1883-1902 period was also approximately 32 percent of the southeast Alaska total, or $473,600.
(c) The total costs incurred in catching the fish was approximately 75 percent of their market value. Thus, had there been no compensation, around 25 percent of the total value of $473,600, or $118,400, would fairly represent the beneficial amount of which the owners were deprived due to the exploitation of their fishing grounds in Areas 2a and 2b.
However, most of the independent fishermen fishing for the canneries were plaintiffs themselves. Therefore, in selling the fish to the canneries which they themselves caught, they have already received compensation in some measure for the total quantity of fish removed from Area 2 waters.
During this early period, about one-third of the salmon catch was taken by the canneries themselves. Thus, around two-thirds were taken by independent fishermen, representing about $79,000 of the $118,400. Approximately 60 percent of the independent fishermen were plaintiffs themselves. Thus, approximately $47,400 of such $79,000 went to plaintiffs, and to this extent they have already been compensated. On this basis, the amount of which they were beneficially deprived with respect to the raw salmon catch was, prior to the taking date, $71,000.
(d) With respect to this area, plaintiffs make no claim for losses for the taking of fish other than salmon.

Areas § and If,

292. (a) Areas 3 and 4 are considered together for this purpose because of the proximity in time of their 1907 and 1909 takings. Thus, the total market value of the raw salmon catch in all of southeast Alaska is computed for the period 1893-1908. This value (on the same bases as herein-above set forth) was $3,494,000.
(b) Based on the number of cases of canned salmon packed in Area 3 in 1901, 1902, 1907 and 1908, and the market value thereof, as against the total produced in southeast Alaska during those years, and the market value thereof, the market value of the raw fish catch in Area 3 during 1893-1908 was approximately 3 percent of the value of the entire catch.
*321 Similarly (but using 1891, 1902, 1907, 1908 and 1909 figures) , tlie market value of sucli catcli in Area 4 during such years was 40 percent of the total value of the entire catch.
Thus, a total of 43 percent of $3,494,000, or $1,502,420, represents the approximate value of the raw salmon catch for Areas 3 and 4 during the 1893-1908 period.
(c) Computed at 25 percent of the raw salmon value, the total beneficial amount of which plaintiffs, as the owners of the fish, were deprived during such years (had there been no compensation to them therefor) would be $375,605.
However, as in Area 2, plaintiffs composed most of the independent fishermen in Areas 3 and 4. Thus, plaintiffs have, in catching and selling fish to the canneries, already received some measure of compensation. On the same basis as was applied to Area 2, about two-thirds of the catch were taken by independent fishermen, representing- about $250,000 of the $375,605.
Sixty percent thereof represents the part paid to plaintiffs themselves. Thus, approximately $150,000 of such $250,000 went to plaintiffs, and to this extent they have already been compensated. On this basis, the beneficial amount of which they were deprived with respect to the raw salmon catch prior to the taking dates was $225,605 ($375,605 minus $150,000).
(d) Plaintiffs make no claim for other fisheries in Area 3. However, in Area 4, the value of the other fisheries was approximately 10 percent of the value of the salmon-resource during the period involved. Limited to Area 4, and reducing the percentage to 8 percent in view of such limitation, the beneficial amount of which plaintiffs were deprived with respect to such other fisheries was approximately $18,000.
(e) The total amount of .which plaintiffs were deprived for the extraction of fish prior to the actual taking of the areas was $225,605 with respect to the raw salmon catch in Areas 3 and 4, and $18,000 with respect to the other fish in Area 4, making a total of $243,605.

Area 5a

293. (a) During the period 1893-1924, the total market value of the raw salmon caught in all of southeast Alaska *322 (calculated on the same basis as hereinabove set forth) was $30,709,000.
(b) B'ased on the number of oases of canned salmon packed in Area 5 in 1924 and 1925, and the market value thereof, the market value of the raw fish catch in Area 5 during 1893-1925 was approximately 6 percent of the value of the entire catch, or approximately $1,842,540.
(c) Computed at 25 percent of the raw salmon Catch, the total beneficial amount of which plaintiffs, as the owners of the fish, were deprived during such years (had there otherwise been no compensation thereifor) would be $460,635. However, as in the other areas, allowance must be made for the fact that plaintiffs themselves composed many of the independent fishermen who caught the fish and sold them to the canneries.
Ia the later years, the canneries themselves, through increasing use of traps, began to supply themselves with more fish than they purchased through 'independent fishermen. About 60 percent of the salmon catch was taken by the canneries themselves. Thus, around 40 percent was taken by independent fishermen, representing about $184,250 of the $460,635.
Using the same basis of 60 percent as the number of natives composing the independent fishermen, approximately $110,550 of such $184,250 went to plaintiffs themselves, and to this extent they have 'already been compensated. On this basis, the amount of which plaintiffs were beneficially deprived with respect to the raw salmon catch in Area 5 prior to the taking date was approximately $350,000.
(d) Plaintiffs make no claim for this area with respect to fish other than salmon.
294. The total beneficial amount of which plaintiffs, as owners of the fish, were deprived as the result of their fisheries resources being exploited in Areas 2, 3, 4 and 5 prior to the respective dates of their actual takings, was $664,605, as follows:
Area 2_ $71,000
Areas 3, 4a and 4b_ 243,605
Area 5_ 350, 000
Total. $664, 605

*323
Minerals

295. Many areas of southeast Alaska were prospected and much development and mining activity took place at early dates long before actual taking of the 'mineral lands by the issuance of patents or the establishment of national forests. The first mineral location was recorded in 1867 on a copper deposit near Kasaan on Prince of Wales Island. The placer gold deposits in the Windham Bay-Powers Creek area were discovered in 1869. Gold was discovered near Silver Bay on Baranof Island in 1871 where considerable prospecting was done and many claims located. By 1885 most of the placer and lode claims of the Juneau Gold Belt had been located following the discovery of placer gold in 1880 on Gold Creek. In 1881 placer and gold locations were made in the area of the Treadwell mines. The success of the Treadwell mines attracted considerable attention to the area. By 1902 several hundred claims had been staked in the area of the Ketchikan District and systematic mining had begun at a number of localities. Commencing with June 19,1887, several hundred patents for mineral claims had been issued. The Organic Act of May 17,1884, made the law's of the United States relating to mining claims applicable to Alaska and miners were thereafter permitted to locate, work, perfect and patent mining claims in the Tlingit and Hadda Territory.
As a consequence of these activities, the mineral resources of large parts of the Tlingit and Haida Territory were exploited before the actual taking of the lands without any compensation to the Indians for such exploitation. (Plaintiffs make no claims in this regard to Areas 1 and 3.) However, the absence of reliable data makes it difficult to measure the actual value, if any, of much of the mineral resources of which plaintiffs were thus deprived. While the sales prices of some of the extracted minerals can be ascertained in some instances, the lack of production cost data makes it impossible to tell whether such prices resulted in any profits and whether, therefore, plaintiffs were deprived of anything of real value.

Area 2b

296. No mineral patents were issued in Area 2b prior to the general taking date. All mineral production in this area prior to August 20, 1902, may therefore be considered as ore *324 extracted before the actual taking of the property 'by the Government. A1902 Geological Survey Paper (“The Ketch-ikan Mining District”) estimated that before 1902 ore of a value of approximately $100,000 in gold from the Ketchikan District had been produced. On Hetta Inlet, the Alaska Copper Company in 1901 claimed, according to a press account, that it bad made shipments of ore to the smelter of 1,125 tons, with net returns of around $50 per ton, totaling approximately $56,000. A 1901 newspaper report stated that a trial shipment of 16 tons from mineral ledges on Coronation Island sampled $88 per ton in silver and lead, and that the operators had 400 additional tons ready for shipment, which would produce, for the 416 tons, the sum of $36,000. On these bases, plaintiffs contend 'that $192,000 in ore values had been extracted from the mines in Area 2b, and that 25 percent thereof, or $48,000, would reasonably represent the profits therefrom resulting from the exploitation, and, therefore, the damages to which plaintiffs are entitled.
The only figure in the above which appears to have sufficient reliability for the purpose here involved is the $100,000 estimate of the Geological Survey concerning pre-19,02 production from the Ketchikan District. Lacking any reliable data concerning the profitableness of such production, and considering that the total amount produced was not large, 15 percent, rather than the 25 percent claimed, would appear to be a more realistic estimate. On this basis, $15,000 would represent the profits realized from the exploitation of such lands of the plaintiffs prior to the taking date.

Area

297. Area 4a contained several of the major mineralized zones of southeast Alaska, the most prominent of which was the Juneau Gold Belt. Extensive prospecting and development work was done, many locations were filed, and much ore was extracted before the respective mineral claims were actually taken by the issuance of patents or otherwise. The extent of pretaking prospecting, development, examination and testing obviously involved the removal of large amounts of valuable ore with respect to which there are no records. Because of the nature of placer mining, which for the most *325 part required a minimum of capital and yielded immediate returns, much of -the gold production from this source went unrecorded. There are some records, however, of production before ¡actual takings in Area 4a.
298. (a) The Treadwell and Gold Creek mines in the Juneau Gold Belt were the outstanding examples of pre-taking production in large quantities. The Paris claim, from which the production of the Treadwell mine was obtained, was patented on March 3, 1888, the earliest patent date of any of the producing mines on Douglas Island. Placer mining on the decomposed outcrop of the Treadwell lode was completed by 1884, by which time there was a placer yield of approximately $95,000. Production of the Paris lode yielded $1,096,336 from 1882 through 1887. $429,889 was produced for the entire year 1888. Allocating one-sixth of the 1888 yield, or $71,648, to production 'before issuance of the patent in March results in- a total yield for the Paris lode, before taking, of $1,167,984. The operating profit from production of $1,526,225 through 1888 was $729,000.
(b) The Gold Creek placers were actively worked during the early years. The small placers, which were mostly exhausted before 1890, were estimated to have produced $850,-000 (finding 153). Since virtually no placer patents in the Gold Creek area were issued before 1890, the pretaking placer production may be considered as at least $800,000. The Gold Creek lode mines produced about $1 million from 1881 to 1903 (finding 162), but neither the properties from which the production came nor the year of production can be specifically identified. The earliest patent in this area was June 19, 1887, 'but many mineral properties remained unpatented in 1903. Since more than 6 years of mining occurred before the first patent was issued and many un-patented properties were mined during the entire 1881-1903 period, it is reasonable to attribute 25 percent of the 1881-1903 lode production, or $250,000, to pretaking production.
(c) The pretaking production of the Treadwell and Gold Creek placers and lodes thus exceeded $2,300,000. Considering the operating experience of Treadwell during its early history, with operating profits equaling almost 50 percent of ore values, and the large amount quickly yielded by *326 placers with little capital outlay, 25 percent of tbe the ore extracted, or $575,000, may fairly be considered as the profits realized from the exploitation of this Tlingit acreage prior to the various dates when if was actually taken.
299. Other mining sections in the Juneau Gold Belt from which there was substantial production prior to their actual taking dates included Sheep Creek, Montana Basin, Berners Bay, and Holkham Bay-Sumdum. The Sheep Creek mines (about 4 miles southeast of Juneau) produced approximately $465,000 by the close of 1903 prior to the issuance of any lode patents (finding 180, n. 38). The Eagle River mine in the Montana Basin section, patents for which were issued in 1906, had an estimated production by 1905 of $250,000 in a period of less than 3 years (finding 166). The Jualin mine in the Berners Bay section, patented March 20, 1900, had production of over $200,000 before that date (finding 171(a)). In the Holkham Bay-Sumdum section, the Bald Eagle mine, patented in 1899, and the Sumdum Chief, patented after 1909, produced over $220,000 from 1894 to 1897 (finding 176(a)). Thus, about $1,135,000 was produced in these four areas prior to the taking dates. Since there is but limited information with respect to operating costs and operating profit, plaintiffs claim 20 percent of the value of the ore extracted as a fair approximation of the amount by which they were damaged. This claim is reasonable. On this basis, profits of approximately $227,000 were realized as a result of the exploitation of these sections of plaintiffs’ lands.
300. (a) Other sections in the Juneau Gold Belt had production before actual taking of at least $50,000 consisting of $25,000 from Yankee Basin (finding 180, n. 41), and $25,000 from the Crystal mine in the Port Snettisham section (finding 177(c)). Outside the Juneau Gold Belt in Area 4a, there was production prior to taking of $25,000 from the Cleveland Peninsula, which included $20,000 in 1898 from a rich ore shoot in the Gold Standard group (finding 180, n. 47(a)), and $5,000 in 1900 from a quartz ore pocket in the Gold Mountain group (finding 180, n. 47(c)). In 1891, $18,000 in gold was recovered from black sand beach deposits *327 of Yakutat Bay in Area 4b (finding 181, n. 55). Tbe total of these smaller recoveries was $93,000.
(b) Plaintiffs also claim compensation of 20 percent of such ore value. However, most of these small workings could not have been very profitable, although here too the Yakutat placers must be considered as low-cost operations. Valuation on a 10 percent profit basis would appear to be more realistic. On this basis, profits of $9,300 were realized from the exploitation of these mineral resources in plaintiffs’ territory prior to their taking.

Area 5a

301. In Area 5a, before the 1925 taking there was early lode production (i.e., up to the dose of 1903) of approximately $15,000 from the vicinity of Funter Bay in the Mansfield Peninsula section, and placer production of $54,000 before 1900 from the beach sands in the Lituya Bay section (finding 267(a)). Because of the large amount of placer production involved, plaintiffs’ claim of 20 percent of the $69,000 pretaking yield in Area 5a is reasonable. This amounts to $13,800.
302. On the above bases, compensation for the minerals extracted from southeast Alaska, before the actual takings of the various areas totals $840,100, as follows:
Area 2b- $15,000
Areas 4a and 4b
Treadwell and Gold Creek_$575, 000
Other Juneau Gold Belt Sections_ 227,000
Other Sections_ 9, 300
-- 811, 300
Area 6a- 13, 800
Total- $840,100

Timber

303.There are no overall data as to total volume or value of the timber that was commercially cut from the several areas of Tlingit and Haida Territory in southeast Alaska prior to the date the areas were taken by defendent. However, partial data permit the making of reasonable estimates. In the 1886 Annual Report of the Governor of Alaska, it was stated *328 (¿hat there were five sawmills in the territory, “the total cut of which will probably not exceed 2,000,000 feet,” and that two vessels “with cargoes aggregating somewhere between half and three-quarters of a million [feet] of valuable timber cut at the mills on Prince of Wales Island” had been seized by United States authorities at San Francisco, presumably because of illegal export. By 1889 there were 11 sawmills in operation in southeast Alaska, one being located at Metla-kahtla in Area 1, four being located within Area 2, and the remaining six located within Area 4. The 1890 Census reported that the sawmill located ait Wrangell was the largest in the territory, having a daily capacity of 80,000 feet, that the sawmill at' Klawak (used for making lumber for the use of an adjoining cannery) had a daily capacity of 15,000 feet, and that the sawmill at a small settlement called Chican had a daily capacity of 8,000 feet. This census also reported the export from Prince of Wales Island of 1,670,000 feet of lumber during the 3-year period 1883-1885. The 1891 Annual Report of the Governor of Alaska reported proceedings against 13 sawmills of southeast Alaska involving depredations of close to 11 million feet of timber with an alleged value of approximately $250,000.
304. Because of stringent regulations pertaining to the cutting of timber, consumers of lumber in southeast Alaska were frequently obliged to import lumber from the Pacific Northwest and to pay high prices therefor, which included a freight charge of $10 a thousand. The Governor of Alaska reported in 1899 that there were then 12 mills in operation in southeast Alaska, “nearly all of very small capacity, and all the lumber which is manufactured is for use in the Territory, none being shipped out” (House Doc. No. 5,56th Cong., 1st Sess., pp. 14-15), and that the prices charged to consumers at Sitka were $13 per thousand for rough lumber, $20 per thousand for flooring and rustic, $25 per thousand for selected boat lumber, and $50 per thousand for clear cedar. He noted that most of the lumber used in the mining enterprises, and the building of the towns and the White Pass Railway, had been imported from Puget Sound despite the abundant forests of southeast Alaska.
*329 305» During the 3-year period 1900-1902, the annual cut of tbe sawmills of southeast Alaska was approximately 8.1 million feet in 1900,10.8 million feet in 1901, and 8.2 million feet in 1902. During the 8-year period, 1909-1916, a total of 234,488,000 feet was cut from the Tongass National Forest for a total value of $284,551. The average annual cut was 29,311,000 feet and the average value per MBF was $1.21.[80]
306. Taking into consideration the rising commercial cut of 'timber in southeast Alaska from approximately 2 million feet in 1886 to 10.8 million in 1901, it may fairly be estimated that the total volume of the timber cut from the forests of southeast Alaska during the 16-year period, 1886-1901, was approximately 80 million feet or an average of about 5 million feet per annum. Further taking into consideration the rise in cut from a range of 8.1 to 10.8 million in 1900-1902 to an average annual cut of 29.3 million during 1909-1916, it may also be fairly estimated that the cut of timber from the forest lands of southeast Alaska within Areas 3,4 and 5 during the Y-year period 1902-1908 was not less than 90 million feet, or an average of around 13 million feet per annum. Based on an average cutting charge or royalty of 25 cents *330 per MBF,[81] which would have been reasonable, plaintiffs, on an ownership basis, would thus have received, for an estimated 170,000 MBF of timber, the sum of $42,500. This amount does not include any payment to plaintiffs for the noncommercial cut of timber by settlers and miners during the periods in question, or the commercial cut of timber from Area 5a during the period 1909 to 1925, for which plaintiffs make no claim.

Townsites

307. The development of the mining and canning industries in southeast Alaska, as well as the area’s location as a gateway for the mining activity in the Yukon and interior Alaska, resulted, as noted, in the establishment of new communities around communications and industrial centers. The increased economic activity resulted in an increase in the white population and many business establishments to service these new population centers and focal points of economic activity. The act of March 3,1891 (26 Stat. 1095) permitted lands in Alaska to be entered for townsite purposes. Much of the townsite land was in fact occupied for residential, commercial, and administrative purposes both before 1891 and before the actual taking of the townsite land by defendant through the issuance of townsite patents or otherwise. Plaintiffs claim fair rental value in the amount of $286,500 for the use and occupancy of certain of these lands in their territory during such pretaking periods. The towns for which such rental value is claimed are those in Area 4a, i.e., Juneau ($50,000); Douglas ($24,750); Skag-way ($55,000); Ketchikan ($38,750); Sitka ($62,000); Wrangell ($42,500); and Petersburg $13,500). The claim is generally calculated by taking what plaintiffs contend were the average values as townsites of the acreage comprising such sites from the times the towns were founded to the dates they were patented or otherwise taken (as estimated *331 from various facts pertaining to the towns’ growth during such periods and the final values claimed as of the taking dates[82]), and then taking 5 percent of such average values as an alleged fair rental value.
However, plaintiffs cite nothing in the record to support their claims as to the amounts of the annual average values of the occupied portions of the several townsites during the pretaking periods, nor is there anything readily identifiable in the record from which such values can reasonably be inferred or estimated. The same is true with respect to the claimed rental value of 5 percent, for which plaintiffs cite no support in the record by way of testimony or otherwise.
Accordingly, for lack of proof, no part of this portion of the claim can be allowed.
Apea 6
308. Prior to June 19,. 1935, the only part of Area 6 that was exploited to a significant extent by white settlers, businessmen and miners was Area 6c. During the last 20 years of the 19th century and the first decade of the 20th century, Area 6c was the center of active cannery operations. Also, with the discovery in 1898 of placer gold in the Porcupine District, significant mining activities commenced in this 'area. The town of Haines which had been founded in 1878 and Port Chilkoot, located about 1% miles southwest of Haines, had a combined white population of 461 in 1910. After a decline in succeeding years, the white population of these communities increased again to 508 in 1939. In the vicinity of Haines, settlers occupied Chilkoot Valley, a good agricultural section.

Fisheries

309. Three canneries were built within Area 6c prior to 1890, one erected in 1882 by the Chilkat Packing Company on the eastern shore of Chilkat Inlet, one built by the Northwest Trading Company in 1883 at Pyramid Harbor on the west side of Chilkat Inlet, and one built in 1889 on Chilkat Inlet by the Chilkat Canning Company. The first was burned in *332 1892 and not restored. Association in 1893 which operated it, except in 1905, until the end of the season of 1908, when it was abandoned. The 'third operated only from 1889 to 1893. After the turn of the century, three new canneries were constructed within Area 6c. The first was built in 1900 by the Chilkoot Packing Company at the head of Chilkoot Inlet. This cannery was closed in 1904. The second was built by the Columbia Canning Company in 1902 on the southern side of Chilkoot Inlet. It was destroyed by fire early in 1919. Also in 1902, tihe third was buil't by the Alaska Fisheries Union on the east side of Chil-koot Inlet. It operated through 1906 when it was sold, and, in 1908, moved to Excursion Inlet.
310. The extent of the fishing operations of the canneries in Area 6c and the fishing methods employed by them caused serious unrest among the Indians of Area 6c and finally resulted in a dispute between the canneries and the Indians which in 1892 nearly broke out into violence. The complaint of the Chi'lkat and Chilkoot Indians was that the canneries and their fishermen had usurped the native fishing grounds, and that, by use of drift nets spread across the inlets, the cannery fishermen were preventing the fish from entering the river where the Indians were accustomed to catch their fish. In an official report to the Secretary of the Interior, it was stated 'that in 1892 “a war was only prevented by the arrival of the U.S. warship Pinta, the Governor and District Attorney.” A council was held at which the Chilkat and Chilkoot chiefs stated the grievances of the Indians. However, the outcome of the meeting was a decision by the Governor that the fishermen employed by the canneries had the right to fish wherever they pleased and in the manner they were pursuing.
311. From the inception of their operations in 1882 to the close of the season of 1900, the canneries operating in Area 6c packed a total of 620,056 cases of salmon. The more valuable reds constituted the great bulk of the catch in this area. On the reasonable basis of an average of 11 fish per case, the total salmon catch packed by these Area 6c canneries in such 1882-1900 period was 6,820,616 fish. During the 5-year period, 1901 through 1905, a total of 430,473 cases was packed by the Area 6c canneries. On the same basis of 11 fish per *333 case, the salmon catch of the Area 6c canneries during the period 1901-1905 was 4,735,203 salmon. For the years after 1905 data as to cases packed in Area 6c is not available. However, the total catch of salmon during the period 1906-1910 in the Chilkat Inlet and Fiver and the Chilkoot Inlet and Fiver was approximately 1,200,000, of which over 1 million were reds.
312. Based on a catch of 11,555,000 salmon packed by the Area 6c canneries from 1882 to 1905, and on an average of 7 cents per fish, which is a reasonable, representative price for the type of fish in this area, the value of the catch was approximately $808,850. Computed at 25 percent of the raw salmon value, the total beneficial amount of which plaintiffs, as the owners of the fish, were deprived during such years was $202,210. In this area, the evidence does not indicate that the canneries purchased any substantial amount of the fish from plaintiffs.

Minerals

313. (a) As shown in finding 283(b), around $1,200,000 in placer gold was taken from Porcupine Creek and its tributaries between 1898 and 1916. $460,000 was produced through 1903. Thus, $740,000 was produced from 1904 to 1916. (After 1916, there was some but only very limited production.)
No value was placed on the eight mineral patented areas covering around 367 acres because it was not known where their locations were in relation to the valuable producing areas or how much gold, if any, had been produced from such areas prior to the patent dates.
(b) The first patent, for 13.99 acres, was issued in May 1904. The second, for 19.33 acres, was issued in June 1904. Therefore, all of the production through 1903 related to a period prior to the issuance of any patents. $460,000 was produced from 1898 to 1903. Twenty-five percent of the value of this extracted placer gold ore, or $115,000, may fairly be considered as the profits realized from the exploitation of this Tlingit acreage prior to 1904.
(c) With respect to the $740,000 production subsequent to 1903, during which period 12 claims were patented in eight *? patents, plaintiffs estimate that about 20 percent of such $740,000, or approximately $140,000, was produced during the periods prior to the issuance of the several subsequent patents, as well as from all the unpatented claims. Between 1897 and 1935, a total of 5,365 claim locations were made in Area 6c, of which 3,997 were placers. On the same 25 percent basis, plaintiffs thus claim $35,000 for the minerals exploited and removed from the district between 1904 and 1935. Considering that only two patents were issued prior to 1905 covering only around 33 of the total 367 acres patented and that production was at the large annual rate of $150,000 during 1904 and 1905; that plaintiffs’ estimate is based on production only through 1916, whereas there was some (although limited) production subsequent thereto (finding 283(b)); and that three patents, covering almost 240 acres of the 367 patented were issued after 1913 (with one covering 160 acres not being issued until 1934), plaintiffs’ claim is reasonable.
(d) The amount of profits realized from the exploitation of the placer gold areas of the Porcupine gold district prior to the issuance of any patents ($115,000), as well as from the unpatented claims prior to June 19, 1935 ($35,000), was at least the sum of $150,000.

Townsite

3,14. (a) As shown in finding 284, in 1918 the Haines townsite trustee delivered deeds to town lots which he had valued at $54,374. The valued lots, streets and alleys covered 64.06 acres. The rest of the land within the 70.8 acres surveyed as the Haines townsite in 1917 was taken up by reserved land. The 1920 Census reported a white population of 131 for Plaines and 186 for nearby Port Ohilkoot. The 1910 Census reported a white population of 209 for Haines and 255 for Port Chilkoot, and in 1900 the white population of Haines was reported to be 78. In 1905, the principal enterprises of Haines were general merchandising, lumbering and fishing, with eight general stores, one sawmill, and four canneries'within a 9-mile radius of the town.
(b) Plaintiffs claim $18,000 as the fair rental value for the use and occupancy of the Haines townsite land for the 18-year period 1900-1917. The claim is based on an estimated *335 average annual value of the land during such period of $20,000 (considering the growth of population between 1905 and 1918, the “probable rise in property values during this period”, and the value of the patented portion of the town as of the patent date) and an “equitable rental value” of 5 percent, or $1,000 per annum, during such period.
For the same reasons as are set forth in finding 307, no amount is allowed with respect to this claim.

Summary of Damages

315. Assuming entitlement to recover, the amount payable to plaintiffs for the use and exploitation of their Area 1-5 lands and fishing grounds prior to the actual several taking dates totals $1,547,205, as follows:
Areas 1, 2, 3,4, and 5
Fisheries_ §664, 605
Minerals_ 840,100
Timber_ 42, 500
Total_ 1, 547,205
If plaintiffs are, on their theory, further entitled to recover with respect to Area 6 for the exploitation of this area that occurred prior to June 19, 1935, the amount would be as follow's:
Fisheries_$202,210
Minerals_ 150, 000
Total_ 352,210
Thus, on this aspect of the case, the total covering all areas would be $1,899,415.
StjmmaRY — Fair Market Value and Damages
316. In summary, the fair market value of plaintiffs’ lands and waters, and their resources, taken by defendant, comprising all the areas the parties have designated as Areas 1-6, was, as of the several taking dates, $14,034,953.80. Damages for the value of the minerals, timber, and fisheries taken from plaintiffs’ lands and waters prior to such several taking dates of Areas 1-5, and which would represent compensation to plaintiffs for the exploitation of such lands and waters during *336 such pretaking periods, totaled $1,547,205. As to Area 6, such damages resulting from such exploitation prior to June 19,1935, of unpatented lands (or lands prior to their having been patented), and from the exploitation of the fisheries of the area, totaled $352,210.
The total of such amounts is $15,934,368.80.
Value to the Indians
317. As set forth in finding 4, defendant presents an alternative “Value to the Indians” basis of compensation and the following findings are made with respect to such theory.[83]
318. Unlike the Indians in the rest of the United'States, plaintiffs never had reservations set aside for their exclusive use and occupancy and were not driven from their ancient dwelling places. Some of their aboriginal villages still exist. Dwindling population did result in the disappearance of some villages, as did the election of some of the plaintiffs to live in the white settlements. Although they no longer have the exclusive right to exploit their lands and waters, plaintiffs still may hunt and trap over practically all of the area originally claimed by them. There has been little interference in the harvesting of the natural vegetable products of the area, such as wild berries. There have been no restrictions on their right to trade.
While there has been interference with their fishing rights in certain areas, plaintiffs may still generally fish in the streams and coastal waters and secure substantially all of the salmon they require, whether fresh or for drying, smoking, and salting for year-round use. The intrusion of the white man into their aboriginal territory has not affected the run of salmon.
Aboriginally plaintiffs made no use of the mineral resources of their territory. The metal utensils and implements they used were obtained through trade.
Plaintiffs have not been denied free access to the forests of southeast Alaska to supply their needs.
319. The takings by defendant of plaintiffs’ lands and waters did deprive plaintiffs of the right of exclusive pos *337 session of their aboriginal territory and the exclusive use of the resources therein. Had plaintiffs retained exclusive possession and use of their lands and waters, it may fairly be assumed that, surrounded by a region occupied and exploited by the white population, plaintiffs too would have exploited the resources of their territory for commercial purposes in order to meet the demands of the white man’s economy. One of the ways by which plaintiffs could have attempted to capitalize upon their resources was by leasing or charging for the privilege of exploiting them. As of the various taking dates, certain of these resources would, in varying degrees, have been in demand by the white man.

Hwnting and Traffing

320. As of the taking dates, the evidence does not establish that any significant revenue could have been derived for the right to hunt or trap in plaintiffs’ territory.

Placer Gold

321. (a) With the exception of the Porcupine District, practically all of southeast Alaska’s placer regions are found in Area 4.
For the purpose in question, it is assumed that as of the taking dates the placer gold removed from the land was still in place and its presence known.
By comparison with other areas, the placer mining regions of southeast Alaska were neither rich nor extensive in area. They were generally small and low grade. For instance, in 1896 the Klondike district produced about $300,000 in placer gold and the following amounts for the following years: 1897 — $2,500,000; 1898 — $10,000,000; 1899 — $16,000,-000; 1900 — $22,275,000. However, for the entire period of 1880 through 1909, southeast Alaska produced only approximately $2,050,000 in placer gold. Many of the placer areas produced only meager returns.
Nevertheless, the discovery of placer deposits has invariably led to a heavy influx of miners, principally because placer mining, if carried out on a simple prospecting and digging basis, requires a relatively small investment. However, hydraulic placer mining, which sometimes succeeds the *338 hand-mining operations, is frequently an expensive operation requiring the investment of considerable capital.
(b) Except for the Spanish Land Grants of the southwest United States, where placer gold was also discovered, there does not appear to have been comparable instances of leasing undeveloped and unproved placer ground. On the Maxwell Grant in northeast New Mexico and southeast Colorado, Maxwell permitted the miners to prospect and work the placer areas upon the payment of $12 per year per claim as rental. After the simple digging aspect ended, Maxwell leased the ground for hydraulic mining on a 5 percent of gross recovery basis. In addition, he leased 600 acres for an annual rental of $1,000.
The amount which can be realized from the leasing of a mining property, either by way of cash rental or a royalty based on gross or net profits, is naturally related to the anticipated yield of the property. Since the placer mines of southeast Alaska were low grade, a low royalty rate would result. In most areas, there would have been a serious question whether or not the cost of production would exceed the total value of the gold recovered.
It would be reasonable to conclude, however, that plaintiffs would have been able to negotiate leases on approximately an average 5 percent royalty basis on the gross value of the gold mined both with the pick and shovel miners (with whom possibly somewhat more than 5 percent could have been arranged) and with the operators who later mined the placer areas by hydraulic methods. Such a lease or leases would have returned to plaintiffs approximately $100,000 from the $2 million in placer gold that was removed from southeast Alaska prior to 1909.

Lode Gold

322. By the several valuation dates it was a matter of common knowledge that the lode gold deposits of southeast Alaska were for the most part of extremely low grade and which, therefore, could hardly be mined at a profit at all or, at best, with only the greatest difficulty. The one exception was the Treadwell mine and adjoining areas. The Tread-well mine, with outstanding management and large investments, did show a substantial profit.
*339 However, had plaintiffs retained exclusive possession and control of 'their lands, development of the Treadwell property would have presented problems which were otherwise not encountered. If the only security were a leasehold interest in, instead of a fee title to, the property, financing problems would arise in marketing stock or floating bonds. In addition, labor problems would arise. The Treadwell operators had a resident work force in the settled towns of Juneau and Douglas. The availability of an adequate force of intelligent workmen was an important factor in the Tread-well mine’s success. Had plaintiffs remained in exclusive possession of these lands, however, there would have been no such towns, and a mining company would have had to import a labor force, and furnish housing, meals, medical care, etc. Furthermore, unless family housing and schools were also provided, the jobs would not be too attractive because the workmen would be separated from their families for long periods.
Under such circumstances, it is highly improbable that mining interests would have been interested in leasing the Treadwell lode, or that the large amount of capital required could have been raised, or that, with the additional required expenses, the venture would have been profitable. Accordingly, it cannot be found that such interests would have paid any significant amount for the right to exploit the lode gold of the area.

Timber

323. Had plaintiffs remained in exclusive control of their lands, their timberlands could not have yielded to them any substantial revenue to the various taking dates. Up to 1954, when the first large pulpmill was established, the timber converted into lumber or other wood products from the southeast Alaska forests was utilized almost wholly to meet local demands. With plaintiffs in exclusive possession and control, there would have been little white population to utilize the timber for local consumption. The timber was not favorably located to compete with the outside lumber markets. No such markets for this predominantly hemlock forest would have been anticipated for the reasonably foreseeable future.
*340 As of the valuation dates, the forest lands of southeast Alaska. would have had no significant exploitable value to plaintiffs.

Fisheries

324. The fish in the lake, stream, and coastal waters appurtenant to the shores of southeast Alaska has always been its chief resource. This valuable resource was exploitable by plaintiffs on the several taking dates since 'the outside demand was so strong.
325. Salmon. The commercial fishing operators would have been interested in leasing sites in the area for their canneries and processing plants. Such sites would be necessary since the fish taken from the adjoining waters could not, as a practical matter, have been processed at plants far removed from the fishing grounds. Salmon run elsewhere in the streams of the Pacific coast, ’and there are large numbers of canneries on such streams and on the coasts of northern California, Oregon, Washington and British Columbia. However, a southeast Alaska site would have the advantage of access to excellent fishing grounds where competition would be confined to the number of operators able to obtain leases from the Indians. Presumably the Indians, in their own self-interest, would have limited the number of such leases which limitation would, among other things, insure proper conservation of their greatest asset.
To the operator, a lease would, however, have the drawback of compelling the investment of considerable capital, on leased lands, for the erection of buildings, wharves, housing facilities, etc., an investment which would have to be amortized within the lease term.
Since the fish runs fluctuate from year to year, a lease arrangement would in all probability have been on a royalty basis. Such an arrangement would have been more satisfactory to the operators and would have resulted in greater revenue to the Indians.
One guide to how much of a lease-royalty a company could afford to pay under the circumstances hereinabove described (the considerations with respect thereto being different from *341 those involved in calculating a fair market value on a purchase and exclusive operation basis) would be to examine the operations and experience of the Alaska Packers Association, a large, adequately financed, and well-managed, cannery organization which operated throughout Alaska. On the basis of this company’s operations from 1902 to 1909, there was an undistributed average annual surplus (i.e., after paying Stockholders dividends of 6 percent on their stock) of around 5 percent of gross earnings, which would be equivalent to approximately 10% cents per case. An operator would have felt justified in splitting this excess profit with the lessor, thus permitting a royalty of around 5 or 6 cents a case.
The pack of canned salmon in southeast Alaska was, by 1908, amounting to around 1 million cases a year. Unless the prospective lessee had a lease giving exclusive rights, this would be about the maximum pack he would calculate against which to apply the royalty. On a 6-cent per case royalty, the lease rental would thus amount to $60,000 a year. Capitalized at 6 percent per annum, the value of the salmon fisheries to the Indians would be $1 million.
326. Halibut and, Herring. It is reasonable to assume that plaintiffs would also have been able to lease processing sites to the halibut and herring fishing interests on a basis of 5 percent of the gross value of the fish.
The average annual value of the southeast Alaska halibut catch in the 1905-1909 period was $163,969.
The average annual value of the herring and herring products of southeast Alaska in the 1905-1908 period was $60,671.
The total annual value of ‘both the halibut and herring would on these bases be $224,640.
On the reasonable assumption that the annual halibut and herring products volume and value would continue on substantially the same basis, the annual rental would thus be, on a 5-percent royalty basis, $11,232.
Capitalized at 6 percent, the total rental value of the halibut and herring fisheries of southeast Alaska would be $187,200. (This value assumes that there was, for the purpose in question, no significant change in value between the Various taking dates.)
*342 Summary — Value to the Indians
327. In summary, on the basis of the evidence, the exploitable value to plaintiffs of their lands, waters, and resources, i.e., the amount the Tlingit and Haida Indians could reasonably have realized had they continued to exercise full and complete possession and control of those lands and waters of southeast Alaska which were taken from them, as delineated in the previous proceedings, was $1,287,200, as follows:
Placer gold fields- $100, 000
Salmon fisheries_ 1,000, 000
Halibut and herring fisheries- 187, 200
Total_$1,287,200
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover the sum of seven million, five hundred forty-six thousand, fifty-three dollars and eighty cents ($7,546,053.80) as equitable and just compensation for all of their claims against the United States, and judgment is entered to that effect.

 For instance, “* * * the United States is liable under such act to compensate tbe Indians for the losses so sustained.” (147 Ct. Cl. at 340). “The most valuable asset lost to these Indians was their fishing rights in the area they once used and occupied to the exclusion of all others.” (Id., at 341.) “The same will be true of lands which were valuable to the Indians for hunting and gathering, or from which they took limited amounts of minerals or timber.” (Id.)

 As defines by the united States Forest Service, “Forest land” in general includes lands at least 10% stocked by trees capable of producing timber or other wood products as well as such lands from which the trees have been removed to less than 10% but which have not been developed for any other use.

 Plaintiffs’ expert with respect to the forest lands valuation was William A Eastman, Jr., a competent and qualified consulting forester and logging engineer. He studied the available literature and maps, as well as the data of the Forest Service, U.S. Department of Agriculture, including forest inventory statistics and management plans, and principally a 1957 extensive Forest Service survey of the Tongass National Forest. In addition, he made a field Inspection of southeast Alaska’s forested areas. His report is in evidence as plaintiffs’ exhibit No. 600.

 Defendant’s valuation expert in this case was C. Marc Miller, a competent and qualified real estate appraiser. On a “fair market value” basis of valuation, he did conclude that, considering all the areas together, the forest lands would have enhanced the value of the entire tract by $592,800. Defendant offers such valuation as an “alternate” finding.

 The Forest Service’s definition of "commercial forest land” Is: “Forest land producing or capable of producing usable crops of industrial wood”.
Its definition of “noncommercial forest land” is: “Forest land Incapable of producing usable industrial wood because of adverse site conditions and not withdrawn for specified purposes.”
Its definition of “commercial accessible” is: “Commercial forest land presently accessible and economically available now and which has not been withdrawn from use.”
Its definition of “commercial inaccessible” Is: “Commercial forest land presently inaccessible and economically unavailable now and not withdrawn for specified purposes. Changing economic climate and Improving logging methods probably will mate portions available for development In the future.”

 “TRe theoretical market value of standing timber Is the residue left -when the total cost of manufacturing and marketing the forest products fabricated therefrom plus a reasonable margin of profit is subtracted from the total price received from the sale of the manufactured forest products. This is also called the ‘realization’ stumpage value. National-forest stumpage is appraised on this basis. Thus, stumpage realization values, theoretically at least, fluctuate up or down directly as does the selling price of the product and inversely as the costs of logging, manufacturing, and merchandising.” Steer (Senior Forest Economist, Division of Forest Economics, Forest Service), “Stumpage Prices of Privately Owned Timber in the United States,” U.S. Department of Agriculture, Technical Bulletin, No. 620, July 1938.

 Plaintiffs’ expert with respect to the mineral lands -was Roy P. Pull, a competent and qualified mining engineer and consulting geologist who is a partner in the firm of Shenon and Pull, Mining Geologists, Salt Lake City, utah. Mr. Pull’s comprehensive and detailed seven-volume report is in evidence as plaintiffs’ exhibits 601-A through G.

 Plaintiffs’ expert on the townsite and settlement lands was Robert R. Nathan, a qualified and competent economist, President of Robert R. Nathan Associates, Inc., Consulting Economists, of Washington, D.C. He was also plaintiffs’ chief expert on the value of the fishing rights. In addition, he consulted with Mr. Eastman and Mr. Full on their timber and mineral lands appraisal wort. Mr. Nathan’s report, consisting of four volumes, is In evidence as plaintiffs’ exhibit 602-A (“Summary of Findings and Valuation”) ; 602-B (“General Economic Development") ; 602-C (“Fisheries”) ; and 602-D (“Town-site and Settlement Land’’).

 As stated, plaintiffs’ chief expert with respect to the fisheries resources was also Mr. Robert Nathan. Mr. Edward D. Hollander, a qualified and competent economist who is also associated with Robert R. Nathan Associates, Inc., also testified and collaborated with Mr. Nathan on this aspect of the case.

 Other established consumer goods industries were earning less than southeastern Alaskan salmon canneries. The average yield on net worth of a number of leading companies in consumer goods markets was around 7 percent in 1900-1903 and 8 percent in 1906-1909. Thus allowing 10 percent as the measure of returns on alternative investment would be reasonable.

 Actually, during 20 years of the cannery’s operations from 1891 to 1910, canned salmon production increased to 18,000 cases, and the annual output value reached $69,000. In the following decade, annual output soared to 82,000 cases, valued at nearly $750,000. In the 1920’s and 1930’s the normal salmon catch within the area’s waters tended to exceed 1 minion fish per season, under various cannery lease arrangements, the town of Metlakahtla received net annual incomes ranging from $4,000 to $17,000 during 1917-1927, and $11,000 to $73,000 during 1928-1935.

 A 1921 Geological Survey Bulletin (No. 714-B, “Lode Mining in the Juneau and Ketchikan Districts”) stated that the remoteness of the lodes from the coast and the difficulties of access, even after a road was built, caused a loss of interest in this area, with no work being accomplished “of late years”. It stated that at that distance from the coast low-grade property would be “of little value”, but that “further prospecting * * * with the purpose of locating lodes of high grade ore, might be well worthwhile” (p. 138).

 As this court sala in Sioux Tribe v. United States, 146 P. Supp. 229 (1956) (Appeal No. 4-55, case remanded to the Indian Claims Commission on November 5, 1958) : “* * * mere knowledge that gold in paying quantities lay beneath the ground in a given tract of land does not make it valuable if it can be mined only at an exorbitant expense” (p. 238). In United States v. Silver Queen Mining Co., 285 F.2d 506 (10th Cir. 1960), one of the cases upon which plaintiffs rely, the court refused to set aside a jury verdict of $50,000 for undeveloped mining property where there was acceptable expert testimony not only as to the extent of the deposit but also as to the cost of development and the ultimate profits that would result if the mine were developed successfully.

 As shown, In 1888 the yield had dropped to $3.55 per ton. Plaintiffs concede that this reduced figure would fairly represent a conservative forecast for operations extending as far in the future as 20 years.

 Plaintiffs claim $1.60 for this figure, the 1889 amount. However, conservative calculations would, considering the length of the forecast, indicate a somewhat higher cost figure, in the same way that plaintiffs, for long-term estimating purposes, lowered the yield per ton from the latest figure.

 Since the addition of another 120 stamps in 1888 would double (to approximately 220,000 tons) the then annual production schedule of 100,000-120,000 tons of ore, the estimated average annual production forecasted; would require the addition of even more stamp equipment.

 The pertinent table is contained in plaintiffs’ exhibit No. 601-A, p. 475.

 (a) On the basis oí an estimated operating profit per ton of $1.40 and a 15 percent rate of return, plaintiffs claim the value to be $3,127,951.
Although it contests the use of “fair market value” as the basis for the recovery in this case, defendant contends that, if such basis is used, the value of the property would be $500,000. This is the only lode deposit in the entire case for which defendant concedes any value as of the taking date.
(b) The actual operations of the Treadwell mine to the time it was closed by flooding on April 21, 1917, show that the prediction of performance on the basis of information available in 1888 would have been sound. During the life of the operation, the mine actually produced 16,476,622 tons which yielded $39,818,913.29, or an average value of $2.4166 per ton. By June 30, 1916, the operation showed a total operating profit of $17,907,530.28, an average of $1.10 per ton. Production records over the life of the operation show a decrease in grade below the $3 per ton value used in the 1888 valuation. This decrease was not the result of encountering a lower grade ore at depth but was the result of a management decision to increase the tonnage by mining low-grade rock. This accounts for the production of almost 16,500,000 tons as against the estimated 9,250,000, as well as the lower per ton value. However, despite the lower per ton value, the total dollar profit of almost $18 million (as against the estimated total of $11,562,691) greatly increased because of the increased tonnage.

 750 feet (average length) X 35 feet (average width) = 26,250 square feet. 26,250 square feet divided by 13 cubic feet per ton = 2,019 tons per vertical foot.

 (a) Plaintiffs claim $835,679 on the basis of an 85 percent recovery, and a $1.40 per ton operating profit. Por the Treadwell mine, only 80 percent recovery was projected.
(b) Production records of the mine indicate that by the date of its closing on April 2, 1917, the mine produced 4,474,647 tons of ore which yielded $11,664,796.59, an average of $2.61 per ton. As in the case of the Treadwell mine, management obviously decided to mine large amounts of lower grade ore at lower per ton yields, but with greater total profits. By the end of June 1916, the mine had recorded an operating profit of $4,078,748.64, and had paid dividends totaling $3,607,381. Thus, the mine actually operated well beyond the 10-year period upon which the valuation is based.

 250 feet (length) X 70 feet (average width) = 17,500 square feet divided by 13 cubic feet per ton = 1,346 tons per vertical foot.

 Plaintiffs claim $275,582 on the basis of an 85 percent anticipated recovery, an operating profit of $1.40 per ton, and a return of 20 percent on investment.

 500 feet (length of ledge) X 40 feet (average width) = 20,000 square feet. 20,000 square feet divided by 13 cubic feet per ton = 1,538 tons per vertical foot.

 Plaintiffs claim .$636,590 based on an 85 percent anticipated recovery (a reduced 80 percent recovery has been applied to the Mexican, 700-Foot, and Ready Bullion, following the application of that percentage by plaintiffs themselves to the Treadwell), an operating profit per ton of $1.40, and return of 20 percent on investment.

 By the end of 1912 the company showed production from the 700-Foot and Ready Bullion mines of 4,378,915 tons from which the yield had been $9,077,677, with an operating profit of $1,998,097. The total production for the two mines was 7,825,797 tons with a total yield of $16,040,238.31. By June 30, 1916, the two mines showed an operating profit of $3,052,300.15. The 700-Foot operation continued until April 21,1917, when it, together with the Tread-well and Mexican mines, were flooded and caved In. The Ready Bullion mine continued production to December 18, 1922.

 Plaintiffs’ expert witness testified it would Rave taken 3 to 5 years after the investor took over the property as a whole to have completed the kind of investigation necessary to arrive at such a precise estimate. Thus, the 130-million-ton figure presumably would not have been arrived at until 1912 to 1914.

 That Alaska-Juneau, after long years of losses, experimentations, and heavy investment, ultimately turned out to be a profitable enterprise was considered as a great achievement in the mining world. A 1941 Geological Survey Bulletin (No. 917-C, “Past Lode-Gold Production from Alaska”) stated: “This enterprise has long been one of the notable mining developments of the world, and the success in handling enormous amounts of low-grade ore cheaply has been brought about through the application of the most advanced technical methods and administrative acumen” (p. 190).
The Bulletin went on to say: “The marvel of the accomplishment becomes all the more striking when it is realized that, according to the company’s report for 1937, the gold content of all the rock from mine to mill during the entire period that mining has been in progress, and in course of which more than 35,000,000 tons of ore were fine-milled and 30,000,000 tons of coarse tailings rejected, has averaged only 0.0453 ounce to the ton. This quantity of gold at the old unit price would be worth about 93.5 cents, or at the new price about $1,585” (id.).

 The Alaska-Juneau 30-stamp mill pilot plant was operated seasonally to 1912. üp to then, and since 1893, when operations commenced, the mine was self-sustaining.
In 1913, a new tunnel and; pilot mill were completed under a 1910 contract with F. W. Bradley, the highly regarded mining engineer who was president of the Treadwell Company, the tunnel being constructed from a point 420 feet above sea level for a distance of 6,500 feet to a point beneath the surface workings, and then rising 800 feet to the surface. The pilot mill, on the shore of Gastineau Channel, had a capacity of 23,000 tons a month. Substantial expenditures were then made preparatory to large-scale production, including a new 8,000-ton mill. The new mill was tested in 1917 and 1918 but failed to meet expectations. The mill capacity was less than 50 percent that expected and the costs were over three times higher than anticipated. In 1919, improvements in milling practices were devised, including facilities for sorting ore from waste rock which had erroneously been excluded from the new mill. Meanwhile, annual losses were incurred from 1914 through 1919 ranging from almost $60,000 in 1914 to over $227,000 in 1918. However, from 1920 on, through 1942, the company showed profits, going as high as over $3,400,000 in 1939. The mine had been redesigned to permit the rejection of a large percentage of the mine-run ore before milling. Operations ceased in 1944 as a result of World War II, with a gross operating profit of over $23,670,000 and dividends of over $14,200,000. Almost 90 million tons of ore had been mined, and when closed in 1944 large tonnages of ore were still in place.
The Ebner property was foreclosed in 1914. After acquisition by the United States Smelting, Mining and Refining Company, further development work was undertaken but discontinued the following year.
The Perseverance mine was also disappointing. Taken over by the Alaska Gold Mining Company in 1914, and further developed, extremely low-grade ore was unexpectedly found. The company operated the mine until 1921 when it was closed down and not reopened until 1934 when it was acquired by the Alaska-Juneau Company, which in 1946 also acquired the Ebner property. The mine’s production from 1889, when it first commenced operations with a 10-stamp mill, to 1907, is not accurately recorded, but production from 1907 through 1912 totaled over $636,000, and almost $9 million in ore was produced from 1915 through 1921. During this latter period, approximately 11 million tons were mined with a profit of approximately 22 cents per ton on an average gold yield of approximately 75 cents per ton.

 Production thereafter was nominal, i.e., $7,370 in 1910; $1,922 in 1911; no production reported in 1912 or 1913; $21 in 1914; $6,985 in 1915, and none thereafter.

 Further development wort was done between 1910 and 1914, resulting in a production of approximately $30.0,000 between 1914 and 1920.

 The Kensington group consisted of a number of claims patented principally between May 1894 and March 1896. There is evidence of some small production from three of the ten claims comprising this group: 23,000 tons from the Northern Beil mine in 1896 — 1897; 5,500 tons from the Bear mine in 1895-1897; and 12,000 tons from the Kensington ore body in 1897-1900. There is, however, no evidence of production on or before the patent dates, nor of the extent of knowledge about the properties at the 1894-1895 patent dates. There was never any significant production from this group. The claimed value appears to be based in large part on alleged sales of the claims between 1902 and 1904 at very high prices.

 The Johnson mine consisted of three claims, which were patented on December 10, 1902. Although the claims were located in 1888, there is no evidence of any development work before the patent date and no indication of the extent of knowledge concerning the properties as of that date. There was some development in 1911, and more in 1915, but these were far beyond the 1902 taking date.

 The Ophir group consisted of the Ophir lode claim and millsite, located in 1885 and 1886, respectively, and patented on May 7, 1894; the Hartford claim, *245 located In 1892 and patented on August 1,1894 ; and ten additional lode claims and two millsites. The development which did take place, however, which was not substantial, was on the Ophir claim, but this was alter the patent date. There is no evidence of the extent of knowledge concerning the property on the patent dates. Such knowledge would appear to have been minimal. By 1905 the Geological Survey reported that only preliminary prospecting had oeen done, after which the ore “was reported not to carry high gold value.” (Bulletin No. 284, p. 33.)

 The Kremming property consisted of six lode claims located on Johnson Creek approximately 1 mile southeast of the Jualin mine. The claims were patented on September 12, 1906. There was no production prior to the patent date, and apparently there has been none since. It was reported in a 1911 Geological Survey Bulletin that although “Rich specimen ore can be obtained” from the property, the developments constructed as of the time the author’s inspection was made (1909, being 3 years after the patent date), consisting of a tunnel 360 feet long, and a shaft 85 feet deep, were “inadequate to show whether a body of milling ore exists” (No. 446, p. 47).

 The Indiana group, located on the northwest extension of the JUalin property, about three-quarters of a mile from the Jualin mine, consisted of ten lode claims patented on April 3, 1905. The property was located in 1896 and some developments made in 1897, consisting of a 10-stamp mill, accessory buildings, and a water pipeline. However, there is no evidence that the property has ever been productive. It was reported in 1911 by the Geological Survey that the “mill had never been operated” and that “it and the buildings have been demolished by winter snows” (id., p. 44). The claimed value is based mainly on the location of the property in relation to the Jualin mine.

 The Horrible and Mexican claims, located in 1885 and 18S6, respectively, were patented on January 18, 1896. These two claims, in addition to three adjoining unpatented claims, were known as the Horrible mine group. The only mine operations on these claims were from spring 1897 to 1898 and in 1901. A 2-mile long aerial tramway was erected, as well as a 400-foot tunnel and a 10-stamp mill. These operations could not have been profitable, for they yielded only $1,500 from 500 tons of ore. The 1911 Geological Survey Bulletin reported that “The quartz is sparingly mineralized * * * ” (id., p. 39). There is no indication of any further interest in or later development of the property after 1901. Value appears to be based principally upon reports of an alleged sale of the claims in 1896 for $60,000.

 The Ivanhoe mine consisted of seven claims, two (located in 1895-1896), patented June 30, 1904, and five (located in 1896). patented April 18, 1906. The mine was operated at intervals from 1897 to 1903, the developments including a 20-stamp mill. However, these operations yielded but $7,000 on 3,000 tons of ore extracted. Operations were abandoned in 1903, prior to the patent dates, and the property lay idle thereafter. Value is based in part on a 1902 sale of the five claims located in 1896 for the alleged amount of $30,000.

 Prospecting extended into the area of Sheep Creek, which empties into Gastineau Channel around 4 miles southeast of Juneau, shortly after the Gold Creek discoveries. Some organized development commenced around 1889, and from then through 1903, the mines of the area, which were located on the continuation of the Gold Creek mineralized zone, produced around $465,000 in gold. However, while the mines were maintained through the 1909 taking date, there is no evidence of any commercially valuable mineral resources remaining, or of any substantial production, after 1903. Certain lode claims were patented in 1905, after production had ceased.

 Value is based only on the minor development work on the Boston King group of claims. It appears, however, that after 1903, only annual assessment work was performed. There was no production from these claims prior to the 1909 taking date (or after). The only patent granted was after such date.

 Value is based principally on the fact that placer claims were patented prior to the 1909 taking date, and there was some placer mining. There is no evidence of any significant production at any time. The lode gold deposits produced too low values to warrant any exploitation.

 This section extends from the north end of Montana Basin to the south coast of Berners Bay. It consists of approximately 500 acres, none patented before the general valuation date. There is no evidence of any substantial production whatsoever, before or since that date, as follows:
Development work on the Aurora Borealis group of claims on Bessie Creek ceased after 1895 (after the production of approximately $25,000 in gold), leaving it inadequately explored, and such work was not subsequently renewed.
Similarly, the Bessie Mine remained idle since 1903, the property previously having shipped only a few tons of ore for testing purposes. Development work was not renewed.
The Alaska-Washington group, which received some early development, had long lain idle before some small development work was resumed in 1910, the year after the valuation date.
The Julia group, on which some, but no systematic, development work had taken place by 1905, apparently received little attention thereafter prior to the 1909 taking date.
The Bex claim, on which, according to a 1906 Geological Survey Bulletin (No. 284, “Report on Progress of Investigations of Mineral Resources of Alaska in 1905”, p. 35) “a rich stringer or pocket of ore, said to have yielded $3,000, was opened in 1903”, received “no attention during the past two years.” There is no evidence of development thereafter.

 This bay extends inland a distance of 8 miles from the mainland coast approximately 60 miles southeast of Juneau. Placer gold was discovered in the area in 1869. Gold-bearing lodes were known in the Windham Bay section since the days of the early placer activity and were located and relocated through the years. This mineralization was generally believed to be the southeastern extension of the Juneau Gold Belt. It was not until 1900, *253 however, that mining companies were formed and active development work begun. There were four distinct mineral zones in the Windham Bay section, three located on Spruce Creek, on which six mining companies were active, and one at the head of the bay. Plaintiffs’ claimed values are on such a zone basis, as well as for five placer claims on Spruce Creek, as follows:

Mineral Zone No. 1

Mineral Zone No. 1 consists of nine claims (the Red Wing group), eight of which were patented June 15, 1908, all nine held by one company (Windham Bay Mining Company), and of an unascertained number of claims (about which there is no evidence available) held by another (the Jenny Reed Gold Mining Company). The operations that were begun on the nine claims in 1901 (the development including two tunnels and a 10-stamp mill) were discontinued in 1902. The ore body veins were reported to carry high values, but the necessity of mining such a large amount of country rock to extract this ore prohibited further operations. Operations apparently were never resumed. A $10,000 value is claimed for the Red Wing group based principally on the theory that the issuance of the patent 6 years after the cessation of operations indicated that the property was still being maintained and therefore regarded by the owners as having value.

Mineral Zone No. 2

This zone consisted of 18 unpatented lode claims, and one placer claim, all owned by three companies (the Yellow Jacket Mining Company, the California-Alaska Mining Company, and the Helvetia Mining Company). Plaintiffs claim $10,000 for the 18 lode claims. There is no indication that these claims were ever productive. Development work on the property of one company (the Yellow Jacket) was discontinued in 1904, that on the property of the second company (California-Alaska) was, after explorations showed the necessity of mining large masses of country rock to obtain the ore, no more, after 1903, than the requisite minimum assessment work, while the results of tests made in 1006 on the property of the only company (Helvetia) still pursuing any active development were, according to the Geological Survey, “apparently not encouraging.” (Bulletin No. 314, 1907, “Report on Progress of Investigations of Mineral Resources of Alaska in 1906”, p. 59.) Value is claimed principally! on the theory that had the three companies combined operations, the resulting increase in volume and decrease in the cost of operating “might have proved economically successful.” This is too speculative.

Mineral Zone No. S

After 1903, no important development work was done in this zone, located at the head of Spruce Creek, and for which zone plaintiffs claim $2,000 as the value as of February 16, 1909. Tunneling and testing by the one company operating in the zone (Windham Chief Gold Mining Company) indicated only low-grade ore of insufficient value to warrant further development at that time. Two claims were patented November 1, 1909. None was patented before the general February 16, 1909 valuation date.

Alaska Mildred Company

The six claims and one millsite of the Alaska Mildred Gold Mining Company, operating at the head of the bay, were located between 1896 and 1902, but not patented until 1914, after the general valuation date. Although there was some development, there is no indication that these claims were ever productive or that, prior to 1909, there was ever any reasonable basis for anticipating they would be. Development work was still in progress in 1906. Plaintiffs claim $5,000 as of February 16,1909, based on the general mineralization, the development work (a minimum being required each year to satisfy assessment requirements) and the fact of location. None of these facts support a claim of market value as of 1909.

Placer Claims

There is no production data concerning the six patented placer claims on Spruce Creek, for which plaintiffs claim $3,000 ($500 per claim), Five, located between June and August 1890, were patented on June 17, 1891, and *254 one, located May 1, 1890, was patented on April 9, 1892. Value is predicated upon the early location dates and the presumption of some production based on the general knowledge that the earliest gold production in Alaska came from this area.

 Taku Inlet is a northerly indentation of the mainland coast, Iff miles long, which opens into Stephens Passage at a point approximately 10 miles southeast of the town of Juneau. Numerous mining locations were made in the Taku Inlet section, but no significant development took place, nor were any of the claims patented, prior to February 16, 1909. Plaintiffs claim $25,000 for 400 mineralized acres, predicating value on (1) reports of the discovery of gold ore bodies of high average assay value; (2) a recorded sale in 1905 of 12 claims for the stated consideration of $200,000 (for which price, however, the evidence shows no reasonable basis and which plaintiffs themselves apparently discount) ; (3) the fact that proofs of labor were filed for 1906 through 1909 on these 12 claims and 3 others; (4) a patent was issued in 1913 (after the taking date) for such 15 claims; and (5) the claims were located on the projection of the Gold Creek mineral zone.
None of the evidence constitutes a sufficient basis to support the finding of any value for this area. There is no satisfactory evidence concerning the character or extent of the deposits, or any suggestion that the inlet was ever productive in any degree.

 (a) George Inlet is a deep-water indentation on the southwestern side of Revillagigedo Island. Mineral locations in this section were confined to an area within 2 miles of the coast, with the major mineralized zone on the west side of the bay. Plaintiffs claim that 550 acres of mineral land in the section had a fair market value of $27,500 as of February 16, 1909, no prior patents having been issued. The claim is based on two groups of gold, as well as other, mineral claims, i.e., the Lon De Van (Telegraph) group, valued at $15,000, the Ashe (Mahoney Creek) group, valued at $10,000, and a marble deposit, valued at $2,500.

Lon De Van (Telegraph) Group

(b) The claims constituting this group were first located in 1896 and relocated in 1899, 1902, and 1904. while there was some development prior to 1909, there is no evidence of any profitable production nor, seemingly, any basis, other than greatly speculative hopes, for believing there would be any. The veins contained only low values in lead, zinc, gold and silver. By open cuts and tunnels, the veins had been opened by 1909, but no profitable exploitation is indicated. Although the mine’s location and formation did lend itself to economical operations, it was recognized that the low grade of the ore would require low cost, large scale, mining for any possibility of commercial success, and that large further investments, in addition to the amounts already invested, would be required before the possibility of success could even be determined. Plaintiffs’ claim of $15,000 is based on the alleged high economic potential of the area. However, because of the low grade of the ore, the entire venture was, as of 1909, too speculative to constitute a basis for the assignment of any significant value. The potential would appear to have been low, not high. (The mine was shut down in 1913 and there is no record of any profitable exploitation ever taking place.)
Ashe (Mahoney) Group
(c) The adjoining Ashe claims were located in 1901. Only limited development work, again disclosing low-grade deposits, had been done on this group before the valuation date. (There was no active development thereafter and no production at all until 1947.) A value of $10,000 is predicated on the *255 known existence of a mineralized vein of lead-zinc which would have warranted further exploitation. .This is an insufficient basis for the claim.

UarVle

(d) In 1906, the Geological Survey (Bulletin No. 284, supra) reported the discovery of a marble belt on George Inlet, and plaintiffs claim $2,500 as the value thereof as of February 26, 1909. The claims containing this marble were located on June 22, 1905. While the Survey stated that “The marble exposed is of good quality and relatively free from fractures and joints” (p. 57), there is no record of any development of this deposit. The mere existence of a deposit which, only on the basis of surface examination, appears promising, is an insufficient basis for the assignment of any significant value.

 (a) The Tongass Narrows section embraces a land area extending 2 miles on each side of the channel into Revillagigedo Island from Gravina Island and includes the Pennock Island area. Several claims were located in the Tongass Narrows section prior to the turn of the century, but no extensive development was undertaken. Mineral value, however, is claimed only with respect to the Goldstream group, consisting of 300 acres, for which plaintiffs claim $20,000 as of February 16, 1909.
(b) The Goldstream group consisted of six claims located between January 2, 1903 and December 18, 1905. The property is situated on the east side of Gravina Island. The presence of gold-bearing mineral deposits in this locality was known as early as 1897. However, development attempts were unsuccessful. The principal work was performed in 1903, including a 5-stamp mill and a shaft. As late as 1908, the Geological Survey reported that the attempts to develop the deposits had met “with little success.” (Bulletin No. 347, supra, p. 177.) This was the situation up to the valuation date. Any finding of significant value as of February 16, 1909, is not warranted. Plaintiffs predicate value in large part on activities long after 1909, and on recorded sales of interests in the claims prior to 1909.

 (a) This island is a heavily timbered mountainous island lying southwest of Ketchikan and separated from Revillagigedo Island by Tongass Narrows. The claimed value (excluding the gold-bearing deposits on the island which plaintiffs included in the Tongass Narrows area) is predicated on the patented copper-gold bearing lode claims of the Victory Copper Mining Company ($20,000) and the Rossland and Deer Park Mining Company ($5,000), as well as several unpatented claims in other locations ($10,000).
(b) The Victory Copper Mining Company acquired patents to ten claims in the vicinity of Seal B.ay on March 2, 1908. Copper-gold bearing deposits of reportedly promising assay values were first discovered in this area in 1898. This was followed by much prospecting and, on the Grotto group of claims, by fairly considerable development work. However, after 1901 little further development work occurred. No production occurred prior to the patent dates (or, so far as the evidence shows, at any time thereafter). In 1908, the Geological Survey reported with respect to the deposits in this area, “In general, deposits are found sporadically and do not appear to persist for any distance along the surface” and “No ore bodies have yet been developed in depth in this area, and it is probable that their occurrence, both horizontally and vertically, is irregular.” (Bulletin No. 347, supra, p. 139.) The evidence is insufficient to support the claimed $20,000 value as of 1908.
(c) The Rossland and Deer Park Mining Company acquired patents to four claims in the Dali Bay area in May and November 1905. The ore body was *256 similar to tliat in the Seal Bay area. Here too there was no production. Furthermore, there was no major development. IThe evidence is insufficient to support the claimed $5,000 value as of May and November 1905.
(d) The claimed $10,000 value for the unpatented claims in the Seal Bay-Dall Bay area is based on alleged sales, a newspaper account indicating value, and developments after the 1909 taking date. On these claims too there was no production or substantial development prior to 1909.

 This peninsula is a large mountainous land mass lying between Ernest Sound and Behm Canal. No claims within the peninsula were patented before February 16, 1909. Value is based upon the following claims and areas within the section:
(a) The Gold Standard Group. This group of 17 claims, for which $50,000 is claimed, was on the west side and about 2.5 miles from the head of Helm Bay. The group was located in 1897. In 1898 the ore from a rich ore shoot near the surface was reported to have yielded approximately $20,000. In 1899 a 5-stamp mill was installed, some buildings erected, and a tramway constructed connecting the mine to the mill and the beach one-half mile away. During 1900 the mill was operated and considerable development took place. In 1901 a $150,000 mortgage on the property was recorded. However, active work was suspended at the end of the year, with only small-scale operations taking place until 1906, when active work again commenced. A small shipment of high-grade ore was made in that year, as well as a considerable output of bullion from the stamp mill. However, work was halted again in 1907 (and the mine remained idle until 1913). Thus the group was idle at the valuation date, and had been idle for over a year. As was generally true of all the mineralized areas on the peninsula, it was recognized that the values of the veins were variable, that, although occasionally high for a short distance, the veins were low in average, and that low-cost mining was essential. Profitability was too speculative on this then idle acreage to warrant the placing of any substantial value thereon.
(b) The Old Glory Group. This group, covering acreage for which plaintiffs claim $15,000, is comprised of the Old Glory and American Eagle claims, and was located on the east side of Gold Mountain about 900 feet above sea level and 1.5 to 2 miles northwest of Smuggler’s Cove. A 2-stamp mill and tunnel were erected in 1902, with some gold samples assaying $10 per ton. Some small production took place prior to 1906, but the property lay idle thereafter through the valuation date. There is no indication that the small workings which had occurred had been profitable, or that prior developments and experience suggested that continued production on the same or a larger scale would likely prove profitable. Plaintiffs’ claimed value (based in part on events occurring long after the taking date) is not supported.
(c) The Gold Mountain Group, comprising four claims covering acreage for which plaintiffs claim $10,000, was located on Gold Mountain, on the west side of Helm Bay, about three-fourths of a mile from tidewater. By 1902 there was some development work accomplished, including the sinking of a 20-foot shaft. Ore samples provided a wide range of assays (“from $4 to several thousand dollars in gold values” according to a Geological Survey Report (1902, Professional Paper No. 1, supra, pp. 58-59)). During the sinking of the shaft, a pocket was encountered which produced about $5,000 in gold values. However, said Geological Survey Report states: “The value of the property must, however, be sought in gold more evenly disseminated in the mineralized zone, and pockets must be regarded as bonanzas” (p. 58). Apparently such form of mineralization was not found, for the record contains no further reports of production. A 1908 Survey Bulletin (No. 347, supra, p. 156) reported that an additional 50-foot shaft revealed a deposit of low average values, and that another vein exposed by shallow shafts and open cuts was “too small to be of great value.” Accordingly, no significant value can be ascribed to this group as of 1909.
(d) The Keystone Claim, covering acreage for which plaintiffs claim $2,000, *257 was located northwest of Smuggler’s Cove about 3 miles south of the Gold Standard group. By 1002, development work was being pushed, with a 120-foot shaft being sunk. The location was favorable for inexpensive mining, good water power being available. However, the development work apparently failed to produce favorable results, for there is no report of any production from this property. The Survey reported in 1908 (id., p. 157) that the “belt * * * carries low values in gold and silver.” At the 1909 taking date, the property was idle and had lain idle for several years.
(e) In addition to the above, 372 lode claims were located within the Cleveland Peninsula section prior to the taking date, the majority within the Helm Bay-Smuggler’s Cove zone of mineralization. Plaintiffs claim $20,000 for the acreage covered by those locations. Value is based principally on newspaper accounts of allegedly valuable strikes, the bonding of claims, contemplated development work, and alleged sales. No production was reported from any of these claims. This $20,000 claim is not supported.

 woronkofski Island is in Stikine Strait, opposite the town of Wrangell. In 1905, the Geological Survey reported (Bulletin No. 259, supra, p. 60) gold-bearing quartz ledges in the granite belt on this island which were located as the Exchange group, consisting of seven unpatented claims. At that time, development work consisted of two tunnels and some open cuts, from which exposures the Survey stated that “fair gold assays are reported” (p. 60). It further stated, however, that the “properties have remained idle for the past few years” (.id.)- No further information is contained in the record and presumably the property was still idle in 1909. Fifteen additional unpatented lode claims existed on the island prior to the taking date, but no development or production was reported on any of them.

 (a) Plaintiffs assert value for approximately 500 acres of unpatented mineral land on this island, consisting of the numerous claims (30-60) owned by the Olympic Mining Company (of which the Hattie group, located In 1900, and the Helen S. group, located in 1902, were the only ones on which any operations were conducted prior to 1909), and of the Maid of Mexico and Maid of Texas groups of six claims.
(b) Active development ended in 1904 on the Helen S. group and in 1903 on the Hattie group (the principal vein of which was described by the Geological Survey in 190.8 as follows: “As a whole it is apparently of too low grade to make ore * * although some shoots containing “good values are reported”). (Bulletin 347, supra, p. 183.) There was some small further development on both groups in mid-1907. There was no production before the valuation date. On September 1, 1905, a $100,000 mortgage was recorded on 15 claims of the company’s holdings, including the Hattie and Hattie S. claims. Plaintiffs claim $20,000 as the value of all of the company’s holdings, emphasizing the large amounts spent for development and the size of the mortgage. However, these are considered to be insufficient bases for the assignment of value.
(c) The four claims comprising the Maid of Mexico group and the two comprising the Maid of Texas group were not located until August-September 1908. The six claims were reportedly sold on January 12, 1909 for $10,000, which plaintiffs claim represents the fair market value as of February 16, 1909. There was no development work before 1914. The alleged sales price *258 of the mining claims is not a reliable basis upon which to of the acreage involved.

 The Stikine River, flowing from British Columbia, dissects the mainland of southeastern Alaska and flows into Frederick Sound about 10 miles north of Wrangell. Plaintiffs assert value for unpatented claims on garnet deposits owned by the Alaska Garnet Mining Company, covering approximately 100 acres, and located on Ruby Creek about 7.5 miles north of Wrangell. The evidence relating to the pre-1909 period consists entirely of the following: a 1902 press account in which a lawyer from Alaska is reported to have stated in Portland, Oregon (in the course of his description of the financial successes of Portland citizens who had invested in Alaska mining ventures), that there were large garnet deposits in this location (then owned by the Alaska Gold Mining Association) although the market for such garnet (used chiefly for manufacturing emery paper) was limited ; and a 1907 press account reporting the organization (by Minneapolis women) of the Alaska Garnet Mining Company to mine the deposits and to cut and polish the garnets in Minnesota. (In 1915 and 1921 the Geological Survey reported that the mine was in operation.) These are insufficient bases upon which to base any value as of 1909.

 The TJnuk River is the dividing line between Area 3 and Area 4a. Since the specific location of the mineralized section of this river area was not defined, plaintiffs value the entire section of 600 acres at $10,000, dividing them equally in acreage and value between the two areas. For the same reasons that no value was found on that part lying in Area 3 (see finding 111), no value is found for the portion lying in Area 4a.

 (a) Silver Bay (in the Sitka Mining District) is a deepwater indentation on the west side of Baranof Island about 4 miles southeast of the town of Sitka. Gold discoveries made In the Silver Bay section in the early 1870’s were the first mineral locations recorded in Alaska. Considerable capital was expended during the early years of development. Plaintiffs assert value for one patented claim (the Cache claim, patented July 30, 1904) ; for the following unpatented groups of claims: the Silver Bay group (3 claims), the Liberty group (3 claims) and the Chicago and Sitka Mining and Milling Company group (13 claims) ; and for the 216 other unpatented claims located before the 1909 valuation date. The area involved covering all these claims is approximately 1,000 acres.
(b) The Cache claim, for which plaintiffs claim $25,000 as of the 1904 patent date, was located in 1872, and developed in the years before 1880, including a 10-stamp mill built in 1879. In early 1880i, the production of $1,800 worth of bullion was reported. Thereafter, the work usually did not exceed the assessment requirements. A patent was issued on July 30, 1904. A 1905 Geological Survey Bulletin (No. 259, supra, p. 58), states that the ore was “reported” to average $7.60 yield per ton, that the mine had been opened by three tunnels, and “considerable ore has been stoped out and treated by a 10-stamp mill on the property.” This referred to the development prior to 1880, for there is no record of any substantial development thereafter. In 1912, the property was deserted and apparently had been for some time, for a Geological Survey Bulletin (No. 504, “The Sitka Mining District, Alaska”, p. 27) then reported that the mill and tramway had fallen into ruins. Thus, the only production or development suggested by the evidence was small, and occurred prior to 1880. There is insufficient evidence to support the assignment of any value as of the 1904 patent date.
(c) The Silver Bay group, for which a value of $10,000 is claimed as of February 16, 1909, was located about 1 mile from the head of Silver Bay, 9 miles southeast of Sitka. The area was discovered in 1876 and developed to some extent thereafter, but never became productive. A 1906 Geological Survey Report (Bulletin No. 314, supra, p. 60) stated that “For a number of years * * * no attempt has been made to work these properties and only *259 meager developments have been accomplished.” There is Insufficient evidence to support the assignment of any value as of 1909.
i(d) The Liberty group, on the west shore of Silver Bay, was located in 1891 and extensively developed the following year. However, little appears to have been done thereafter. There is no record of any production. It was a low-grade ore body necessitating low-cost mining methods. In 1912, a Geological Survey Bulletin (No. -504, supra, p. 29) reported no developments were underway nor had any been for at least several years. There is insufficient evidence to support the claimed $5,00.0 value or the assignment of any value as of 1909.
(e) The Chicago and Sitka Mining and Milling Company operated the Bauer mine located 2 miles southwest of the head of Silver Bay. Development of the property was underway in 1900 and for several years thereafter, the main development being a 90.0-foot tunnel. (However, by 1904, the Geological Survey reported (Bulletin No. 259, supra, p. 58) that only the requisite assessment work was being done. No later development was reported in Geological Survey publications, and the mine, which was of low grade, was never productive. The claimed average assay value of $4.50 in gold per ton for the large ore body is not established. There is insufficient evidence to support the claimed $10,000 value or the assignment of any significant value as of 1909.
(f) Other Locations. There were 216 other lode claims located in the Silver Bay section prior to February 16, 1909 concerning which there was not sufficient Information to permit individual evaluations, but for which plaintiffs claim $10,000 as of February 16, 1909, because they were in an area of known mineralization. This is an insufficient basis upon which to predicate value.

 Rodman Bay indents the northern coast of Baranof Island about 80 miles north of the town of Sitka. .The Rodman Bay Company owned the Dewey group of nine claims located in September 1898 and patented on March 1, 1902, and a second group of three claims located in April 1901 and patented on January 2, 1903. The only evidence supporting the claimed $50,000 value as of the patent dates consists of press accounts, including several which appeared in 1901-19,03, describing considerable development work and expenditures to mine the low-grade ore, including a railroad 7 miles long, as well as highly optimistic predictions by the owners or operators themselves. There were no references to any deposits in this section in official publications. The mine was shut down late in 1903, reopened in 1904, and again closed In 1905. No production from it was ever reported. The optimistic hopes of the owners, as reflected in press accounts, and the expenditures they made, are in themselves an insufficient basis upon which to support the assignment of any value to the mineral lands of the section.

 (a) The only significant metalliferous deposit on Admiralty Island prior to the February 16, 1909 taking date was the Mammoth group of claims in the vicinity of Young Bay on the north end of the island. Two claims were located on June 21, 1897, and nine more were added on July 24, 1899. None was patented prior to 1909. Plaintiffs claim $5,000 as the value of these eleven claims as of 1909. Development work on these deposits was discontinued (other than the requisite assessment work) in 1905, after a test revealed unfavorable results. Thus, at the taking date, the property was inoperative and unpromising. The claimed value is unsupported.
■(b) Marble deposits existed In various parts of the Island for which plaintiffs claim $5,000 as the fair market value as of February 16, 1909. No effort was made to quarry any of this marble prior to the taking date. As shown by a 1914 Geological Survey Bulletin (No. 592, “Mineral Resources of Alaska, Re *260 port on Progress of Investigations in 1913”, pp. 106 — 107), its value, based importantly on the effect that fracturing and jointing of the beds would have on profitable quarrying operations, was not even established as of that date. The mere known existence of a marble deposit as such is not indicative of value. All that the Survey would say in 1914 about the deposits on Admiralty Island was that surface appearances suggested that further investigations might be warranted.

 There were some placer gold operations in the auriferous black sand deposits in the Yakutat Bay area. In 1891, the working of these deposits yielded around $18,00,0. However, the deposits were not extensive, and the development of a satisfactory method of recovering the fine gold presented problems. After 1900, there is a lack of additional data concerning these Yakutat black placers. .Plaintiffs concede they would not have been considered of value as of February 16,1909.

 Tie full quotation from the report is as follows:
“Definite information concerning the reason for the search for petroleum could not be obtained. Probably the principal incentive was the discovery of petroleum farther northwest in a similar topographic situation; but it is reported that surface indications of oil have been seen, though the present study failed to find any of the localities. Whatever the reason, the shores of the [Yakutat] bay were staked promiscuously, both on the glacial deposits of the foreland and the hard rocks of the mountains. No explorations were made so far as could be learned.
There seems little reason to suspect the presence of oil here. The glacial deposits of the foreland may of course cover oil-bearing beds, but nothing short of borings would demonstrate this. The rocks of the Yakutat series seem unpromising, both because of their barrenness of organic remains and their shattered condition, which would seem to be most unfavorable for the storage of oil. Altogether the prospect of finding petroleum here seems very slight. None of the Alaska oil wells are in rocks of this lithologic character or age.”

 Plaintiffs rely heavily upon 5-year leases issued by the Department of the Interior in 1956 and 1957 (subsequently renewed for another 5 years), and upon 10-year leases issued in 1961, for oil and gas development in this area. These leases cover approximately 274,140 acres of land within Area 4b. under the leases, providing for a rental of $2 per acre, the Government will receive, by their termination dates in 1966 and 1967, $548,280 for the 10-year periods involved. In addition, the leases contain royalty provisions in the event of production. Plaintiffs contend these subsequent events prove that the pessimism indicated by the 1906 Geological Survey Report was not well founded, and that the expenditure of such sizable sums by interested oil companies Indicates the area was, as of 1909, a valuable potential petroleum producing area.
However, it is the knowledge as of 1909, not almost 50 years later, that is determinative. Furthermore, the record would not support, on the basis of technical considerations, a finding of value even as of 1956 and 1957, or 1961. There is, for instance, no evidence as to whether any oil has been discovered or produced in this area.

 Thus, the required return on investment of 10 percent may be considered as part of plaintiffs’ costs, the total production costs being calculated by subtracting the “excess profit” of 27 cents per ease from the selling price of $3.30 per case, leaving $3.03 per case as production cost, as follows :
Price per case of canned salmon_ $3. 30
Costs per case, including 10 percent return on investment_ — 3. 03
“Excess profit” per case_ $0. 27

 On Area 4 plaintiffs claim a reasonably prospective continued annual increase of 8.5 percent for 10 years and 8.5 percent for the next 10 years because they contend the future of the industry appeared to be more certain in 1908 than it was in 1902. While the industry was, of course, 6 years older, It is nevertheless to be noted that there was neither a sharp nor a steady increase in the total pack between 1902 and 1908, 907,000 cases having been packed in 1902, and 1,012,000 in 1908, with the aforementioned declines for the years 1903, 1904, and 1905, taking place during such period.

 On the basis of plaintiffs’ claimed projections for 20 years (see n. 59), there would be an, average annual pack of approximately 800,000 eases. Plaintiffs calculate the profit per case to be applied thereto as 56 cents, yielding an estimated average annual return of approximately $450,000 ($448,000), to which plaintiffs apply a 5 percent capitalization rate, resulting in a claimed valuation of $9,000,000.

 Plaintiffs propose a valuation based on profits of $40,000 a year, but do not explain In their requested findings how this figure is arrived at. Furthermore, plaintiffs capitalize such figure at 5 percent, thus arriving at a proposed $800,000 valuation. However, considering the industry’s history In the 5 years immediately preceding 1909 (1904-1908), the growth and stabUity picture is not such as to warrant such a low capitalization rate, despite the optimism current in 1909. In 1906, the price decline was so sharp and the supply so great that many halibut fishermen ceased fishing entirely.

 The increase in value of the production of gold and fish from 1898 to 1908 was as follows:

Value of gold and fishery production In southeast Alasita (lSSe-1908)

1896 1900 1905 1908
Gold_ $1,462,000 $2,606,000 $3,430,000 $3,448,000
Fisheries-905,000 2,003,000 1,788,000 3,636,000
Total. $2,367,000 $4,609,000 $5,218,000 $7,084,000

 The decline in the population of Douglas (and Treadwell) in the decades following the 1917 mine cave-in was more than offset by the rise in the population of Juneau. (By 1958, Juneau-Douglas was reported to have a population of 9.900.

 Plaintiffs claim this value Is too low and should be adjusted upward to $160,000. iThey contend that the trustee’s system of lot grouping reduced all lots In each category or zone (except the lowest value zone) to the equivalent of the minimum valued lots in the zone. While this procedure may have understated values in some instances, why this should have been true in all instances, or why it was the situation in all but the lowest valued zone, is not apparent. The upward adjustment has been made on the basis of a comparison with 1911 values of lots In Ketchikan. ¡Thus, 1911 Ketchikan values are being compared with 1897 Juneau values (based on the trustee’s values fixed in 1894). This is not proper.
Plaintiffs also contend the tax assessment rolls for the period in question justify an upward adjustment, but, exclusive of the broad opinion of its expert to this effect, plaintiffs cite nothing in the record which contains any basic data to support the contention or the opinion.

 Defendant’s expert agreed that $10 per aere for homesteaded lands ’would be an appropriate valuation.

 The proof with respect to what the 1909 tax rolls showed is not entirely satisfactory. However, the townsite trustee appraised 46 acres of land covered by Survey 437 for $171,328. This valuation was made between the 1910-1911 survey date and the date of approval by the trustee in February 1913. Plaintiffs’ expert checked the trustee’s valuations against the Ketchikan tax office assessment rolls of August 1911 for unimproved lots and found the values to be essentially the same. An examination of the rolls for 1912 and 1913 showed the values to be slightly higher than the assessments in 1911 for the same lots.
Plaintiffs’ expert arrived at his 1909 value by taking the trustee’s $171,328 valuation and working back to 1909. Using annual rates of increase as a base, he arrived at a figure of $150,000. This is, of course, improper. A prospective purchaser in 1909 would not have known of the 1910-1913 valuations and thus could not have used them as a starting point, as plaintiffs’ expert did. However, in view of the expert’s reiterated comparisons between the trustee’s valuations and the assessment rolls, it is a fair inference, taking the essence of his entire Ketchikan discussion into consideration, that the expert’s 1909 $150,000 valuation also comports with the 1909 assessment rolls. Although not so stated explicitly, it seems clear that this is what he meant, otherwise the comparisons the expert did make between the tax rolls and the trustee’s valuation would be meaningless.
The most valuable lots valued by the trustee were near the waterfront, toward the center of town. These were valued at approximately $200 per 1,000 square feet. The next group, ranging from $100 to $200 per 1,000 square feet, were also in the center of town but away from the waterfront. The least valuable lots, in four groups, ranged from $0 to $100 per 1,000 square feet ($0 to $12; $13 to $25; $26 to $50; $51 to $100). The average value of the land in the valued area occupied by lots, streets and alleys (46 acres) was $3,725. The weighted average value of the least valuable lots (the four groups) was $359 per acre.

 The claimed values are based wholly on the 1911 trustee values, and then working back to 1902 and 1904.

 Plaintiffs claim $100,000, or $800 per acre, for the 125 acres. This is based on the 1923 valuation (when Sitka’s white population was approximately 500), showing an average value of $1,165 per acre for the 49.8 acres valued out of the 125-acre total. However, a 1909 prospective purchaser would not have known of the 1923 valuation, and thus could not have used such data to derive a 1909 value.

 A subdivisional survey conducted from 1914 to 1916 included an area of 405 acres. Additions to tbe Wrangell townsite were surveyed in 1925 and 1932 for areas of 25 acres and 76 acres, respectively.

 These show a total value of lots of $221,935 for 142 acres, or $1,563 per acre, including streets and alleys. The high value lots had an average value of $364 per 100 square feet, or in excess of $10,000 per acre, including streets and alleys. The lower value lots had an average of $20 per 1,000 square feet or $581 per acre, including streets and alleys. The town did not experience much growth after 1909. In 1929 the white population was only 651 (as against 434 in 1909), with a total population of 948 (as against 868 in 1909).

 under tlie trustee’s 1919 lot valuations, 125 acres of the subdivided land had a value of $110,300. This acreage consisted of 39.93 acres that had been patented in 1908, valued by the trustee at $28,000, or $700 per acre, and 85 acres of the tract patented in 1919 as the Petersburg townsite, valued by the trustee at $82,287, or $968 per acre. The average value of the land in the area of the low value lots forming a part of the town site patent was $697 per acre.

 Plaintiffs’ values are in large part based on the land values In the town reported for 1919 by the town trustee.

 The trustee reported that monies received in lot assessments totaled $5,348.65. The assessment rate was 6.5 percent. Thus, the value of the lots may be calculated as $82,287 for the 85 acres subdivided under Survey No. 1252. (n. 71.)
From assessed valuations made in 1917 on both land and buildings, and the value of buildings alone, the land in the town (125 acres) was, without improvements, valued at $110,330. (n. 71.)
Subtracting $82,287 from $110,330 leaves approximately $28,000 for the 39.03 acres in Survey No. 282.
In his 1919 townsite appraisal, the trustee did not assess all the land in the 125 acres. The area assessed, being the land privately owned (the balance being town property) was about 85 acres. At $82,287, the 85 acres thus had an average value of $968. (n. 71.)
Based on the assessments, the lot values in the 85 acres ranged from $100 to $2,250 (i.e., a 4,432 square foot lot close to the waterfront on Main Street).
The white population of the town increased from 424 in 1909 to 575 in 1919.

 Helntzleman (Regional Forester, Alaska Region, Forest Service), “Pulp Timber Resources of Southeastern Alaska”, p. 11.

 Two cords are approximately 1,000 board feet.

 The Forest Service commented as follows on this failure:
“* * * company officials announced closure of the mill claiming that the low price of pulp, $35.00 a ton, coupled with freight charges that totaled $12.40' on every dry ton landed at Seattle made it impossible to operate at a profit. *****
The failure of this operation was apparently due to pulp market competition and lack of finances to construct a plant of greater size or one that could produce paper or dry pulp. Shipping baled wet-pulp with 55 to 60 percent water content in the quantities produced simply didn’t pay.” Timber Management Plan, Tengase National Forest, Forest Service, Department of Agriculture (1958), p. 8.

 In 1958, the Forest Service reported:
“From the time the Tongass National Forest was first established until the operation of the Ketchikan Pulp Company plant in 1954, the forest industry of S.E. Alaska has operated almost completely on Sitka spruce. As in the States, the market for hemlock lumber was poor. Because of the preponderance of hemlock, representing 75 percent of the total volume of the forest, the brunt of the demand for logs prior to the development of a local pulp timber market was generally borne by portions of the Sitka spruce types which were easily accessible to tidewater. This readily-accessible type diminished rapidly under such cutting practices, often resulting in partial cuts which left substantial residual volumes of hemlock, cedar and the poorer spruce standing on the cutover areas.” Timber Management Plan, Tongass National Forest, Forest Service, Department of Agriculture (1958), p. 7.

 The 1904 Survey bulletin noted that the deposits actually producing gold were confined to certain creeks “which crosscut the areas of mineralized slates, and that neighboring valleys contain no valuable amounts of gold,” and that “the gravels of the tributaries entering Klehini River from the north are believed to be of no economic importance” (p. 19).

 On such basis, defendant’s expert found a fair market value of $3,24.6,585 (wbich he rounded out to $3,2,50,000) composed as follows:
Timber. ¡Principally because the Tongass National Forest is predominantly composed of western hemlock (good primarily for pulp timber only) for which there was insignificant demand on the taking dates, as well as huge supplies elsewhere, and considering also the high transportation costs from Alaska to outside markets, defendant’s expert concluded that the forest lands of southeast Alaska had little value as of such dates. The only value he conceded arose from the spruce stands in the accessible commercial forest lands, for which there was some local demand. There was also a tremendous volume of spruce available in the States. The average annual stumpage sold by the Forest Service from the forest in the 1909-1916 period was approximately 29,311,000 board feet per year, upon which the Service realized an average of $35,569 per year. The expert concluded that a hypothetical purchaser would reasonably believe he could annually dispose of the same amount of stumpage and realize the same value. Capitalized at 6 percent, he arrived at a total value of $592,800.
However, it is, of course, improper to base 1891, 1902, 1907, and 1909 values on 1909-1916 statistics. 'No purchaser as of such dates would even have known of such statistics based on such subsequent sales. (In its requested findings, defendant seeks a finding that “The forests of Alaska had no value as of any of the valuation dates.”) (Defendant’s requested findings, p. 334.)
Mineral Lands. Value is found only with respect to placer and lode gold acreage, as follows:
Plaoer Gold. Noting that the total yield in gold in the placer areas of southeast Alaska was, between 1880 and 1909, in excess of $2 million, defendant’s expert concluded that a hypothetical purchaser would have concluded that, through sale or lease of the placer regions (principally in the Juneau and Porcupine Creek areas) on a 5 percent royalty basis, he could realize in excess of $100,000, which would, therefore, be the amount such placer areas would have added to the overall value of the taken lands. Here again, valuation is not made on an individual area taking date basis (although most of the placer regions (except for the Porcupine District) are in Area 4). Some of the placer regions were exhausted by the taking dates of the areas in which they were located, thus having no value at such dates.
Gold Lode Mining. (Defendant’s expert, noting the very large amounts spent on the southeast Alaska gold mines which turned out to be unprofitable, found value only with respect to the low grade ore areas near Juneau, and particularly the Treadwell Mine. As to this mine, he concluded that a hypothetical purchaser as of 1909 would have considered the property to be an extremely valuable one “with a rosy future extending many years into the future” (defendant’s exhibit 140, p. 297), and that it would “have added a substantial sum to the overall value which he would have placed on the Tlingit and Haida Tract” (id.). The expert concluded that such a purchaser could have reasonably believed that capital would be interested in the develop *? ment of the low grade ores of the Juneau region and that he could obtain $500,000 therefor. This is the value he placed on 5,518.30 acres of lode mineral lands in the entire southeast Alaska tract taken.
Shorelands With Fishing Bights Appurtenant Thereto. Defendant’s expert noted that Alaska’s fisheries (principally salmon) have been the backbone of its economy and that, although southeast Alaska’s land area was only one-sixteenth of Alaska, it produces almost two-fifths of the entire fish catch. The expert concluded that a purchaser of the Tlingit and Haida Territory would thus have ownership of all of the lands bordering the waters of southeast Alaska and would therefore be in complete control of the fishing of the region. Thus, the value of the fisheries would be reflected in the value of the shore-lands of the region which controlled the fishing. Such a hypothetical purchaser would have concluded, the expert felt, that, with proper fishing control and conservation measures, the fisheries would represent a very profitable business in perpetuity.
On the basis of records of the Alaska Packers Association, an adequately financed and well-managed organization (but whose operations were not confined to southeast Alaska), the expert calculated that, from 1002 to 1909, the association earned an average annual profit of $474,175, or 39j5 cents per case. On a paid-up capital of $5,750,80:0, a 6 percent annual return amounts to $345,048, leaving an “excess” profit, i.e., an undistributed average annual surplus, of $129,127, or 10% cents per ease. This represents around 5 percent of the association’s gross earnings. The expert felt that this surplus would be the maximum that anyone would pay annually for the privilege of operating salmon canneries in southeast Alaska.
By 1908, southeast Alaska was producing approximately 1 million cases of canned salmon a year, and the expert felt that this would be the maximum the area could be expected to yield in the future. Thus, 1 million X 10% cents equals $107,500, which would represent the annual “excess” profit. Capitalized at 6 percent, a value of $1,791,677 is produced for the salmon fishing rights (expressed in terms of the salmon canneries).
As to the other fisheries, the expert similarly calculated 5 percent of the annual gross value of the fish marketed in 1908 or 1909, or the annual average of the few years prior thereto, totaling $290,745 (i.e., halibut — $163i,969; the salteries — $60,408; herring — $60,718; minor species — $5,650) as the annual amount an operator would have been willing to pay. Five percent of such $290,745 equals $14,537.25 which, also capitalized at 6 percent, produces a value of $242,308 (actually $242,288) for the production of the fisheries of southeast Alaska other than the salmon canneries.
Townsites. The expert did not feel that the townsites would have added anything to the overall value of the tract and that the land involved should be valued as in an original state of nature. Their value, he felt, was only incidental to the fishing, lumbering or mining industries, around which they grew.
Homesteads. There were 1,980 acres of homesteaded lands. The expert felt a value of $10 per acre, or $19,800 would be the amount a hypothetical purchaser would feel this acreage enhanced the overall value of the tract.

 As was pointed out by Witten, Special Inspector of the General Land Office, in his 1903 Report on the Agricultural Prospects, Natives, Salmon Fisheries, Coal Prospects and- Development, and Timber and Lumber Interests of Alaska, the only law authorizing the cutting of timber for commercial purposes was the act of May 14, 1898, section 11, which authorized the Secretary of Interior to sell timber to persons presenting petitions therefor describing, by natural landmarks or otherwise definitely, the land upon which the timber stood. The timber was then required to be examined and appraised and bids were then called for, with the timber sold to the highest bidder.
However, this method was considered so cumbersome that it was generally disregarded. What was needed for commercial use was evidently simply taken. Mr. Witten stated: “I am informed by the register and receiver that not a single application to purchase has ever been presented under the act of May 14, 1898” (p. 91).
under the law, settlers, residents and individual miners and prospectors could, without first obtaining Government permission, take free of charge from unoccupied, unreserved lands, for firewood, fencing, building, mining, prospecting, and domestic purposes, timber not to exceed in any one year a stumpage value of $100, provided the timber was required for individual use.
Mr. Witten observed that “Nearly, if not quite all, of the timber consumed by these mills in Alaska is cut from public lands, and of course the persons who cut it are trespassers, unless it is taken for individual use. This has time out of mind been the custom, the people of Alaska having felt that their isolated condition and the demands made upon them in the development of the country justified them in doing so, since any of the methods heretofore provided for the sale of Alaskan timber have been considered by the Alaskans to be extensive and tedious” (p. 91).

 Plaintiffs claim a fair royalty would be 50 cents per MBIT, which was the amount of royalty charged by the Provincial Government in British Columbia during the period 1888 — 1906 for cutting of timber on timberlands sold by the Province (in addition to sales prices of $2.50 per acre to 1891, and $5 per acre to 1906). See finding 24(b). However, as noted in finding 24(a), the composition of the stands in these forests was superior to those of southeast Alaska, the percentage of hemlock being much less.

 Claimed by plaintiffs to have been $1,430,805, but found at $716,940 (finding 251).

 Keeling strongly that the theory has no validity, plaintiffs have not presented any requested findings with respect to this theory.